**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| SUZANNA BOWLING, individually and on behalf of all others similarly situated, | **CASE NO.** |
| Plaintiff, |  |
| v. | **CLASS ACTION COMPLAINT** |
| JOHNSON & JOHNSON and McNEIL NUTRITIONALS, LLC, | **JURY TRIAL DEMANDED** |
| Defendants. |  |

Plaintiff Suzanna Bowling brings this action on behalf of herself and all others similarly situated against Defendants Johnson & Johnson and McNeil Nutritionals, LLC ("McNeil") (collectively, "J&J" or "Defendants").  Plaintiff makes the following allegations pursuant to the investigation of her counsel and based upon information and belief, except as to the allegations specifically pertaining to herself, which are based on personal knowledge.

<u>**NATURE OF THE ACTION**</u>

1.      This is a class action lawsuit regarding Defendants' false and misleading labeling of Benecol Regular and Light Spreads (together, "Benecol Spreads"), each of which uniformly claims that the product (i) contains "No Trans Fats" and "No Trans Fatty Acids," and (ii) is generally recognized as safe for human consumption (the "Misrepresentations").  However, Benecol Spreads contain trans fat through the use of partially hydrogenated oils.  Thus, the labels on Benecol Spreads are false and misleading.

2.      In June 2015, the FDA concluded that partially hydrogenated oils – the same oils found in Benecol Spreads – are not "generally recognized as safe" for use in human food due to "an increased risk of coronary heart disease by contributing to the buildup of plaque inside the arteries that may cause a heart attack." Thus, Benecol Spreads are not generally recognized as safe for human consumption.

3.      The false and misleading labels on Benecol Spreads are highly material to consumers and serve to differentiate Benecol Spreads from comparable butter and margarine products. These labels allow Defendants to charge a price premium for Benecol Spreads. For example, Benecol Spreads command more than a 407% price premium, per ounce, over margarine:

| Brand | Quantity | Price | Unit Price |
|-------|----------|-------|------------|
| Benecol Regular Spread | Net Wt:  8 oz. | $3.98 | $0.498 per oz. |
| Land O'Lakes Margarine | Net Wt:  1 lb. | $1.57 | $0.098 per oz. |

4.      Plaintiff seeks relief in this action individually, and on behalf of a class of purchasers for breach of express warranty, breach of the implied warranty of merchantability, unjust enrichment, violation of New York's General Business Law § 349, violation of New York's General Business Law § 350, negligent misrepresentation, and fraud.

**THE PARTIES**

5.      Plaintiff Suzanna Bowling is a citizen of New York, residing in New York, New York. During the class period, Plaintiff Bowling purchased Benecol Spreads for personal use and not for resale from a Wal-Mart retail store located in New York. Prior to her purchase of

Benecol Spreads, Ms. Bowling reviewed the products' labeling and packaging and saw that Benecol Spreads were labeled as having "No Trans Fats" and "No Trans Fatty Acids."  Plaintiff Bowling saw these representations prior to and at the time of purchase, and understood them as representations and warranties that Benecol Spreads (i) do not contain trans fats and (ii) are generally recognized as safe for human consumption.  Plaintiff Bowling relied on these representations and warranties in deciding to purchase Benecol Spreads.  Accordingly, these representations and warranties were part of the basis of the bargain, in that she would not have purchased Benecol Spreads had she known that the products (i) do contain trans fats and (ii) are not generally recognized as safe for human consumption.  In reliance on these representations and warranties, Plaintiff Bowling paid a tangible increased cost for Benecol Spreads, which were worth less than represented because Benecol Spreads do, in fact, contain trans fats and are not generally recognized as safe for human consumption.  Plaintiff Bowling also understood that in making the sale, her retailer was acting with the knowledge and approval of the Defendants and/or as the agent of the Defendants.  Plaintiff Bowling further understood that the purchase involved a direct transaction between herself and Defendants, because the purchase came with Defendants' representations and warranties that Benecol Spreads do not contain trans fats, and are generally recognized as safe for human consumption.

6.      Defendant Johnson & Johnson is a New Jersey corporation with its principal place of business at One Johnson & Johnson Plaza, New Brunswick, New Jersey.  Johnson & Johnson is an international medical device, pharmaceutical, and consumer goods manufacturer founded in 1886.  Its common stock is a component of the Dow Jones Industrial Average, and the company is listed in the Fortune 500.  Johnson & Johnson has manufactured, marketed, and sold Benecol Spreads during the class period.

7.      Defendant McNeil Nutritionals, LLC is a Delaware corporation with its principal place of business in Pennsylvania, and is a wholly-owned subsidiary of Johnson & Johnson. McNeil is subject to Johnson & Johnson's control, and the companies share employees, resources, and accounts.  McNeil represents that it "is a global marketer of innovative nutritional products," as it markets Splenda sweetener products, Viactiv dietary supplements, and Lactaid milk supplements.  McNeil has manufactured, marketed, and sold Benecol Spreads during the class period.

8.      Plaintiff reserves the right to amend this Complaint to add different or additional defendants, including without limitation any officer, director, employee, supplier, or distributor of Defendants who has knowingly and willfully aided, abetted, or conspired in the false and deceptive conduct alleged herein.

9.      Whenever reference is made in this Complaint to any representation, act, omission, or transaction of a defendant, that allegation shall mean that the defendant did the act, omission, or transaction through its officers, directors, employees, agents, and/or representatives while they were acting within the actual or ostensible scope of their authority.

## JURISDICTION AND VENUE

11.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2)(A) because this case is a class action where the aggregate claims of all members of the proposed class are in excess of $5,000,000.00, exclusive of interest and costs, and Plaintiff, as well as most members of the proposed class, are citizens of a state different from Defendants.  This Court also has supplemental jurisdiction over state law claims pursuant to 28 U.S.C. § 1367.

12.     Pursuant to 28 U.S.C. § 1391, this Court is the proper venue for this action because a substantial part of the events, omissions, and acts giving rise to the claims herein

occurred in this District.  Plaintiff Bowling is a citizen of New York, resides in this District, and

purchased Benecol products from Defendants in this District.  Moreover, Defendants distributed,

advertised, and sold Benecol products, which are the subject of the present complaint, in this

District.

## FACTS COMMON TO ALL CLAIMS

**A.** **Benecol Spreads Are Labeled As Having "No Trans Fats" And "No Trans Fatty Acids," Despite Containing Partially Hydrogenated Soybean Oil**

13.     There are two versions of Benecol Spreads – Benecol Regular Spread and

Benecol Light Spread.  During the class period, both the Regular and Light Spreads were labeled

as containing "No Trans Fats" and "No Trans Fatty Acids."  However, this is false because each

variety of Benecol Spreads contain partially hydrogenated oils, which always contains trans fats.

*Benecol Regular Spread*

14.     The front label and top of Benecol Regular Spread represents that it has "No

Trans Fat":



15.    Additionally, the back label of Benecol Regular Spread represents that it has "No Trans Fatty Acids."  However, the ingredient list on the back of Benecol Regular Spread also represents that it contains "Partially Hydrogenated Soybean Oil," which always contains trans fats:



***Benecol Light Spread***

16.    The front label and top of the Benecol Light Spread represents that it has "No Trans Fat":



17.     Additionally, the back label of Benecol Light Spread represents that it has "No Trans Fatty Acids."  However, the ingredient list on the back of Benecol Light Spread also represents that it contains "Partially Hydrogenated Soybean Oil," which always contains trans fats.



**The Manufacturing And Nature Of Partially Hydrogenated Oils**

18.     Artificial trans fat is manufactured via an industrial process called partial

hydrogenation, in which hydrogen atoms are added to normal vegetable oil by heating the oil to

temperatures above 400°F in the presence of metals such as rhodium, ruthenium, and nickel.

The resulting product is known as partially hydrogenated oil ("PHO"), which is the main source

of trans fat in the American diet and is used in Benecol Spreads.

19.     PHO was invented in 1901 and patented in 1902 by German chemist Wilhelm

Normann.  PHO molecules chemically differ from the natural fat molecules in other food

products.

20.     Natural fat predominantly comes in two varieties, with the exception of trace

amounts of natural trans fat from animals:  (1) fats that lack carbon double bonds ("saturated

fat") and (2) fats that have carbon double bonds with the hydrogen atoms on the same side on the

carbon chain ("cis fat").  Trans fat, however, has carbon double bonds with hydrogen atoms on

opposite sides of its carbon chain:



21.     PHO was initially marketed as a "wonder product" that was attractive to the

packaged food industry because it combines the low cost of unsaturated cis fat with the

flexibility and long shelf life of saturated fat.  Like cis fat, PHO is manufactured from low-cost

legumes, while saturated fat is derived from relatively expensive animal and tropical plant

sources.  Given its versatility, ten years ago PHO was used in 40% of processed packaged foods.

Now, given its toxic properties, few food companies continue to use PHO.

**PHOs Always Contain Trans Fats**

22.     PHOs always contain industrially-produced trans fatty acids.

23.     Unlike other edible oils, trans fats are an integral component of PHOs and are purposely produced in these oils to affect the properties of the oils and the characteristics of the foods to which they are added.

24.     The two most common PHOs currently used by the food industry – partially hydrogenated soybean oil and partially hydrogenated cottonseed oil – are not currently listed as Generally Recognized As Safe ("GRAS") or as approved food additives.

**Trans Fats Are Harmful**

25.     Since 2003, both controlled trials and observational human studies on trans fatty acid have consistently confirmed the adverse effects of trans fatty acids on intermediary risk factors and the increased risk of Coronary Heart Disease ("CHD").

26.     There is a progressive and linear cause and effect relationship between trans fatty acid intake and adverse effects on blood lipids that predict CHD risk, including low-density lipoprotein cholesterol ("LDL-C"), high-density lipoprotein cholesterol ("HDL-C"), and ratios such as total cholesterol ("total-C")/HDL-C and LDL-C/HDL-C.[1]

27.     Consumption of trans fat increases LDL-C ("bad" cholesterol), decreases HDL-C ("good" cholesterol), and increases ratios of total-C/HDL-C and LDL-C/HDL-C compared with the same of amount of energy intake (calories) from cis-unsaturated fatty acids.  Increases in

---

[1]  LDL-C, HDL-C, total-C/HDL-C ratio, and LDL-C/HDL-C ratio are all currently considered to be risk biomarkers for CHD.  A biomarker is a characteristic that can be objectively measured and indicates physiological processes.  A risk biomarker is a biomarker that indicates a risk factor for a disease.  Stated otherwise, a risk biomarker is a biomarker that indicates a component of an individual's level of risk for developing a disease or level of risk for developing complications of a disease.

LDL-C, total-C/HDL-C, and LDL-C/HDL-C, as well as decreases in HDL-C, are adversely

changed with respect to CHD risk.

28.     The increased risk of CHD from consumption of any amount of trans fat means

that consumption of PHOs, the primary dietary source of trans fat, also leads to increased LDL-C

levels and an increased risk of CHD.

29.     Numerous authorities have concluded that there is no threshold intake level for

industrially-produced trans fat that would not increase an individual's risk of CHD.  Stated

otherwise, there is no safe level of artificial trans fat intake.  Accordingly, consumption of PHOs

could be harmful (*i.e.*, increased risk for CHD) under any condition and in any amount.

30.     In addition to an increased risk of CHD, trans fat consumption (and, accordingly,

consumption of food products containing PHOs) has also been connected to a number of other

adverse effects on health, including worsening insulin resistance, increased risk of diabetes, and

adverse effects on fetuses and breastfeeding infants, such as impaired growth.

**PHOs Are No Longer Generally Recognized As Safe For Human Consumption By The FDA**

31.     On June 17, 2015, the Food and Drug Administration ("FDA") determined "that

there is no longer a general consensus that PHOs, the primary source of industrially-processed

*trans* fat, are generally recognized as safe for use in human food, based on current scientific

evidence."  80 F.R. 34650, 34669.

32.     According to the FDA, "the available, relevant scientific evidence demonstrates

an increased risk of coronary heart disease (CHD) attributable to *trans* fat."

33.     "FDA has considered the available information and concluded that there is a lack

of consensus among qualified experts that PHOs, as the primary dietary source of [industrially-

processed trans fatty acids], are safe for use in human food."

34.     As the FDA detailed, the same PHOs found in Benecol Spreads are not "generally recognized as safe" for use in human food due to "an increased risk of coronary heart disease by contributing to the buildup of plaque inside the arteries that may cause a heart attack."

## CLASS ACTION ALLEGATIONS

35.     Plaintiff seeks to represent a class defined as all persons in the United States who purchased Benecol Spreads (the "Class").  Excluded from the Class are persons who made such purchase for the purpose of resale.

36.     Plaintiff also seeks to represent a subclass of all Class members who purchased Benecol Spreads in New York (the "Subclass").

37.     Members of the Class and Subclass are so numerous that their individual joinder herein is impracticable.  On information and belief, members of the Class and Subclass number in the hundreds of thousands.  The precise number of Class members and their identities are unknown to Plaintiff at this time but may be determined through discovery.  Class members may be notified of the pendency of this action by mail and/or publication through the distribution records of Defendants and third-party retailers and vendors.

38.     Common questions of law and fact exist as to all Class members and predominate over questions affecting only individual Class members.  Common legal and factual questions include, but are not limited to:  whether Benecol Spreads contain trans fats; whether Defendants warranted that Benecol Spreads do not contain trans fats; whether Benecol Spreads are generally recognized as safe for human consumption; whether Defendants breached these warranties; and whether Defendants committed statutory and common law fraud by doing so.

39.     The claims of the named Plaintiff are typical of the claims of the Class in that the named Plaintiff purchased Benecol Spreads in reliance on the representations and warranties described above, and suffered a loss as a result of that purchase.

40.     Plaintiff is an adequate representative of the Class and Subclass because her interests do not conflict with the interests of the Class members she seeks to represent, she has retained competent counsel experienced in prosecuting class actions, and she intends to prosecute this action vigorously.  The interests of Class members will be fairly and adequately protected by Plaintiff and her counsel.

41.     The class mechanism is superior to other available means for the fair and efficient adjudication of the claims of Class and Subclass members.  Each individual Class member may lack the resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish Defendants' liability.  Individualized litigation increases the delay and expense to all parties and multiplies the burden on the judicial system presented by the complex legal and factual issues of this case.  Individualized litigation also presents a potential for inconsistent or contradictory judgments.  In contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court on the issue of Defendants' liability.  Class treatment of the liability issues will ensure that all claims and claimants are before this Court for consistent adjudication of the liability issues.

## COUNT I
### (Breach Of Express Warranty)

42.     Plaintiff hereby incorporates by reference the allegations contained in all preceding paragraphs of this complaint.

43.     Plaintiff brings this claim individually and on behalf of the members of the proposed Class and Subclass against Defendants.

44.     Defendants, as the designers, manufacturers, marketers, distributors, and/or sellers, expressly warranted that Benecol Spreads (i) contained "No Trans Fats" and "No Trans Fatty Acids," and (ii) are generally recognized as safe for human consumption.

45.     In fact, Benecol Spreads are not fit for such purposes because each of these express warranties is false.  Particularly, Benecol Spreads contain trans fats, and are not generally recognized as safe for human consumption.

46.     As a direct and proximate cause of Defendants' breach of express warranty, Plaintiff and Class members have been injured and harmed because:  (a) they would not have purchased Benecol Spreads on the same terms if they knew that the products contained trans fats, and are not generally recognized as safe for human consumption; (b) they paid a price premium for Benecol Spreads due to Defendants' promises that Benecol Spreads contained "No Trans Fats" and "No Trans Fatty Acids," and are generally recognized as safe for human consumption; and (c) Benecol Spreads do not have the characteristics, ingredients, uses, benefits, or quantities as promised.

## COUNT II
### (Breach Of The Implied Warranty Of Merchantability)

47.     Plaintiff hereby incorporates by reference the allegations contained in all preceding paragraphs of this complaint.

48.     Plaintiff brings this claim individually and on behalf of the members of the proposed Class and Subclass against Defendants.

49.     Defendants, as the designers, manufacturers, marketers, distributors, and/or sellers, impliedly warranted that Benecol Spreads (i) contained "No Trans Fats" and "No Trans Fatty Acids," and (ii) are generally recognized as safe for human consumption.

50.     Defendants breached the warranty implied in the contract for the sale of Benecol Spreads because they could not pass without objection in the trade under the contract description, the goods were not of fair average quality within the description, and the goods were unfit for their intended and ordinary purpose because Benecol Spreads contain trans fats, and are not generally recognized as safe for human consumption.  As a result, Plaintiff and Class members did not receive the goods as impliedly warranted by Defendants to be merchantable.

51.     Plaintiff and Class members purchased Benecol Spreads in reliance upon Defendants' skill and judgment and the implied warranties of fitness for the purpose.

52.     Benecol Spreads were not altered by Plaintiff or Class members.

53.     Benecol Spreads were defective when they left the exclusive control of Defendants.

54.     Defendants knew that Benecol Spreads would be purchased and used without additional testing by Plaintiff and Class members.

55.     Benecol Spreads were defectively designed and unfit for their intended purpose, and Plaintiff and Class members did not receive the goods as warranted.

56.     As a direct and proximate cause of Defendants' breach of the implied warranty, Plaintiff and Class members have been injured and harmed because:  (a) they would not have purchased Benecol Spreads on the same terms if they knew that the products contained trans fats, and are not generally recognized as safe for human consumption; (b) they paid a price premium for Benecol Spreads due to Defendants' promises that Benecol Spreads contained "No Trans

Fats" and "No Trans Fatty Acids," and are generally recognized as safe for human consumption; and (c) Benecol Spreads do not have the characteristics, ingredients, uses, benefits, or quantities as promised.

## COUNT III
### (Unjust Enrichment)

57.     Plaintiff hereby incorporates by reference the allegations contained in all preceding paragraphs of this complaint.

58.     Plaintiff brings this claim individually and on behalf of the members of the proposed Class and Subclass against Defendants.

59.     Plaintiff and Class members conferred benefits on Defendants by purchasing Benecol Spreads.

60.     Defendants have been unjustly enriched in retaining the revenues derived from Plaintiff and Class members' purchases of Benecol Spreads.  Retention of those moneys under these circumstances is unjust and inequitable because Defendants misrepresented that Benecol Spreads (i) contained "No Trans Fats" and "No Trans Fatty Acids," and (ii) are generally recognized as safe for human consumption.  These misrepresentations caused injuries to Plaintiff and Class members because they would not have purchased Benecol Spreads if the true facts were known.

61.     Because Defendants' retention of the non-gratuitous benefits conferred on them by Plaintiff and Class members is unjust and inequitable, Defendants must pay restitution to Plaintiff and Class members for its unjust enrichment, as ordered by the Court.

## COUNT IV
### (Violation Of New York's General Business Law § 349)

62.     Plaintiff hereby incorporates by reference the allegations contained in all preceding paragraphs of this complaint.

63.     Plaintiff brings this claim individually and on behalf of the proposed Subclass against Defendants.

64.     New York's General Business Law § 349 prohibits deceptive acts or practices in the conduct of any business, trade, or commerce.

65.     In its sale of goods throughout the State of New York, Defendants conduct business and trade within the meaning and intendment of New York's General Business Law § 349.

66.     Plaintiff and members of the Subclass are consumers who purchased products from Defendants for their personal use.

67.     By the acts and conduct alleged herein, Defendants have engaged in deceptive, unfair, and misleading acts and practices, which include, without limitation, misrepresenting that Benecol Spreads (i) contained "No Trans Fats" and "No Trans Fatty Acids," and (ii) are generally recognized as safe for human consumption.

68.     The foregoing deceptive acts and practices were directed at consumers.

69.     The foregoing deceptive acts and practices are misleading in a material way because they fundamentally misrepresent the characteristics and quantity of Benecol Spreads to induce consumers to purchase same.

70.     By reason of this conduct, Defendants engaged in deceptive conduct in violation of New York's General Business Law.

71.     Defendants' actions are the direct, foreseeable, and proximate cause of the damages that Plaintiff and members of the Subclass have sustained from having paid for and consumed Defendants' products.

72.     As a result of Defendants' violations, Plaintiff and members of the Subclass have suffered damages because: (a) they would not have purchased Benecol Spreads on the same terms if they knew that the products contained trans fats, and are not generally recognized as safe for human consumption; (b) they paid a price premium for Benecol Spreads due to Defendants' promises that Benecol Spreads contained "No Trans Fats" and "No Trans Fatty Acids," and are generally recognized as safe for human consumption; and (c) Benecol Spreads do not have the characteristics, ingredients, uses, benefits, or quantities as promised.

73.     On behalf of herself and other members of the Subclass, Plaintiff seeks to recover her actual damages or fifty dollars, whichever is greater, three times actual damages, and reasonable attorneys' fees.

## COUNT V
### (Violation Of New York's General Business Law § 350)

74.     Plaintiff hereby incorporates by reference the allegations contained in all preceding paragraphs of this complaint.

75.     Plaintiff brings this claim individually and on behalf of the proposed Subclass against Defendant.

76.     New York's General Business Law § 350 prohibits false advertising in the conduct of any business, trade, or commerce.

77.     Pursuant to said statute, false advertising is defined as "advertising, including labeling, of a commodity … if such advertising is misleading in a material respect."

78.     Based on the foregoing, Defendants have engaged in consumer-oriented conduct that is deceptive or misleading in a material way which constitutes false advertising in violation of Section 350 of New York's General Business Law.

79.     Defendants' false, misleading, and deceptive statements and representations of fact were and are directed to consumers.

80.     Defendants' false, misleading, and deceptive statements and representations of fact were and are likely to mislead a reasonable consumer acting reasonably under the circumstances.

81.     Defendants' false, misleading, and deceptive statements and representations of fact have resulted in consumer injury or harm to the public interest.

82.     As a result of Defendants' false, misleading, and deceptive statements and representations of fact, Plaintiff and the Subclass have suffered and continue to suffer economic injury.

83.     As a result of Defendants' violations, Plaintiff and members of the Subclass have suffered damages due to said violation because:  (a) they would not have purchased Benecol Spreads on the same terms if they knew that the products contained trans fats, and are not generally recognized as safe for human consumption; (b) they paid a price premium for Benecol Spreads due to Defendants' promises that Benecol Spreads contained "No Trans Fats" and "No Trans Fatty Acids," and are generally recognized as safe for human consumption; and (c) Benecol Spreads do not have the characteristics, ingredients, uses, benefits, or quantities as promised.

84.     On behalf of herself and other members of the Subclass, Plaintiff seeks to recover her actual damages or five hundred dollars, whichever is greater, three times actual damages, and reasonable attorneys' fees.

## COUNT VI
### (Negligent Misrepresentation)

85.     Plaintiff hereby incorporates by reference the allegations contained in all preceding paragraphs of this complaint.

86.     Plaintiff brings this claim individually and on behalf of the members of the proposed Class and Subclass against Defendants.

87.     As discussed above, Defendants misrepresented that Benecol Spreads (i) contained "No Trans Fats" and "No Trans Fatty Acids," and (ii) are generally recognized as safe for human consumption.  Defendants had a duty to disclose this information.

88.     At the time Defendants made these representations, Defendants knew or should have known that these representations were false or made them without knowledge of their truth or veracity.

89.     At an absolute minimum, Defendants negligently misrepresented and/or negligently omitted material facts about Benecol Spreads.

90.     The negligent misrepresentations and omissions made by Defendants, upon which Plaintiff and Class members reasonably and justifiably relied, were intended to induce and actually induced Plaintiff and Class members to purchase Benecol Spreads.

91.     Plaintiff and Class members would not have purchased Benecol Spreads if the true facts had been known.

92.     The negligent actions of Defendants caused damage to Plaintiff and Class members, who are entitled to damages and other legal and equitable relief as a result.

## COUNT VII
### (Fraud)

93.     Plaintiff hereby incorporates by reference the allegations contained in all preceding paragraphs of this complaint.

94.     Plaintiff brings this claim individually and on behalf of the members of the proposed Class and Subclass against Defendants.

95.     As discussed above, Defendants provided Plaintiff and Class members with false or misleading material information and failed to disclose material facts about Benecol Spreads, including but not limited to the fact that they contain trans fats, and are not generally recognized as safe for human consumption.  These misrepresentations and omissions were made with knowledge of their falsehood.

96.     The misrepresentations and omissions made by Defendants, upon which Plaintiff and Class members reasonably and justifiably relied, were intended to induce and actually induced Plaintiff and Class members to purchase Benecol Spreads.

97.     The fraudulent actions of Defendants caused damage to Plaintiff and Class members, who are entitled to damages and other legal and equitable relief as a result.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, seek judgment against Defendants, as follows:

a.      For an order certifying the nationwide Class and the Subclass under Rule 23 of the Federal Rules of Civil Procedure and naming Plaintiff as a representative of the Class and Subclass and Plaintiff's attorneys as Class Counsel to represent the Class and Subclass members;

b.      For an order declaring the Defendants' conduct violates the statutes referenced herein;

c.      For an order finding in favor of Plaintiff, the nationwide Class, and the Subclass on all counts asserted herein;

d.      For compensatory, statutory, and punitive damages in amounts to be determined by the Court and/or jury;

e.      For prejudgment interest on all amounts awarded;

f.      For an order of restitution and all other forms of equitable monetary relief;

g.      For injunctive relief as pleaded or as the Court may deem proper; and

h.      For an order awarding Plaintiff and the Class and Subclass their reasonable attorneys' fees and expenses and costs of suit.

## **JURY DEMAND**

Plaintiff demands a trial by jury on all causes of action and issues so triable.


Dated:  May 25, 2017                    Respectfully submitted,

**BURSOR & FISHER, P.A.**

By:    */s/ Neal J. Deckant*
          Neal J. Deckant

Scott A. Bursor
Joseph I. Marchese
Neal J. Deckant
Frederick J. Klorczyk III
888 Seventh Avenue
New York, NY 10019
Telephone: (646) 837-7150
Facsimile:  (212) 989-9163
E-Mail: scott@bursor.com
       jmarchese@bursor.com
       ndeckant@bursor.com
       fklorczyk@bursor.com

*Attorneys for Plaintiff*