**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SUZANNA BOWLING, individually and on behalf of all others similarly situated,<br><br>                      Plaintiff,<br><br>     v.<br><br>JOHNSON & JOHNSON and McNEIL NUTRITIONALS, LLC<br><br>                  Defendants. | Civil Action No. 1:17-cv-03982-AJN |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTFF'S
MOTION FOR CLASS CERTIFICATION, APPOINTMENT OF CLASS
REPRESENTATIVE, AND APPOINTMENT OF CLASS COUNSEL**

Dated:  July 30, 2018

**BURSOR & FISHER, P.A.**

Scott A. Bursor
Joseph I. Marchese
888 Seventh Avenue
New York, NY 10019
Telephone: (646) 837-7150
Facsimile:  (212) 989-9163
E-Mail: scott@bursor.com
        jmarchese@bursor.com

**BURSOR & FISHER, P.A.**

Frederick J. Klorczyk III
Neal J. Deckant
1990 North California Blvd., Suite 940
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
E-Mail:  fklorczyk@bursor.com
        ndeckant@bursor.com

*Attorneys for Plaintiff*

**TABLE OF CONTENTS**

PAGE(S)

I.     INTRODUCTION ......................................................................................... 1

II.    PLAINTIFF'S CLAIMS ARE SUSCEPTIBLE TO COMMON PROOF ........................ 4

     A.    Common Evidence Shows That Benecol Contains Trans Fat ................................ 4

     B.    Common Evidence Shows That The No Trans Fat Claims Are
             False And Misleading ........................................................................................ 5

     C.    The No Trans Fat Claims Are Material To Consumers ........................................ 9

     D.    *Reid* Tolled The Statute Of Limitations ............................................................ 10

III.   THE REQUIREMENTS OF FED. R. CIV. P. 23(A) ARE MET ................................... 12

     A.    Numerosity ....................................................................................................... 12

     B.    Commonality .................................................................................................... 13

     C.    Typicality ......................................................................................................... 13

     D.    Adequacy ......................................................................................................... 14

     E.    The Classes Are Ascertainable ......................................................................... 15

IV.   THE REQUIREMENTS OF RULE 23(B)(3) ARE MET .......................................... 17

     A.    Common Questions Of Law Or Fact Predominate ............................................. 17

          1. Common Questions Of Fact Predominate ........................................................ 17

          2. Common Questions of Law Predominate As To Plaintiff's
             Claims Under New York Gen. Bus. Law §§ 349 & 350 ................................. 18

          3. Common Questions Of Law Predominate As To Plaintiff's
             Nationwide Unjust Enrichment Claim ........................................................... 19

          4. Common Questions Of Law Predominate As To Plaintiff's
             Fraud And Negligent Misrepresentation Claims .............................................. 22

     B.    Damages Are Measurable On A Classwide Basis ............................................... 23

     C.    Class Litigation Is Superior To Other Methods of Adjudication ......................... 24

V.    CONCLUSION ................................................................................................ 25

# TABLE OF AUTHORITIES

PAGE(S)

## CASES

*Amchem Products, Inc. v. Windsor*,
 521 U.S. 591 (1997) ........................................................................................ 25

*American Pipe & Const. Co. v. Utah*,
 414 U.S. 538 (1974) .................................................................................. 10, 11

*Amgen Inc. v. Conn. Ret. Plans & Trust Funds*,
 133 S. Ct. 1184 (2013)..................................................................................... 17

*Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*,
 222 F.3d 52 (2d Cir. 2000) .............................................................................. 14

*Ballard v. Equifax Check Servs., Inc.*,
 186 F.R.D. 589 (E.D. Cal. 1999)..................................................................... 25

*Casey v. Merck & Co.*,
 653 F.3d 95 (2d Cir. 2011) .............................................................................. 11

*Chavez v. Occidental Chem. Corp.*,
 300 F. Supp. 3d 517 (S.D.N.Y. 2018) ............................................................. 12

*Citibank, N.A. v. Walker*,
 12 A.D.3d. 480 (N.Y. App. Div. 2d Dep't 2004) ........................................... 21

*Consol. Rail Corp. v. Hyde Park*,
 47 F.3d 473 (2d Cir. 1995) .............................................................................. 12

*Cullen v. Margiotta*,
 811 F.2d 698 (2d Cir. 1987) ............................................................................ 11

*Curley v. AMR Corp.*,
 153 F.3d 5 (2d Cir. 1998) ................................................................................ 19

*Ebin v. Kangadis Food Inc.*,
 297 F.R.D. 561 (S.D.N.Y. 2014).............................................................. passim

*Famular v. Whirlpool Corp.*,
 2017 WL 2470844 (S.D.N.Y. June 7, 2017) ................................................... 12

*Fogarazzao v. Lehman Bros., Inc.*,
 232 F.R.D. 176 (S.D.N.Y. 2005)..................................................................... 13

*Ge Dandong v. Pinnacle Performance Ltd.*,
 2013 WL 5658790 (S.D.N.Y. Oct. 17, 2013)............................................ 22, 23

*Goldemberg v. Johnson & Johnson Cons. Cos., Inc.*,
    317 F.R.D. 374 (S.D.N.Y. 2016) ................................................................. 16

*Guido v. L'Oreal, USA, Inc.*,
    284 F.R.D. 468 (C.D. Cal. 2012) ................................................................ 18

*Hart v. BHH, LLC*,
    2017 WL 2912519 (S.D.N.Y. July 7, 2017) ............................... 15, 22, 25

*In re Abbott Laboratories Norvir Anti-Trust Litig.*,
    2007 WL 1689899 (N.D. Cal. 2007) .......................................................... 20

*In re Amla Litig*,
    282 F. Supp. 3d 751 (S.D.N.Y. 2017) ....................................................... 21

*In re Checking Account Overdraft Litig.*,
    307 F.R.D. 656 (S.D. Fla. 2015) ................................................................ 20

*In re Fosamax Products Liability Litig.*,
    694 F. Supp. 2d 253 (S.D.N.Y. 2010) ...................................................... 11

*In re Initial Pub. Offerings Sec. Litig.*,
    471 F.3d 24 (2d Cir. 2006) .......................................................................... 15

*In re LIBOR-Based Financial Instruments Antitrust Litig.*,
    2015 WL 6243526 (S.D.N.Y. Apr. 15, 2016) ......................................... 12

*In re Petrobas Sec.*,
    862 F.3d 250 (2d. Cir. 2017) ...................................................................... 16

*In re Rezulin Prod. Liab. Litig.*,
    390 F. Supp. 2d 319 (S.D.N.Y. 2005) ...................................................... 20

*In re Scotts EZ Seed Litig.*,
    304 F.R.D. 397 (S.D.N.Y. 2015) ................................................... 13, 15, 18

*In re Scotts EZ Seed Litig.*,
    2017 WL 3396433 (S.D.N.Y. Aug. 8, 2017) ........................................... 24

*In re Scotts EZ Seed Litig.*,
    2018 WL 1274965 (S.D.N.Y. Mar. 5, 2018) ........................................... 24

*Int'l Bus. Machs. Corp. v. Liberty Mut. Ins. Co.*,
    363 F.3d 137 (2d Cir. 2004) ................................................................. 19, 20

*Jermyn v. Best Buy Stores, L.P.*,
    256 F.R.D. 418 (S.D.N.Y. 2009) .......................................................... 18, 21

*Leider v. Ralfe*,
    387 F. Supp. 2d 283 (S.D.N.Y. 2005) ................................................................. 18

*Makaeff v. Trump University, LLC*,
    2014 WL 688164 (S.D. Cal. Feb. 21, 2014) ....................................................... 18

*Mandarin Trading Ltd. v. Wildenstein*,
    16 N.Y.3d 173 (2011) ........................................................................................ 21

*Marisol A. v. Giuliani*,
    126 F.3d 372 (2d Cir. 1997) .............................................................................. 13

*Maurizio v. Goldsmith*,
    230 F.3d 518 (2d Cir. 2000) .............................................................................. 18

*Moore v. PaineWebber, Inc.*,
    306 F.3d 1247 (2d Cir. 2002) ................................................................. 17, 22, 23

*Noble v. 93 Univ. Place Corp.*,
    224 F.R.D. 330 (S.D.N.Y. 2004) ....................................................................... 16

*Osarczuk v. Associated Univs., Inc.*,
    130 A.D.3d 592 (N.Y. App. 2d Dep't 2015) ..................................................... 11

*Pennsylvania Emp. Benefit Trust Fund v. Zeneca, Inc.*,
    710 F. Supp. 2d 458 (D. Del. 2010) .................................................................. 20

*Podlin v. Ghermezian*,
    2014 WL 2601416 (S.D.N.Y. May 28, 2014) ................................................... 20

*Postlewaite v. McGraw-Hill*,
    333 F.3d 42 (2d Cir. 2003) ............................................................................. 9, 10

*Reid v. Johnson & Johnson*,
    780 F.3d 952 (9th Cir. 2015) ...................................................................... passim

*Roach v. T.L. Cannon Corp.*,
    778 F.3d 401 (2d Cir. 2015) .............................................................................. 23

*Robidoux v. Celani*,
    987 F.2d 931 (2d Cir. 1993) .............................................................................. 14

*Rodriguez v. It's Just Lunch, Int'l*,
    300 F.R.D. 125 (S.D.N.Y. 2014) ............................................................ 21, 22, 25

*Seijas v. Republic of Argentina*,
    606 F.3d 53 (2d Cir. 2010) ................................................................................ 25

*Simon v. Philip Morris Inc.*,
    124 F. Supp. 2d 46 (E.D.N.Y. 2000) .................................................. 20

*Steinberg v. Nationwide Mut. Ins. Co.*,
    224 F.R.D. 67 (E.D.N.Y. 2004) ........................................................ 19

*Sykes v. Mel S. Harris and Assocs., LLC*,
    780 F.3d 70 (2d Cir. 2015) ............................................................. 24

*Vaccaro v. Bank of Am., N.A.*,
    2016 WL 4926201 (S.D.N.Y. Sept. 15, 2016) .......................................... 8

*Wal-Mart Stores, Inc. v. Dukes*,
    131 S. Ct. 2541 (2011) .................................................................. 13

*Washington v. New York City Dep't of Educ.*,
    2018 WL 3342324 (2d Cir. July 9, 2018) ............................................... 8

*Yollin v. Holland America Cruises, Inc.*,
    97 A.D.2d 720 (N.Y. App. 1st Dep't 1983) ........................................... 11

**STATUTES**

New York Gen. Bus. Law § 349 ........................................................ 4, 18, 19

New York Gen. Bus. Law § 350 ........................................................ 4, 18, 19

**RULES**

Fed. R. App. P. 5 ...................................................................... 12

Fed. R. Civ. P. 23 .................................................................. 15, 23

Fed. R. Civ. P. 23(a)(1) ............................................................... 12

Fed. R. Civ. P. 23(a)(2) ............................................................... 13

Fed. R. Civ. P. 23(a)(3) ............................................................... 13

Fed. R. Civ. P. 23(b)(3) ........................................................... passim

**REGULATIONS**

21 C.F.R. § 101.13(b) ................................................................... 6

21 C.F.R. § 101.13(b)(1) ................................................................ 6

21 C.F.R. § 101.13(b)(2) ................................................................ 6

21 C.F.R. § 101.13(b)(4) ................................................................................ 7

21 C.F.R. § 101.13(i) ..................................................................................... 6

21 C.F.R. § 101.13(i)(3) ................................................................................ 7

68 Fed.Reg. 41,434 ....................................................................................... 7

**OTHER AUTHORITIES**

W. Rubenstein, Newberg on Class Actions § 4:54 (5th ed. 2012) ............................................. 23

Wright, Miller, & Kane, Fed. Prac. & Proc. Civ. § 1781 ........................................................ 23

## I. INTRODUCTION

Defendants Johnson & Johnson ("J&J") and McNeil Nutritionals, LLC ("McNeil") (collectively, "Defendants") manufactured and sold Benecol Regular Spread and Benecol Light Spread (hereinafter, "Benecol"). From January 1, 2008 through December 31, 2011,[1] every tub of Benecol sold claimed "No Trans Fat" and "No Trans Fatty Acids" (together, the "No Trans Fat" claim): [2]



Klorczyk Decl. Ex. A at McNeil0000006; *id.* Ex. B at McNeil0000023; *id.* Ex. C. The packaging reinforced Benecol's purported heart-healthy message by associating it with a heart image immediately adjacent to the No Trans Fat claim, which was written in bold type and all capital letters. *Id.*; *see also* Klorczyk Decl. Ex. D, Belke Dep. at 87:16-19.

---

[1] The labeling for the Benecol spreads changed in ▉▉▉▉▉▉▉, at which point the "No Trans Fat" and "No Trans Fatty Acid" ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉. As Benecol's Assistant Brand Manager testified, the Benecol units with the changed labels first appeared on store shelves after 2011. *See* Klorczyk Decl. Ex. D, Belke Dep. at 137:3-15 ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉. Thus, every tub of Benecol on store shelves through 2011 was labeled with the No Trans Fat claim.

[2] "Trans fat" and "trans fatty acids" are synonymous. *See* Klorczyk Decl., Ex. E, Steele Dep. at 47:24-48:2 ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ *see also id.* Ex. H ("*trans* fatty acid … also referred to as '*trans* fat'").

According to Sean Belke, Benecol was ███████████████████████████

██████████████████████ Klorczyk Decl. Ex. D, Belke Dep. at 124:4-8.  As Laura Zeno – another

former Assistant Brand Manager for Benecol – confirmed, Benecol consumers ███████████████

██████████████████████ Klorczyk Decl. Ex. F, Zeno Dep. at 170:12-22.

But trans fats are ████████████████ Klorczyk Decl. Ex. D, Belke Dep. at

26:19-27:1.  The FDA has repeatedly warned about the adverse impact of trans fat on heart

health in general, and on cholesterol levels in particular.  This is because trans fats raise "bad"

cholesterol levels.  Even in 1999, research "showed that consumption of diets containing trans

fatty acids, like diets containing saturated fats, <u>results in increased serum low-density lipoprotein

cholesterol (LDL–C),</u>[3] <u>a major risk factor for C[oronary] H[eart] D[isease]</u>" (or "CHD").

Klorczyk Decl. Ex. G at 41435 (emphasis added); *id.* at 41442-49 (analyzing scientific evidence

concerning the consumption of trans fatty acids); *see also* Klorczyk Decl. Ex. H at 34663 ("Our

conclusion that there is a linear relationship … between *trans* fat intake and CHD risk is

consistent with the body of evidence from controlled feeding studies on the proportionality of

fatty acid intake and blood lipids …").  Since 2003, the FDA has therefore maintained that

> Consumers must know – <u>and the agency believes is material
> information that the reasonable consumer should know</u> – the
> amount of *trans* fat in food products that they select as part of their
> total daily diet to choose products that would allow them to reduce
> their intake of *trans* fat, and thus, reduce the risk of CHD.
>
> …

---

[3] There are two types of cholesterol:  LDL-C and HDL-C.  LDL-C is considered the "bad" cholesterol.  Trans fat increases serum LDL–C ("bad" cholesterol), and reducing trans fat intake reduces coronary heart disease ("CHD") risk.  Klorczyk Decl. Ex. G at 41467.  As the FDA further noted, "<u>[a]lthough the effect of trans fat on LDL-C ['bad' cholesterol] and CHD risk is the primary basis for trans fat labeling, trans fat may also increase CHD risk by lowering high-density lipoprotein cholesterol (HDL-C) ('good' cholesterol).</u>"  *Id.* (emphasis added).

> Consumers would be misled without having *trans* fat information available on the label.

Klorczyk Decl. Ex. G at 41438 (emphasis added).

Nonetheless, during the class period, "No Trans Fat" appeared five separate times on Benecol's packaging, while "No Trans Fatty Acids" appeared twice. Klorczyk Decl. Ex. A at McNeil0000006; *id.* Ex. B at McNeil0000023; *id.* Ex. C. It was on the tub. It was on the lid. It was on the outer sleeve, not just once but three times – on the front, back, and top – written in all capitalized, bolded letters. In total, No Trans Fat and No Trans Fatty Acids appeared in seven different places. Klorczyk Decl. Ex. D, Belke Dep. at 100:2-101:5 ████████████████ ████████████████ ; *id.* at 107:3-21 ████████████████████████████████ ████████████ *see also* Klorczyk Decl. Ex. F, Zeno Dep. at 80:2-86:3. The only part of the retail packaging that did not reference the No Trans Fat claim was the bottom. *See* Klorczyk Decl. Ex. E, Steele Dep. at 100:7-12.

The No Trans Fat claim is straightforward. Laura Zeno agreed that it can only mean that Benecol ████████████████ *See* Klorczyk Decl. Ex. F, Zeno Dep. at 125:20-23; *id.* at 130:22-131:20 ████████████████████████████████ ████████████████████████████████████ Mr. Belke put it best:



Klorczyk Decl. Ex. D, Belke Dep. 33:10-21. The No Trans Fat claim is therefore binary – it is

either true or false. *See id.* at 70:15-21 ████████████████████████████████

████████████████████████████████████████████████████████████

As explained below in Section II.B, however, the Ninth Circuit already determined that

Benecol's "statement ['No Trans Fat'] is not true" against these same Defendants. *Reid v.*

*Johnson & Johnson*, 780 F.3d 952, 967 (9th Cir. 2015). Thus, Defendants are collaterally

estopped from re-litigating this issue. *See infra* § II.B.

Plaintiff brings claims for unjust enrichment, violation of New York Gen. Bus. Law

§§ 349 and 350, negligent misrepresentation, and fraud. Plaintiff seeks to certify and represent

the following classes:

> All persons who purchased Benecol Regular Spread or Benecol
> Light Spread from January 1, 2008 to December 31, 2011 in the
> United States (the "Nationwide Class"); and
>
> All persons who purchased Benecol Regular Spread or Benecol
> Light Spread from January 1, 2008 to December 31, 2011 in New
> York (the "New York Class").

## II. PLAINTIFF'S CLAIMS ARE SUSCEPTIBLE TO COMMON PROOF

### A. Common Evidence Shows That Benecol Contains Trans Fat

Partially Hydrogenated Oils ("PHOs") "are the primary dietary source of industrially-

produced *trans* fatty acids." Klorczyk Decl. Ex. H at 34650. Defendants admit Benecol

contained partially hydrogenated soybean oil from the product's inception.



Klorczyk Decl. Ex. E, Steele Dep. at 168:3-15; *see also id.* at 140:1-9, 149:13-16.

_____. *Id.* at 155:19-156:9, 157:9-20.  Every tub of Benecol sold contained 7.5% partially hydrogenated soybean oil.  *See id.* at 145:11-146:1, 151:3-8, 156:2-7, 157:15-25; *see also* Klorczyk Decl. Ex. I at McNeil0015809 (Regular); *id.* at McNeil0015814 (Light); *id.* Ex. J at McNeil0019297 (Light); *id.* at McNeil0019303 (Regular). _____

Klorczyk Decl. Ex. E, Steele Dep. 74:20-75:13; *see also id.* at 149:21-150:4; Klorczyk Decl. Ex. F, Zeno Dep. 138:4-18.

**B.**  **Common Evidence Shows That The No Trans Fat Claims Are False And Misleading**

Defendants admitted in their Answer and in deposition testimony that Benecol contains partially hydrogenated oils that have trans fat in them.  Defs.' Answer ¶ 1, Dkt. No. 27 ("Defendants admit that Benecol® Spread and Benecol® Light Spread contain a small amount of partially hydrogenated oils."); Klorczyk Decl. Ex. E, Steele Dep. 74:20-75:13 ("A:  [P]artially hydrogenated oils are trans fats. … A:  [P]artially hydrogenated soybean oil is the trans fat for the Benecol spreads.").

Under the FDA regulations, the general rule is that "nutrient content claims" are not permitted on food labels. Nutrient content claims are statements that "expressly or implicitly characterize[] the level of a nutrient." 21 C.F.R. § 101.13(b). …

…

FDA regulations specifically address trans fat. They provide that trans fat should generally be disclosed in the nutrition label "except that label declaration of trans fat content information is not required for products that contain less than 0.5 grams of total fat in a serving if no claims are made about fat, fatty acid or cholesterol content." *Id.* § 101.9(c)(2)(ii). The regulation further provides:

> If the serving contains less than 0.5 gram, the
> content, when declared, shall be expressed as zero.
> Except as provided for [under the provisions
> allowing for simplified format labeling], if a
> statement of the trans fat content is not required
> and, as a result, not declared, the statement "Not a
> significant source of trans fat" shall be placed at the
> bottom of the table of nutrient values. *Id.*

*Reid v. Johnson & Johnson*, 780 F.3d 952, 960 (9th Cir. 2015) (emphasis added).

> … These regulations create two categories of nutrient content claims, "expressed" and "implied," imposing a different set of requirements for each type of claim. 21 C.F.R. § 101.13(b)(1)-(2). The "No Trans Fat" claim is an expressed claim because it "is [a] direct statement about the level ... of [trans fat] in the food." *Id.* § 101.13(b)(1). FDA regulations authorize expressed claims that "do [] not in any way implicitly characterize the level of the nutrient in the food and [are] not false or misleading in any respect (e.g., '100 calories' or '5 grams of fat')." *See id.* § 101.13(i)(3).

> The FDA has provided guidance about whether a "No Trans Fat" nutrient content claim is permissible for products containing small amounts of trans fat. In one of its warning letters, the FDA indicated that "No Trans Fat" is "an unauthorized nutrient content claim ... which has not been defined by FDA." The agency noted that the letter's recipient could <u>make a truthful statement on a product's label that specifies the amount of trans fat per serving</u>." *See* 21 C.F.R. § 101.13(i). In a second letter, the FDA similarly indicated that "trans fat-free" is an "unauthorized nutrient content claim."

A nutrient content claim fails if it is "false or misleading in *any* respect." 21 C.F.R. § 101.13(i)(3) (emphasis added). <u>Because Benecol contains some trans fat (between 0 and 0.5 grams per serving), its "No Trans Fat" claim is misleading in at least one respect.</u> … [T]he FDA explicitly decided not to authorize a "No Trans Fat" claim in light of a lack of scientific information. *See* 68 Fed.Reg. 41,434, 41,464-65. …

McNeil says its "No Trans Fat" claim is the equivalent of its statement on the nutrition label that Benecol contains 0 grams of trans fat per serving, a statement it must make under section 101.9(c)(2)(ii). FDA regulations allow a label to include synonyms of authorized nutrient content claims, *id.* § 101.13(b)(4), which McNeil claims is exactly what its "No Trans Fat" claim is. But, as noted, claims required on a nutrition label under section 101.9(c), like Benecol's "0 grams trans fat per serving" claim, are not nutrient content claims and thus are not covered by section 101.13(b)(4)'s synonym rule. <u>That McNeil must say Benecol contains 0 grams of trans fat per serving on its nutrition label makes no difference here.</u>

*Id.* at 962-63 (emphasis added).

It is clear, however, that Benecol's label prominently states that Benecol contains "No Trans Fat." <u>That statement is not true.</u> Although Benecol may contain a relatively small amount of trans fat per serving, the FDA found that the existing scientific evidence was not sufficient for it to approve "No Trans Fat" claims. <u>Despite this finding, McNeil made such a claim.</u> Given that the FDA has indicated in warning letters that claims like "No Trans Fat" are not authorized, McNeil cannot shield itself from liability with the FDA's regulations.

*Id.* at 967 (emphasis added).

As the Ninth Circuit recognized, the FDA previously indicated in at least two warning letters that the claim "No Trans Fat" is "an unauthorized nutrient content claim … which has not been defined by FDA." *Id.* at 962. *See also* Klorczyk Decl. Ex. K (BestLife International, Inc. Warning Letter); Klorczyk Decl. Ex. L (Cytosport warning letter).

The Ninth Circuit's conclusion on this point is binding against Defendants. "The doctrine of collateral estoppel bars re-litigation of a legal or factual issue that was previously decided where: '(1) the issues in both proceedings are identical, (2) the issue in the prior proceeding was actually litigated and actually decided, (3) there was [a] full and fair opportunity to litigate in the prior proceeding, and (4) the issue previously litigated was necessary to support a valid and final judgment on the merits.'" *Washington v. New York City Dep't of Educ.*, 2018 WL 3342324, at *2 (2d Cir. July 9, 2018) (internal citation omitted).

First, whether Benecol's No Trans Fat claims were authorized by FDA regulations is identical to the issue decided in *Reid*. In *Reid*, Defendants identified one of the issues on appeal as whether "Appellant's claims [are] preempted by the Food, Drug and Cosmetic Act … and regulations of the United States Food and Drug Administration ('FDA'), as the District Court ruled, because they seek to impose disclosure and labeling requirements that are different from those required by federal law?" Klorczyk Decl. Ex. M at 2.

Second, Defendants had a full and fair opportunity to litigate this issue in *Reid* and in fact did so. Both J&J and McNeil were the defendants in *Reid* and were represented by the same counsel as they were here. *See Reid*, 780 F.3d at 955 ("Robert Reid appeals the district court's decision dismissing his false advertising lawsuit against Johnson & Johnson and McNeil Nutritionals, LLC (collectively, 'McNeil')."); *id.* ("Mollie F. Benedict, and Amanda Villalobos, Tucker Ellis LLP, Los Angeles, CA, for Defendants-Appellees.").

Finally, this issue was actually litigated and decided in *Reid*. As the Ninth Circuit explained, "[t]he preemption analysis of the 'No Trans Fat' claim turns on whether the statement is authorized by FDA regulations." *Reid*, 780 F.3d at 959. As such, this issue was "necessarily decided" for purposes of collateral estoppel. *See Vaccaro v. Bank of Am., N.A.*, 2016 WL

4926201, at \*5 (S.D.N.Y. Sept. 15, 2016) ("The requirement that the issue in question be necessarily decided in the previous case, however, does not mean that the prior decision must 'have been explicit ... if by necessary implication it is contained in that which has been explicitly decided.'" (quoting *Postlewaite v. McGraw-Hill*, 333 F.3d 42, 48 (2d Cir. 2003)). Since the Ninth Circuit's decision that Benecol's No Trans Fat claim was not authorized by the FDA was the basis for overturning the District Court's dismissal of the plaintiff's claims in *Reid*, it was necessary to support a valid and final judgment on the merits.

**C.     The No Trans Fat Claims Are Material To Consumers**

The "No Trans Fat" and "No Trans Fatty Acids" claims on every unit of Benecol sold during the Class Period were █████████████ Klorczyk Decl. Ex. D, Belke Dep. at 90:23-91:7 ████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████ Indeed, the claims were omnipresent, appearing 7 times on each unit's packaging. The No Trans Fat claim differentiated Benecol from competitors. *See* Klorczyk Decl. Ex. F, Zeno Dep. at 229:9-14 ████████████ ████████████████████████████████████ ████████████████████████████████ ██████████████

Plaintiff's consumer survey expert, J. Michael Dennis, Ph.D., conducted a consumer perception survey, in part to determine whether the No Trans Fat claim was ████████ ████████████████████████████████████████████ ████████████████████████████████████ ██████████████████████████████████████████████

9

*Id.* ¶ 17 (emphasis in original). ████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████ *Id.*

(emphasis in original).  Plaintiff Bowling's understanding of the claims comport with the

understanding of the two-thirds majority of consumer survey respondents.  *See* 7/26/18 Bowling

Decl. ¶ 3 ("I understood [the No Trans Fat] claims to mean that the product did not contain any

trans fat.").

> ### D.    *Reid* Tolled The Statute Of Limitations

The statutes of limitations for Plaintiff's and the Class's state law claims were tolled by

the filing of the *Reid* and *Martinelli* cases in California.  Both *Reid* and *Martinelli* are class

actions raising the same claims, for the same products, against the same defendants.  However,

*Reid* was voluntarily dismissed following remand from the Ninth Circuit without a ruling on

class certification, whereas class certification in *Martinelli* is currently pending.  Plaintiff

Bowling filed this action following the *Martinelli* court's denial of the plaintiff's motion for

leave to amend to add Plaintiff Bowling to the California case.  *See Martinelli*, Case No. 15-cv-

01733-MCE (E.D. Cal. May 23, 2017), Dkt. No. 78.

It is well-established that the statute of limitations for <u>federal</u> claims in a federal lawsuit

is tolled while a putative class action is pending.  The U.S. Supreme Court established this

principle in *American Pipe & Const. Co. v. Utah*, 414 U.S. 538, 560-61 (1974), where an

individual class member sought to intervene in a timely class action after the statute of

limitations had run out on the individual's claim.  However, *American Pipe* is not directly

applicable for federal courts considering state law claims in diversity cases. Rather, the Second Circuit concluded that "a federal court evaluating the timeliness of state law claims must look to the law of the relevant state to determine whether, and to what extent, the statute of limitations should be tolled by the filing of a putative class action in another jurisdiction." *Casey v. Merck & Co.*, 653 F.3d 95, 100 (2d Cir. 2011). Nonetheless, as a matter of state law, "New York courts have, in the interest of avoiding 'court congestion, wasted paperwork and expense,' long embraced the principles of *American Pipe.*" *Cullen v. Margiotta*, 811 F.2d 698, 719-20 (2d Cir. 1987) (quoting *Yollin v. Holland America Cruises, Inc.*, 97 A.D.2d 720, 720 (N.Y. App. 1st Dep't 1983) ("We … hold that the timely commencement of the action by plaintiff herein satisfied the purpose of the contractual limitation period as to all persons who might subsequently participate in the same suit as members of the class. *See American Pipe* ….")); *see also Osarczuk v. Associated Univs., Inc.*, 130 A.D.3d 592, 595 (N.Y. App. 2 Dep't 2015) ("New York courts have adopted [the *American Pipe*] rule.").

Even though New York state courts have plainly incorporated *American Pipe* tolling into New York's common law, "[s]ome states that have adopted *American Pipe* tolling have refused to expand the doctrine to include 'cross-jurisdictional class action tolling,' thereby declining to apply the tolling doctrine in situations where they otherwise would have if the original class action had been filed in its own jurisdiction." *In re Fosamax Products Liability Litig.*, 694 F. Supp. 2d 253, 257 (S.D.N.Y. 2010). Unfortunately, New York state courts have not squarely addressed the issue of whether *American Pipe* serves to toll cross-jurisdictional class actions. Accordingly, the Court must conduct an *Erie* analysis to determine whether the New York Court of Appeals is likely to uphold the doctrine in the specific context of cross-jurisdictional tolling of class actions.

In applying these rules, federal courts applying New York law regularly apply cross-jurisdictional class action tolling. *See, e.g.*, *In re LIBOR-Based Financial Instruments Antitrust Litig.*, 2015 WL 6243526, at *146 (S.D.N.Y. Apr. 15, 2016) (concluding "that New York would apply cross-jurisdictional tolling as to both residents and non-residents."); *Famular v. Whirlpool Corp.*, 2017 WL 2470844, at *9 (S.D.N.Y. June 7, 2017) (holding "[f]or the reasons explained herein and in *In re LIBOR-Based Financial Instruments Antitrust Litigation*, 2015 WL 6243526, at *138-147, the Court predicts the New York Court of Appeals would apply cross-jurisdictional tolling.")[4]; *Chavez v. Occidental Chem. Corp.*, 300 F. Supp. 3d 517, 529-34 (S.D.N.Y. 2018) (holding "it is most likely that New York would apply cross-jurisdictional tolling."). Here, the Court should be persuaded by the three holdings in *In re LIBOR*, *Famular*, and *Chavez* and apply cross-jurisdictional tolling.

## III. THE REQUIREMENTS OF FED. R. CIV. P. 23(A) ARE MET

### A. Numerosity

Rule 23(a)(1) requires that the class be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). A presumption of numerosity attaches to classes of more than 40 in the Second Circuit. *Consol. Rail Corp. v. Hyde Park*, 47 F.3d 473, 483 (2d Cir. 1995). The Class easily satisfies this requirement. Here, between 2008 and 2011, Defendants sold approximately ███████ units of Benecol across the United States. 7/30/18 Declaration of Colin B. Weir ("Weir Decl.") Table 1. ██████ units were sold in New York. *Id.* Thus, the numerosity requirement is easily satisfied.

---

[4] Tellingly, following the *Famular* decision, the Second Circuit denied a Fed. R. App. P. 5 appeal regarding whether the District Court appropriately applied cross-jurisdictional tolling. *See* Klorczyk Decl. Ex. N.

## B.    Commonality

Commonality is met "if there are questions of law or fact common to the class."  Fed. R. Civ. P. 23(a)(2).  In other words, Plaintiff's and Class members' claims "depend on a common contention," "capable of class-wide resolution … meaning that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011).  The commonality requirement is met where the individual circumstances of class members differ, but "their injuries derive from a unitary course of conduct by a single system."  *Marisol A. v. Giuliani*, 126 F.3d 372, 377 (2d Cir. 1997).  "Even a single question of law or fact common to the members of the class will satisfy the commonality requirement."  *Dukes*, 131 S. Ct. at 2562.

Where, as here, a plaintiff challenges false and misleading product labeling, the commonality requirement is routinely satisfied.  *See, e.g., Ebin v. Kangadis Food Inc.*, 297 F.R.D. 561, 565 (S.D.N.Y. 2014) (holding that a common question in a consumer class action brought under the GBL is whether the defendant olive oil distributor defrauded purchasers by claiming that its product constituted "100% Pure Olive Oil"); *In re Scotts EZ Seed Litig.*, 304 F.R.D. 397, 405 (S.D.N.Y. 2015) (holding that a common question is whether a product claim promising thicker grass growth is false or misleading).  A central issue in this case is whether the No Trans Fat claim found on every unit of Benecol sold during the class period is false or misleading.  "The answer to that question is common to all class members, and is apt to drive the resolution of this litigation."  *In re Scotts EZ Seed Litig.*, 304 F.R.D. at 405.

## C.    Typicality

Rule 23(a)(3) requires Plaintiffs' claims to be "typical" of the class.  Fed. R. Civ. P. 23(a)(3).  "The typicality requirement is not demanding."  *Fogarazzao v. Lehman Bros., Inc.*,

232 F.R.D. 176, 180 (S.D.N.Y. 2005). Typicality is satisfied "when each class member's claim arises from the same course of events and each class member makes similar legal arguments to prove the defendant's liability." *Robidoux v. Celani*, 987 F.2d 931, 936 (2d Cir. 1993).

Where, as here, "it is alleged that the same unlawful conduct was directed at or affected both the named plaintiff and the class sought to be represented, the typicality requirement is usually met irrespective of minor variations in the fact patterns underlying individual claims." *Id.* at 936-37. As discussed above, the same unlawful conduct – the No Trans Fat claim – was directed at each class member. *See supra* § II.C. The lead plaintiff's and absent class members' claims arise from the same course of events, and each class member will make similar legal arguments to prove defendants' liability. Thus, the plaintiff and all of the class members will marshal the same evidence and arguments in support of their claims.

### D. Adequacy

Adequacy requires that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). "Generally, adequacy of representation entails inquiry as to whether: 1) plaintiff's interests are antagonistic to the interest of other members of the class and 2) plaintiff's attorneys are qualified, experienced, and able to conduct the litigation." *Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 222 F.3d 52, 60 (2d Cir. 2000). Both of these factors are met here.

Plaintiff "relied on the truth of the [No Trans Fat claims] when deciding to purchase the [Benecol Light] spread." Bowling Decl. ¶ 3. Plaintiff intends to fairly and adequately represent the interests of the class. *Id.* ¶¶ 4-5. Since Plaintiff's individual and class claims arise from Benecol's uniformly false and misleading No Trans Fat claims, she seeks remedies equally applicable and beneficial to the class. *Id.* ¶ 6. Plaintiff has no conflicts of interest with the

proposed class and has demonstrated her commitment to pursue these claims by providing allegations for inclusion in the Complaint (which she reviewed prior to the filing), and by consulting periodically with counsel to review, discuss, determine, and participate in the actions to be taken in pursuit of this case on behalf of all class members. *Id.* ¶¶ 4-5.

Plaintiff's counsel, Bursor & Fisher, P.A., are experienced and qualified class action lawyers who have experience litigating consumer claims like the ones at issue here. The firm has been appointed class counsel in dozens of cases in both federal and state courts, and has won multi-million dollar verdicts or recoveries in 5 of 5 class action jury trials since 2008. *See* Klorczyk Decl. Ex. O, Bursor & Fisher, P.A. Firm Resume. Other courts in this district have already recognized the qualifications of Plaintiffs' counsel in appointing them as class counsel in similar consumer-product class actions. *See Ebin v. Kangadis Food Inc.*, 297 F.R.D. 561, 566 (S.D.N.Y. 2014) ("As for plaintiffs' counsel, Bursor & Fisher, P.A. are class action lawyers who have experience litigating consumer claims …. The firm has been appointed class counsel in dozens of cases in both federal and state courts ….") (Rakoff, J.); *In re Scotts EZ Seed Litig.*, 304 F.R.D. 397, 407 (S.D.N.Y. 2015) (same) (Briccetti, J.); *Hart v. BHH, LLC*, 2017 WL 2912519, at *6 (S.D.N.Y. July 7, 2017) ("The first prong is easily dispensed with in view of the undersigned counsel's work in similar consumer product class actions in this district. … This Court therefore finds that Bursor & Fisher, P.A., is qualified, experienced, and able to conduct this litigation.") (Pauley, J.).

### E. The Classes Are Ascertainable

Though it does not appear in the text of Rule 23, courts in this circuit have recognized an "implied requirement of ascertainability." *Ebin*, 297 F.R.D. at 566-67 (quoting *In re Initial Pub. Offerings Sec. Litig.*, 471 F.3d 24, 30 (2d Cir. 2006)). "The ascertainability doctrine that governs

in this Circuit requires only that a class be defined using objective criteria that establish a membership with definite boundaries." *In re Petrobas Sec.*, 862 F.3d 250, 264 (2d. Cir. 2017) (rejecting the argument that proposed classes must be "administratively feasible" and holding that the class was "clearly objective" and "sufficiently definite" where it included people who acquired specific securities during a specific period in "domestic transactions" because the class was "identified by subject matter, timing, and location," which made it "objectively possible" to ascertain members).

Although an effort to identify class members must be made "at some point in the case," there is no requirement that any class members, other than the named class representatives, be identified prior to class certification. *See, e.g.*, *Noble v. 93 Univ. Place Corp.*, 224 F.R.D. 330, 341-42 (S.D.N.Y. 2004) (internal quotations and citations omitted).

Here, the Class is defined objectively such that Class Members can be identified by reference to "objective criteria." For the nationwide class, Class Members consist of individuals who purchased Benecol in the United States from 2008 to 2011. Similarly, members of the New York Class consist of individuals who purchased Benecol in New York from 2008 to 2011. The nature, location, and timing of the purchase are objective facts. Thus, it is objectively possible to ascertain Class Members by reference to these criteria. Accordingly, the ascertainability requirement is met even though class members may not possess receipts or other documentation evidencing their purchases. *See Ebin*, 297 F.R.D. at 567 (finding nationwide class of olive oil purchasers ascertainable even though they were unlikely to have proof of purchase); *Goldemberg v. Johnson & Johnson Cons. Cos., Inc.*, 317 F.R.D. 374, 398 (S.D.N.Y. 2016) ("[D]enial of class certification in consumer protection cases like these on the basis of ascertainabiltiy would severely contract the class action mechanism").

16

## IV.  THE REQUIREMENTS OF RULE 23(B)(3) ARE MET

Rule 23(b)(3) authorizes class certification where "questions of law or fact common to class members predominate over any questions affecting only individual members," and "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).  Both are met here.

### A.      Common Questions Of Law Or Fact Predominate

"Class-wide issues predominate if resolution of some of the legal or factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof, and if these particular issues are more substantial than the issues subject only to individualized proof."  *Moore v. PaineWebber, Inc.*, 306 F.3d 1247, 1252 (2d Cir. 2002).  Notably, Rule 23(b)(3) calls only for "a showing that questions common to the class predominate, not that those questions will be answered, on the merits, in favor of the class."  *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 133 S. Ct. 1184, 1191 (2013).

#### 1.      Common Questions Of Fact Predominate

Plaintiff's central allegation is that the No Trans Fat and No Trans Fatty Acids claims are false and misleading because Benecol contains trans fat and trans fatty acids.  *See supra* §§ I-II.  Accordingly, the determination of the following common questions of fact will resolve issues central to the validity of Plaintiff's and Class Members' claims in a single stroke:  (1) whether Defendants labeled and advertised Benecol as containing "No Trans Fat" and "No Trans Fatty Acids;" (2) whether these labeling claims were material to Class Members' decision to purchase Benecol; (3) whether Benecol does in fact contain trans fat or trans fatty acids; and (4) whether Class Members were damaged by purchasing Benecol that contained trans fat or trans fatty acids notwithstanding the label claims to the contrary.  Each of these questions can be answered with

common evidence as described above.

<strong>2.    Common Questions of Law Predominate As To Plaintiff's<br>Claims Under New York Gen. Bus. Law §§ 349 & 350</strong>

Common questions of law also predominate with respect to Plaintiff's claims under New York Gen. Bus. Law §§ 349 and 350 that she brings on behalf of herself and the New York Class. To establish a prima facie case under § 349, a plaintiff must demonstrate that "(1) the defendant's deceptive acts were directed at consumers, (2) the acts are misleading in a material way, and (3) the plaintiff has been injured as a result." *Maurizio v. Goldsmith*, 230 F.3d 518, 521 (2d Cir. 2000). "Deceptive acts" are defined objectively as those that are "likely to mislead a reasonable consumer acting reasonably under the circumstances." *Id.* at 522; *see also Leider v. Ralfe*, 387 F. Supp. 2d 283, 292 (S.D.N.Y. 2005). "The same analysis applies to claims brought under Section 350." *In re Scotts EZ Seed Litig.*, 304 F.R.D. 397, 409 (S.D.N.Y. 2015). Additionally, neither Section 349 nor 350 require proof of reliance … nor proof that defendants intended to mislead consumers. *Id.* at 409 (citations omitted).

Plaintiff alleges that Benecol's misrepresentations (i) were directed at consumers, (ii) were false or misleading in a material way, and (iii) caused injury to Plaintiff. *See* Class Action Complaint, Dkt. No. 1 ("Compl.") ¶¶ 62-84. Plaintiff will prove these claims with the same common evidence described above. *See Jermyn v. Best Buy Stores, L.P.*, 356 F.R.D. 418, 435-36 (S.D.N.Y. 2009) (certifying GBL §§ 349 and 350 claims where "[t]he predominant issue before the Court is whether Best Buy's advertisements about its price match guarantee were false and misleading because the company had a secret Anti-Price Matching Policy."); *Guido v. L'Oreal, USA, Inc.*, 284 F.R.D. 468, 480-83 (C.D. Cal. 2012) (certifying class under GBL §§ 349 and 350 where all purchasers of hair product were subject "to the same deceptive marketing and advertising"); *Makaeff v. Trump University, LLC*, 2014 WL 688164, at *14 (S.D. Cal. Feb. 21,

18

2014) ("Based on the same showing of the UCL claims, the Court concludes common issues predominate for alleged violations of New York General Business law.").  Indeed, the fact that these statements appeared prominently on the packaging 7 times – on every side except the bottom – is evidence of their materiality.  *See, e.g., Ebin*, 297 F.R.D. at 568 (certifying class under GBL § 349 where "every class member saw the same representation that Capatriti was '100% Pure Olive Oil' because the statement appeared in large letters on the front, back, left, right, and top of the tin.  …  The same generalized evidence will be used to establish whether Capatriti's label is false, and if so, whether it was likely to mislead a reasonable consumer acting under the circumstances.").  Finally, the materiality of the No Trans Fat claim is confirmed by Dr. Dennis's consumer perception survey which found ████████████████████████████ ████████████.  Dennis Decl. ¶ 17.  Dr. Dennis's finding of materiality is corroborated by his conjoint study, ██████████████████████████████ ████████████████████████████████.  *Id.* ¶ 18.

### 3. Common Questions Of Law Predominate As To Plaintiff's Nationwide Unjust Enrichment Claim

Common questions of law predominate with respect to Plaintiff's unjust enrichment claim that she brings on behalf of herself, the Nationwide Class, and the New York Class.  *See* Compl. ¶¶ 57-61.  As a "federal court sitting in diversity," the Court unquestionably "has the ability to adjudicate class action litigation that involves the application of numerous state laws." *Steinberg v. Nationwide Mut. Ins. Co.*, 224 F.R.D. 67, 79 (E.D.N.Y. 2004).  "Choice of law does not matter, however, unless the laws of the competing jurisdictions are actually in conflict." *Int'l Bus. Machs. Corp. v. Liberty Mut. Ins. Co.*, 363 F.3d 137 (2d Cir. 2004).  Laws are in conflict "[w]here the applicable law from each jurisdiction provides different substantive rules." *Curley v. AMR Corp.*, 153 F.3d 5, 12 (2d Cir. 1998).  A "material conflict" is a conflict that is likely to

have "a significant possible effect" on the outcome of the case. *Simon v. Philip Morris Inc.*, 124 F. Supp. 2d 46, 71 (E.D.N.Y. 2000). "In the absence of substantive difference, however, a New York court will dispense with choice of law analysis; and if New York law is among the relevant choices, New York courts are free to apply it." *Int'l Bus. Mach. Corp.*, 363 F.3d at 143.

Here, the law of unjust enrichment is largely uniform throughout the United States. Indeed, "[t]here is general agreement among courts that the 'minor variations in the elements of unjust enrichment under the laws of the various states ... are not material and do not create an actual conflict.'" *In re Checking Account Overdraft Litig.*, 307 F.R.D. 656, 675 (S.D. Fla. 2015) (quoting *Pennsylvania Emp. Benefit Trust Fund v. Zeneca, Inc.*, 710 F. Supp. 2d 458, 477 (D. Del. 2010)). *See also, e.g.*, *In re Abbott Laboratories Norvir Anti-Trust Litig.*, 2007 WL 1689899, at *9-10 (N.D. Cal. 2007) (certifying nationwide unjust enrichment class because "the variations among some states' unjust enrichment laws do not significantly alter the central issue or the manner of proof"). "Application of the unjust enrichment doctrine has a 'universal thread,' … and the claim is well-suited for multi-state class treatment by virtue of its uniform availability and focus on the defendant's ill-gotten gain." *In re Checking Account Overdraft Litig.*, 307 F.R.D. at 675 (citation omitted).

Importantly, New York's choice of law rules do "not give particular weight to the state in which the act conferring the benefit was done … where, as here, the place where the enrichment was received can be identified and bears a strong relationship to the occurrence and the parties." *In re Rezulin Prod. Liab. Litig.*, 390 F. Supp. 2d 319, 341-42 (S.D.N.Y. 2005). Here, Defendants received their ill-gotten gains in their home state – New Jersey. Since "there is no actual conflict between New York and New Jersey's unjust enrichment laws," *Podlin v. Ghermezian*, 2014 WL

2601416, at *6 (S.D.N.Y. May 28, 2014), *aff'd*, 601 F. App'x 31 (2d Cir. 2015), the Court can apply New York's unjust enrichment law to the Nationwide Class.

New York law requires proof "that (1) the other party was enriched, (2) at that party's expense, and (3) that 'it is against equity and good conscience to permit [the other party] to retain what is sought to be recovered.'" *Mandarin Trading Ltd. v. Wildenstein*, 16 N.Y.3d 173, 182 (2011) (alteration in original) (quoting *Citibank, N.A. v. Walker*, 12 A.D.3d 480, 481 (N.Y. App. Div. 2d Dep't 2004)). "The essential inquiry in any action for unjust enrichment … is whether it is against equity and good conscience to permit the defendant to retain what is sought to be recovered." *Id*. (internal citation omitted). This claim is therefore susceptible to common proofs described above. *See In re Amla Litig*, 282 F. Supp. 3d 751, 768 (S.D.N.Y. 2017) ("Plaintiffs have therefore shown that common issues predominate as to their unjust enrichment claims.").

At a minimum, the Court should certify Plaintiff's unjust enrichment claim against Defendants on behalf of the New York Class. *See Jermyn*, 256 F.R.D. at 436 ("But, for the same reasons articulated for the section 349 claim, the Court believes that 'common questions of law and fact will continue to predominate because it does not appear that any such [individual] issues would be unique to each plaintiff.' … The predominant issue for the unjust enrichment claim is whether Best Buy was enriched at the class' expense by using an undisclosed policy of aggressively discouraging and denying customers' valid price match requests."); *Rodriguez v. It's Just Lunch, Int'l*, 300 F.R.D. 125, 148 (S.D.N.Y. 2014) ("Moreover, in every case cited by the parties involving section 349 and unjust enrichment claims arising out of the same core facts in which the court granted certification of the section 349 claim, the court also granted certification of the unjust enrichment claim.").

21

### 4. Common Questions Of Law Predominate As To Plaintiff's Fraud And Negligent Misrepresentation Claims

Common questions of law also predominate with respect to Plaintiff's claims for negligent misrepresentation and fraud that she brings on behalf of herself, the Nationwide Class, and the New York Class. *See* Compl. ¶¶ 85-97. As Judge Pauley explained in certifying a nationwide fraud class last year:

> The "Second Circuit has held that the predominance requirement is met for claims sounding in fraud that are based on uniform representations made to all members of the class." *Ebin*, 297 F.R.D. at 569 (citing *Moore v. PaineWebber, Inc.*, 306 F.3d 1247, 1253 (2d Cir. 2002)) ("Fraud actions must ... be separated into two categories: fraud claims based on uniform misrepresentations made to all members of the class and fraud claims based on individualized misrepresentations. The former are appropriate subjects for class certification because the standardized misrepresentations may be established by generalized proof."). Many elements of a fraud claim – misrepresentation, reliance, and causation – are easily addressed through generalized proof of the product's label and proof of plaintiffs' purchases.

*Hart*, 2017 WL 2912519, at *8 (S.D.N.Y. July 7, 2017). As Judge Pauley further explained, "the elements of fraud are generally the same" and that "[p]roving knowledge and intent to deceive, while subject to varying standards in certain states, can be addressed on a classwide basis." *Id.* Indeed, "'many courts in this Circuit … have held that reliance may be proved through circumstantial evidence that plaintiffs would not have purchased a product but for a defendant's uniform misrepresentations … about that product.'" *Rodriguez*, 300 F.R.D. at 139 (quoting *Ge v. Pinnacle Performance Ltd.*, 2013 WL 5658790, at *9 (S.D.N.Y. Oct. 17, 2013)).

Here, Defendants knowingly and purposely lied about the presence of trans fat in a product that was marketed to people concerned about their cholesterol and heart health. Trans fat is arguably poison for someone with a heart condition or cholesterol issues in particular. *See supra* § I. Nonetheless, Defendants affixed the "No Trans Fat" claim to every side but the

bottom of Benecol's packaging.  *See id.*  This action is therefore an "appropriate subject[] for class certification because the standardized misrepresentations may be established by generalized proof."  *Moore*, 306 F.3d at 1253.  Indeed, it is impossible that Class Members did not rely on Defendants' misrepresentation as it went to Benecol's core purpose – to reduce cholesterol.  *See, e.g.*, Bowling Decl. ¶ 3.  Once again with respect to the claims for fraud and negligent misrepresentation, the same common evidence detailed above will determine Defendants' liability with respect to all class members.

### B. Damages Are Measurable On A Classwide Basis

When issues of liability can be determined with classwide evidence, the predominance standard is generally satisfied even if damages are not provable in the aggregate.  *See* Advisory Committee's 1966 Notes on Fed. Rule Civ. Proc. 23, 28 U.S.C. App. at 141 ("[A] fraud perpetrated on numerous persons by the use of similar misrepresentations may be an appealing situation for a class action, and it may remain so despite the need, if liability is found, for separate determination of the damages suffered by the individuals within the class."); *Roach v. T.L. Cannon Corp.*, 778 F.3d 401, 407 (2d Cir. 2015) (denial of class certification inappropriate "simply because damages cannot be measured on a classwide basis"); Wright, Miller, & Kane, Fed. Prac. & Proc. Civ. § 1781, at 235-37; W. Rubenstein, Newberg on Class Actions § 4:54 at 205 (5th ed. 2012) ("[I]ndividual damage[s] calculations should not scuttle class certification under Rule 23(b)(3).").

Moreover, damages calculations in this case are straightforward.  Plaintiff's central allegation is that the No Trans Fat claim is false and misleading because Benecol contains trans fat.  *See supra* § I.  Since Benecol was ███████████████████████████████ *see* Klorczyk Decl. Ex. F, Zeno Dep. at 171:9-15, Plaintiff's measure of damages rests on the

fact that a certain percentage of the price consumers paid for Benecol constituted a price premium solely attributable to the No Trans Fat claim. Weir Decl. ¶¶ 43-44. Based on his conjoint survey,[5] Dr. Dennis concludes that the ███████████████████████████ ████████████████████████ ████ ████████████████████████ ██████████████████████████████████ Dennis Decl. ¶¶ 18, 49. Using the ██████ premium calculated by Dr. Dennis, Mr. Weir calculates damages with the following formula: ████ ██████████████████████████████████ Weir Decl. ¶ 53.

Additionally, Plaintiff's claims under GBL §§ 349 & 350 provide for statutory damages of $50 and $500 per violation, respectively. The Second Circuit has held that "[i]t is not disputed that statutory damages under GBL § 349 can be assessed on the basis of common proof, as they are capped at $50." *Sykes v. Mel S. Harris and Assocs., LLC*, 780 F.3d 70, 87 (2d Cir. 2015); *see also In re Scotts EZ Seed Litig.*, 2017 WL 3396433, at *18 (S.D.N.Y. Aug. 8, 2017) ("Because statutory damages are available for the New York class in this case, the damages calculation for the New York class may be proved on a class-wide basis."), *reconsideration denied by* 2018 WL 1274965 (S.D.N.Y. Mar. 5, 2018). Here, using Defendant's sales records, Mr. Weir has calculated statutory damages using the following formula "Number of Units Sold x Damages per Violation = Total Statutory Damages." Weir Decl. ¶¶ 56-58.

### C. Class Litigation Is Superior To Other Methods of Adjudication

Finally, a class action is the superior method of adjudication. Rule 23(b)(3) provides four factors for the Court's consideration:

> (A) [T]he interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the

---

[5] Laura Zeno agrees that a conjoint survey can be used to "assess which product attributes carry a price premium." Klorczyk Decl. Ex. F, Zeno Dep. at 176:1-16.

desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the difficulties likely to be encountered in the management of the class action.

Fed. R. Civ. P. 23(b)(3). All four of these factors favor class treatment here.

"Class action certifications to enforce compliance with consumer protection laws are desirable and should be encouraged." *Ballard v. Equifax Check Servs., Inc.*, 186 F.R.D. 589, 600 (E.D. Cal. 1999). It would cost Class Members much more to litigate an individual case than they could recover in damages. Where proceeding individually would be prohibitive due to the minimal recovery, "the class action device is frequently superior to individual actions." *See Seijas v. Republic of Argentina*, 606 F.3d 53, 58 (2d Cir. 2010). Here, the average price for a tub of Benecol was $4.80. The relatively small amount at issue for each Class Member renders individual litigation infeasible, but a class action offers the potential for meaningful redress to the Class. *See Rodriguez*, 300 F.R.D. at 141 ("[G]iven the relatively modest amount of monetary damages for each individual plaintiff at issue, the Court finds that the class members have little interest in controlling the litigation individually because it would be prohibitively expensive related to the expected recovery.") (citations omitted); *Hart*, 2017 WL 2912519, at *9 (S.D.N.Y. July 7, 2017) (finding superiority requirement was satisfied where "the cost of brining a lawsuit substantially outweighs the cost incurred in purchasing a defective pest repeller"); *Amchem*, 521 U.S. at 617 (emphasizing that the policy "at the very core of the class action mechanism is to overcome the problem that small recoveries do not provide the incentive" for individuals to bring claims). Moreover, this case is manageable as a class action because liability will be established predominantly through the common classwide evidence.

## V. CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that the Court grant her motion for class certification in its entirety.

Dated:  July 30, 2018

Respectfully submitted,

**BURSOR & FISHER, P.A.**

By:    */s/ Joseph I. Marchese*
         Joseph I. Marchese

Scott A. Bursor
Joseph I. Marchese
888 Seventh Avenue
New York, NY 10019
Telephone: (646) 837-7150
Facsimile:  (212) 989-9163
E-Mail: scott@bursor.com
       jmarchese@bursor.com

**BURSOR & FISHER, P.A.**

Frederick J. Klorczyk III
Neal J. Deckant
1990 North California Blvd., Suite 940
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile:  (925) 407-2700
E-Mail:  fklorczyk@bursor.com
       ndeckant@bursor.com

*Attorneys for Plaintiff*