**Exhibit 25**

**(Filed Under Seal)**

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

SUZANNA BOWLING, individually and on
behalf of all others similarly situated,

Plaintiff,

v.

JOHNSON & JOHNSON and McNEIL
NUTRITIONALS, LLC,

Defendants.

Case No. 1:17-cv-03982-AJN

Reply Declaration

of

**COLIN B. WEIR**

November 16, 2018

MAY REFERENCE MATERIALS DESIGNATED "CONFIDENTIAL" OR "HIGHLY
CONFIDENTIAL -- ATTORNEYS' EYES ONLY" UNDER PROTECTIVE ORDER

I, Colin B. Weir, declare as follows:

I am Vice President at Economics and Technology, Inc. ("ETI"), One Washington Mall, 15th Floor, Boston, Massachusetts 02108.  ETI is a research and consulting firm specializing in economics, statistics, regulation and public policy.

## I. QUALIFICATIONS, BACKGROUND, AND EXPERIENCE

1.    I hold a Masters of Business Administration, with honors, from the High Technology program at Northeastern University, Boston, Massachusetts.  I hold a Bachelor of Arts degree cum laude in Business Economics from The College of Wooster, Wooster, Ohio.  I have provided expert testimony before federal and state courts, the Federal Communications Commission, and state regulatory commissions, and have contributed research and analysis to numerous ETI publications and expert testimony at the state, federal, and international levels.  I have consulted on a variety of consumer and wholesale products cases, calculating damages relating to food products, household appliances, herbal remedies, health/beauty care products, electronics, furniture, and computers.  My Statement of Qualifications, which outlines my professional experience, publications, and record of expert testimony, is attached hereto as Exhibit 1.  This includes a list of all cases in which, during the previous four years, I have testified as an expert at trial or by deposition.  Prior to joining ETI, I worked at Stop and Shop Supermarkets for a period of seven years, working as a cash department head, grocery/receiving clerk, and price-file maintenance head.

2.    Contained in Exhibit 1 is a list of numerous litigations in which I have participated in the design, execution and/or determination of the economic suitability of conjoint surveys, or have been found by the court to have expertise in conjoint analysis.  These cases include, but are not limited to *Hadley v. Kellogg; In re: Arris Cable Modem Consumer Litigation; Fitzhenry-Russell v. Dr. Pepper Snapple Group, Inc.; Jones v. Nutiva; Hunter v. Nature's Way; Looper v.*



*FCA; Sanchez-Knutson v. Ford Motor Company; Belfiore v. Procter and Gamble; Kurtz v.*
*Kimberly Clark; In re Scotts EZ Seed Litigation; and In re: ConAgra Foods.*

    3.   I received graduate level training in conjoint analysis as part of my MBA.  I take
continuing education in advanced conjoint design, execution, and analysis through Sawtooth
Software, a leading provider of conjoint analysis software.

## II.  ENGAGEMENT

    4.   I provide this declaration in connection with the case filed by Suzanna Bowling
("Plaintiff") in the above-captioned action against Johnson & Johnson and McNeil Nutritionals,
LLC ("Defendants").  I make this declaration based upon my own personal knowledge and, if
called as a witness in this action, I would be able to competently testify as to the facts and
opinions set forth herein.

    5.   I have been advised by Counsel for Plaintiff that individuals purchased certain
Benecol brand Products[1] which were labeled as containing "No Trans Fats" and "No Trans Fatty
Acids" ("the Claims").[2]  I have been further advised that Plaintiff alleges that these Claims are
false and misleading to reasonable consumers and therefore should not have been made.  I have
been asked by Counsel for Plaintiff to review the September 20, 2018 Declaration of Denise
Martin,[3] David Reibstein,[4] and Carol Scott,[5] and to respond thereto.

---

[1] Benecol Regular and Light spreads.

[2] *See, generally,* Class Action Complaint, filed May 25, 2017 ("Complaint").

[3] Rebuttal Declaration of Dr. Denise N. Martin, September 20, 2018 ("Martin Declaration").

[4] Expert Report of Dr. Carol A. Scott, September 20, 2018 ("Scott Report").

[5] Rebuttal Expert Report of David Reibstein, September 20, 2018 ("Reibstein Declaration").


ECONOMICS AND
TECHNOLOGY, INC.

6. ETI is being compensated at the rate of $600 per hour for my work on this case. The opinions expressed in this declaration are my own, and my compensation is not dependent upon the substance of these opinions or the outcome of the litigation.

7. The documents, data and other materials that I relied upon in forming my opinions are identified throughout my report and in Exhibit 2, attached hereto. In addition, I have relied upon my educational background and 15 years of experience.

### III. NEITHER MARTIN NOR REIBSTEIN DISPUTE
### THAT CONJOINT IS A RELIABLE METHOD

8. Below, I will address the specific criticisms raised by Martin, Reibstein, and Scott. First, it is notable that neither Martin nor Reibstein suggest that conjoint analysis is an invalid method--nor could they. Conjoint analysis is a time-tested, peer-reviewed, well-accepted and widely used method. Conjoint has a long history of use in litigation to determine economic damages (including in scenarios virtually identical to this case), as well as in academia and in industry.[6] In fact, Scott teaches conjoint to her students.[7] Martin's firm, NERA, regularly conducts conjoint analyses for its clients.[8] Reibstein has designed numerous conjoint studies

---

[6] *Applying Conjoint Analysis to Legal Disputes: A Case Study*, Wind, Yoram, *et al.*; *See, e.g., Khoday v. Symantec Corp.*, 2014 WL 1281600, at *10 (D. Minn. March 13, 2014); *Sanchez-Knutson v. Ford Motor Company*, 310 F.R.D. 529, 538-39 (S.D. Fl. 2015); *In re: Lenovo Adware Litigation*, 2016 WL 6277245, at *21 (N.D. Cal. Oct. 27, 2016); *Guido v. L'Oreal, USA, Inc.*, 2014 WL 6603730, at *5, *10-*14 (C.D. Cal. July 24, 2014); *Brown v. Hain Celestial Group, Inc.*, 2014 WL 6483216, at *19 (N.D. Cal. Nov. 18, 2014); *Microsoft v. Motorola, Inc.*, 904 F.Supp.2d 1109, 1119-20 (W.D. Wa. 2012); *In re Scotts EZ Seed Litig.*, 304 F.R.D. 397, 413-15 (S.D.N.Y. 2015); *Dzielak v. Maytag*, 2017 WL 1034197, at *6 (D. NJ. March 17, 2017); *TV Interactive Data Corp. v. Sony Corp.*, 929 F. Supp. 2d 1006, 1022 & n.6 (N.D. Cal. 2013); *Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121 (9th Cir. 2017); *In re Arris Cable Modem Consumer Litig.*, 2018 WL 3820619, at *25-*31 (N.D. Cal. Aug. 10, 2018); *Hadley v. Kellogg Sales Co.*, 2018 WL 3954587, at *11-*16 (N.D. Cal. Aug. 17, 2018).

[7] Deposition of Carol Scott, October 11, 2018, ("Scott Deposition") at 29.

[8] Deposition of Denise Martin, December 15, 2017, ("Martin Martinelli Deposition"), at 227.



himself and agrees that conjoint is a "standard and accepted technique in marketing research" and is "commonly utilized" to analyze the component features that make up a product.[9]

9.   Instead, Martin and Reibstein quibble about the implementation or validation of these methods. In many instances, their criticisms are speculative at best.  What little empirical work that was done by Martin and Reibstein is of little probative value.

10.   Not one of three experts proffered by Defendants can know with any certainty whether the results of the Dennis Conjoint Survey are accurate, because none of those experts calculated the price premium solely attributable to the "No Trans Fat" Claim on Benecol:

- Scott:      "I did not determine if there is a price premium and did not calculate any value if there is one."[10]

- Martin:    "I haven't done a fulsome analysis of price premium here."[11]

- Reibstein:  "Q.   Did you do anything as part of your work in this case to try to calculate whether there was a price premium solely attributable to the no trans fat claim?      A.   I did not."[12]

## IV.  RESPONSE TO MARTIN AND REIBSTEIN

**Summary**

11.   In their respective testimony, both Martin and Reibstein assert -- falsely -- that a conjoint survey cannot be used to estimate a marketplace outcome.[13]  Martin also asserts --

---

[9] Deposition of David Reibstein, October 25, 2018, ("Reibstein Deposition") at 84-85.

[10] Scott Deposition, at 27.

[11] Deposition of Denise Martin, November 8, 2018, ("Martin Deposition"), at 52.

[12] Reibstein Deposition, at 21.

[13] *See, e.g.,* Martin Declaration, at paras 20-29; Reibstein Declaration, at para 44.



falsely -- that "observed market price data" contradicts the price premium attributable to the "No Trans Fats" and "No Trans Fatty Acid" Claims determined by Dr. Dennis using conjoint analysis.[14] In reality, the market data Martin cites demonstrates no such thing. Martin and Reibstein's opinions about conjoint are baseless, and Martin's "analysis" of market data is rife with error:

- Martin and Reibstein incorrectly assert that conjoint studies can only determine "Willingness to Pay";

- Martin and Reibstein incorrectly assert that "Willingness to Pay" cannot be used to determine a marketplace outcome;

- Martin's market price "analysis" fails to include data on marketplace forces such as competition from Benecol substitutes, the actions of others (including pricing, product development, packaging), promotional activity, and all marketing activity generally;

- Despite cherry picking so-called "facts" and market data for her "analysis," Martin in fact demonstrates ██████████████████████████ ████████████████████████████;

- Martin's market price "analysis" fails to take into account the fact ████████████ ████████████████████████████████ ████████████████████████████;

- Martin's "analysis" spans a gap in the available data, which she admits is problematic to know whether the observed prices reflect the price premium.

12. For these reasons and more, as I discuss in greater detail below, neither Martin's nor Reibstein's assertions deserve any weight.

---

[14] Dennis Report, at 49-50.



**Conjoint analysis is used regularly to estimate marketplace outcomes**

13.   Martin and Reibstein assert that conjoint analysis cannot be used to determine a marketplace outcome.[15]   Martin and Reibstein are wrong.   Conjoint analysis is used to estimate marketplace outcomes, including the calculation of market price premiums attributable to specific product attributes.

14.   Conjoint analysis has long been used to study marketplace outcomes:

> The market simulator is usually considered the most important tool resulting from a conjoint analysis project.  The simulator is used to convert raw conjoint (part-worth utility) data into something much more managerially useful: ***simulated market choices***.  A market simulator lets an analyst or manager conduct what-if games to investigate issues such as new product design, product positioning, and ***pricing strategy***.  [...] For example, the objective may be to ***determine how much more may be charged for a product*** or service by offering a new feature without any net loss in the marketplace.[16]

15.   Numerous courts have recognized the ability of conjoint analysis to determine a market price premium.[17]

16.   During her deposition, Martin also acknowledged that conjoint analysis has regularly been used in litigation contexts to calculate Class-wide damages.

---

[15] Martin Declaration, at paras 22-23; Reibstein Declaration, at para 73.

[16] *Getting Started with Conjoint, Strategies for Product Design and Pricing Research*, Bryan K. Orme, (2014) ("Getting Started with Conjoint") at 91-93 [emphasis supplied].

[17] *Applying Conjoint Analysis to Legal Disputes: A Case Study*, Wind, Yoram, *et al.*; *See, e.g., Khoday v. Symantec Corp.*, 2014 WL 1281600, at *10 (D. Minn. March 13, 2014); *Sanchez-Knutson v. Ford Motor Company*, 310 F.R.D. 529, 538-39 (S.D. Fl. 2015); *In re: Lenovo Adware Litigation*, 2016 WL 6277245, at *21 (N.D. Cal. Oct. 27, 2016); *Guido v. L'Oreal, USA, Inc.*, 2014 WL 6603730, at *5, *10-*14 (C.D. Cal. July 24, 2014); *Brown v. Hain Celestial Group, Inc.*, 2014 WL 6483216, at *19 (N.D. Cal. Nov. 18, 2014);  *Microsoft v. Motorola, Inc.*, 904 F.Supp.2d 1109, 1119-20 (W.D. Wa. 2012); *In re Scotts EZ Seed Litig.*, 304 F.R.D. 397, 413-15 (S.D.N.Y. 2015); *Dzielak v. Maytag*, 2017 WL 1034197, at *6 (D. NJ. March 17, 2017); *TV Interactive Data Corp. v. Sony Corp.*, 929 F. Supp. 2d 1006, 1022 & n.6 (N.D. Cal. 2013); *Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121 (9th Cir. 2017); *In re Arris Cable Modem Consumer Litig.*, 2018 WL 3820619, at *25-*31 (N.D. Cal. Aug. 10, 2018); *Hadley v. Kellogg Sales Co.*, 2018 WL 3954587, at *11-*16 (N.D. Cal. Aug. 17, 2018).



Q. What kind of methods have you seen used to determine class wide damages for consumer products sold at retail?

A. I've seen several methods in the course of my career, proposed by plaintiff's experts as capable of measuring class wide damages. Those include conjoint surveys here.[18]

17. Additionally, although Martin has never actually conducted a conjoint analysis herself,[19] it appears that other members of her firm regularly employ conjoint in litigation contexts.

Q. Does NERA perform conjoint surveys on behalf of its clients?

A. Yes. I know we have.

Q. For what purposes have you performed such conjoints?

A. Again, I personally have not.

Q. Well, has NERA performed such conjoint?

A. For example, I know colleagues of mine have conducted materiality surveys in the conjoint space to understand whether a difference in a product pass value to consumers.

Q. And are those differences referring to labeling differences or?

---

[18] Martin Martinelli Deposition, at 20-21. [objections omitted for brevity]

[19] Q. When was the last time you designed a conjoint survey?

A. I have never personally designed a conjoint survey.

Q. When was the last time you conducted a conjoint survey?

A. Again, I have never personally conducted a conjoint survey. The design and implementation of those surveys is a separate science, and not one that I'm expert in. I'm expert in the sort of theory behind conjoint analysis and its application here, or attempted application here, to estimate an alleged price premium.

[Martin Martinelli Deposition, at 108-109.]


ECONOMICS AND
TECHNOLOGY, INC.

A.  Truth is, I don't really know.  I think they may well have done them in the
labeling context. It's also sometimes literally product attributes, trademark
infringement and whether consumers are confused about this product looking
like that product, for example.  I know we've done conjoint surveys and in that
context.  I'm sure there are other contexts.[20]

18.    The Dennis Survey can and does incorporate sufficient marketplace data (e.g.,
marketplace price points, alternative products) to allow for an estimation of a marketplace
outcome: namely the price premium arising from Defendants' use of the challenged Claims on its
Products.  I discuss the incorporation of such supply side factors in greater detail below.

**The Dennis Survey does not calculate "Willingness to Pay"**

19.    Martin and Reibstein assert that conjoint analysis can only calculate "Willingness to
Pay" and cannot estimate a marketplace outcome.[21]  They assert that "Willingness to Pay" cannot
be used to determine a price premium.  Martin and Reibstein are wrong.

20.    I define "Willingness to Pay" as the maximum amount someone would pay for a
particular product or feature.

21.    While conjoint analysis can be used in certain circumstances to calculate
"Willingness to Pay," that is not the only output of conjoint analysis.  Bryan Orme describes the
difference between "Willingness to Pay" and market-based outcomes using the story of Gilligan's
Island.[22]

22.    In the television series "Gilligan's Island" the cast of characters become stranded on
a remote island and all attempts at rescue or escape are thwarted by the show's namesake,
Gilligan.  Two of the other characters are Mr. and Mrs. Howell, an extremely wealthy couple.  If
one were to ask Mr. and Mrs. Howell what their TOTAL willingness to pay to gain safe passage

---

[20] Martin Martinelli Deposition, at 227.

[21] Martin Declaration, at para 23; Reibstein Report, at para 73.

[22] Getting Started with Conjoint, at 90-91.



off the island and back to civilization, they might offer millions of dollars for a chance to get home. However, if a boat operator arrived and offered the Howells a ride home for $1,000 (i.e., the actual market price), they would only pay the thousand dollars -- not millions -- to get home. This exercise demonstrates, that by using actual or approximate marketplace data in a survey, one can gain an understanding of the marketplace premium (the $1,000) rather than the TOTAL willingness to pay (the millions), which was not tethered to any approximate understanding of what the market price actually was.

23. When a conjoint survey contains information about market prices, or proxies therefore, the survey can calculate a marketplace outcome (e.g., the Howell's will purchase the boat ride for $5,000) rather than "Willingness to Pay" (e.g., the Howell's would pay untold millions to get off of the island).

24. The conjoint survey performed by Dr. Dennis includes the relevant market data necessary to calculate a marketplace price premium. As stated in my first declaration and during deposition, Dr. Dennis and I made sure to include market-based price points and alternative product selections to simulate a marketplace outcome for the Benecol Products.[23]

25. Martin and Reibstein are simply wrong to assert that the Dennis survey determines the maximum amount that an individual is "willing to pay."

**Even if the Dennis survey did calculate "Willingness to Pay" that data could still be used to determine damages in this litigation**

26. Martin actually admits that Dennis does not calculate the total willingness to pay, but rather the willingness to pay of one individual.[24] While Martin describes this as the "median" consumer, the more appropriate term of art would be the "marginal" consumer. It is commonly

---

[23] Weir Declaration, at para 36.

[24] Martin Declaration, at para 33.



understood in the economics profession that the market price is equivalent to the willingness to pay of the marginal consumer-- the consumer who switches their decision to purchase at the prevailing market price.

27.   A recent court order certified a class based upon a price premium damages theory and a conjoint methodology utilizing calculations of "Willingness to Pay" to measure the market price premium.  The order summarizes the defendant's position (which parallels Defendants' and their experts' position in this litigation) and dismisses those arguments while explaining how "Willingness to Pay" can be used to determine a market price premium:

> Dial argues that Boedeker's model does not actually measure a market-determined price premium. The price of a product in a competitive market, Dial says, is determined by the intersection of market demand and market supply for a particular transaction at a particular time. Boedeker's model, however, measures only a difference in consumer "willingness to pay" for the challenged attribute, failing to take into consideration any market conditions or other factors that would affect the supply side curve and so influence product price in the market. [...]

> Dial's experts' criticism of Boedeker's model perhaps rests on a misunderstanding of what it purports to do. The model does not, as Dial contends, seek to determine an "average" or a "median" expression of consumer "willingness to pay" for the Dial Complete product without the claimed feature, unconnected to supply side market forces. Rather, Boedeker's model purports to calculate the "Marginal Consumer's Willingness to Pay" for that product in the actual market in which the products with the allegedly false claims were sold. The distinction is important, for, as explained in a brief paper co-authored by Lisa Cameron, Michael Craig, and Nobel Laureate in Economics Daniel McFadden:

> *Defendants have argued that WTP ["willingness to pay"] results emerging from the conjoint analysis do not directly address the value of the patents in question. However it is important to note that different research questions require different information about WTP. For example, if the researcher seeks qualitative information about how much consumers value the infringing level(s) of the attribute at issue, he can develop a conjoint survey that provides that average or median consumer WTP . . . .*



ECONOMICS AND
TECHNOLOGY, INC.

> *On the other hand, if the researcher wants to assess the price premium associated with the infringing feature, then he will need to develop a conjoint survey that assesses the WTP of the marginal consumer - i.e. the consumer who is indifferent between buying and not buying the infringing product. It is the WTP of the marginal consumer that is equivalent to the price premium associated with the infringing level of the attribute; this marginal consumer can be identified by offering respondents a "no buy" option. (Lisa Cameron, Michael Cragg, & Daniel McFadden, "The Role of Conjoint Surveys in Reasonable Royalty Cases," LAW360 (Oct. 16, 2013), http://www.law360.com/articles/475390/the-role-of- conjoint-surveys-in-reasonable-royalty-cases) (last visited Mar. 24, 2017) (emphasis supplied).*

> In the example given, it was appropriate for the authors to directly equate the marginal consumer's "willingness to pay" with the price premium associated with a patented feature of a product, because in such cases it is the value added to the product that is of interest. In this case, however, another step is required to determine a price premium associated with the misrepresented product feature. ***The marginal consumer's willingness to pay for the product without the feature is equivalent to the market price of that product in the actual market into which the set quantity of offending products was sold***, which price must then be subtracted from the market price actually paid for the product with the claimed feature. That calculation will yield the price premium associated with the "Kills 99.99% of Germs" claim.[25]

28.   As is made plain by the *In re: Dial* order, that output can still be used to determine the market price premium for the challenged Claims.  Dennis does offer consumers a "no buy" option in his survey, and as such, can identify the marginal consumer -- and the price premium solely attributeable to the "No Trans Fat" Claim -- in the market simulator.

**Martin acknowledges the impacts of product differentiation**

29.   As I noted in the Weir Declaration, in economics, the concept of product differentiation can be summarized as the introduction of product attributes that allows the

---

[25] *In re: Dial Complete Marketing and Sales Practices Litigation*, MDL Case No. 11-md-2263-SM, Opinion No. 2017 DNH 051 [emphasis supplied].


ECONOMICS AND
TECHNOLOGY, INC.

consumer to differentiate between otherwise similar products, with the goal of increasing sales and profits.[26]

30.  Martin agrees.  At deposition, Martin testified that firms engage in product differentiation in order to increase sales of their products.

> Q.  Do manufacturers differentiate their products in order to increase their bottom line?
>
> A.  Yes, I believe that can be a goal of product differentiation.[27]
>
> * * * * * * * * * *
>
> Q.  One of the ways that can happen is to increase the sales volume, right?
>
> A.  If they have successfully differentiated their product in a way that increases demand, then yes, that would increase sales volume.[28]

31.  Martin also admitted that product differentiation can result in manufacturers charging higher prices than competitors as a result of the differentiation.

> Q.  Can differentiation lead to higher prices?
>
> A.  Again, we have to be careful what you mean by differentiation, but yes, in certain circumstances a differentiator that is important to consumers, that consumer's value, can mean that the product with that differentiator commands a higher price.[29]
>
> * * * * * * * * * *
>
> Q.  Manufacturers may differentiate a product in order to not only sell more of that product, but also to sell more at a higher price. Is that possible?

---

[26] Case, Fair & Oster, Principles of Microeconomics, 9th Edition, 2009, at 305-316, 449.

[27] Martin Martinelli Deposition, at 42-43. [objections omitted for brevity]

[28] Martin Martinelli Deposition, at 43. [objections omitted for brevity]

[29] Martin Martinelli Deposition, at 43. [objections omitted for brevity]



ECONOMICS AND
TECHNOLOGY, INC.

A. Sure, that could be a goal. I think all manufacturers generally like to sell more at a higher price. That's another of those fundamental tenants of economics.[30]

32. Riebstein agrees.

Q. In your experience, as an expert in marketing, why do manufactures include product claims on their product packaging?

A. I would think that for some people some of that information might be important to them.[31]

33. Defendants appear to understand the concept of product differentiation. Laura Zeno, Marketing Manager for Johnson & Johnson, testified that her definition of a differentiated product (as a professional and academic in marketing) is "it's the sum of many parts, brand equity the product delivers, packaging, advertising."[32]

34. While Martin acknowledges that product differentiation can raise the price of a product, during her deposition Martin testified that she does not believe Benecol differentiated the Products on the basis of the "No Trans Fats" and "No Trans Fatty Acid" Claims:

Q. You would agree that one way for a manufacturer to differentiate its product is to label it with a "No Trans Fat" claim correct?

A. No.

Q. Why do you say no?

A. Well, obviously I couldn't answer that question in general. I am of the opinion here that the Benecol product was not being differentiated on the basis of a "No Trans Fat label" on its products.

---

[30] Martin Martinelli Deposition, at 43-44. [objections omitted for brevity]

[31] Reibstein Deposition, at 22.

[32] Deposition of Laura Zeno, May 24, 2017, at 6, 229.



> Q. Can a manufacturer differentiate its product from competitors by using a claim that is not used on the competitor products?
>
> A. I can't give a general answer to that question either. You really have to look at the particular claim, the particular market, the particular company in order to reach a conclusion about that.
>
> Q. Would one way to differentiate a product be to sell a product labeled as being No Trans Fat when many competitors do not make that claim?
>
> A. It's certainly not the case here. I don't know whether it could be the case in another market. I'd have to look at the circumstances in that market and for those products.[33]

35. While Martin appears to have concluded that Benecol is not differentiated on the basis of the Claims at issue in this case, she does not appear to have conducted any independent research to determine whether consumers viewed Benecol as differentiated with respect to the "No Trans Fats" and "No Trans Fatty Acid" Claims.

> Q. Now, in connection with this case you did not endeavor to research personally how consumers understand the "No Trans Fat" claim at any time; is that right?
>
> A. I didn't conduct independent research.[34]

Nor has Martin conducted any independent empirical research to measure the price premium attributable to the Claims.[35]

> Q. Did you attempt to conduct a conjoint analysis to study whether the price of Benecol would be higher with the No Trans Fat claim that without that claim, holding all other product claims equal?

---

[33] Martin Martinelli Deposition, at 44-45.

[34] Martin Martinelli Deposition, at 63. [objections omitted for brevity]

[35] As I discuss later, during her Martinelli deposition, Martin admitted that her before and after price comparison cannot be used to determine the price premium attributable to the Claims.



ECONOMICS AND
TECHNOLOGY, INC.

A. It would be wrong intellectually to engage in that exercise. It's not the right tool, the wrong tool for the question. I have not, I would not. We have a variety of critics of Dr. Dennis' proposal and Mr. Weir's proposal that rely on that technique.[36]

\* \* \* \* \* \* \* \* \* \*

Q. That's also what I'm asking you. I'm just simply asking apart from criticizing Dr. Dennis and apart from your independent analysis of the record information in this case, did you perform any independent research to determine if consumers would not have purchased the Benecol spreads if the No Trans Fat claim had not been made holding all else equal? Did you perform any research on that point?

A. In addition to the research that I've already described, no. [37]

36. Martin's position that Benecol is not differentiated based upon the No Trans Fat claim is unsubstantiated and defies common sense, at least in the marketing profession. The No Trans Fat Claim appears on Benecol five times, in bold, all capitals: **NO TRANS FAT.** On a product designed to lower cholesterol, the complete absence of a type of fat that *increases* cholesterol would clearly be a differentiating element of Benecol.

37. It is also literally true that the Claim differentiated Benecol from its competitors. As Martin acknowledged, Benecol's primary competitors did not use the no trans fat claim during the class period.

I believe the two primary products that McNeil considered to be Benecol's competitors were the ███████████████████████████. And I don't believe during the class period either of those had no trans fat on the label.[38]

38. However, Defendants' expert Reibstein was more reasonable Martin.

---

[36] Martin Martinelli Deposition, at 103.

[37] Martin Martinelli Deposition, at 115-116.

[38] Martin Deposition, at 86.


ECONOMICS AND
TECHNOLOGY, INC.

> Q. Okay. Again, in the context where the no trans fat claim appears five separate times on each package of the Benecol Spreads, in that context, do you agree that someone at the defendant's believe there was value to putting that claim on the label for consumers to see?
>
> A. So I would think that somebody might of thought, somebody at the Defendants might have thought, that some people might find that of some value.[39]

39. Given that Martin acknowledges that product differentiation has the potential to raise the price of a product it is surprising that she concludes Benecol is not differentiated on the basis of the "No Trans Fats" and "No Trans Fatty Acid" Claims, since she has undertaken no independent research to support her conclusion. It is also surprising since Martin herself has conducted an analysis that shows that both price and volume decreased following the removal of the Claim that she alleges has no differentiating impact on sales of Benecol.

**The damages analysis takes into account myriad supply side factors**

40. Martin and Reibstein assert that Dennis and I have failed to properly control for supply side factors in our analyses. They are wrong.

41. As I discussed in the Weir Declaration, Dennis considered and accounted for supply side factors in the determination of his price premium calculation.[40] The Dennis survey includes market-based price points.[41] Dennis also considered information from Benecol marketing materials, as well as from exploratory interviews with purchasers of the Products when selecting the other attributes and levels for inclusion in the conjoint.[42] Dennis has also taken into account the fact that the quantity supplied of the Products is a known fact, and is fixed as a matter of

---

[39] Reibstein Deposition, at 25.

[40] Weir Declaration, at para 30-40.

[41] Weir Declaration, at para 36.

[42] Dennis Report, at para 47.



history.[43]  In addition to these factors that influenced the Dennis survey design, after the
completion of the survey, the results were calculated using Hierarchical Bayes regression.[44]  As
discussed in the Weir Declaration, the use of Hierarchical Bayes regression provides for,
amongst other factors, the ability to estimate better market-level results from a conjoint survey.[45]

42.  I have also considered supply side factors in my determination of damages.  First,
unlike in a Lanham Act or intellectual property litigation where a but-for quantity of sales may
need to be determined, in this litigation, the historic number of units sold is a fact (as I have
discussed above) and in this litigation, it would be antithetical to the concept of class definition
to suggest that the quantity supplied be anything other than the actual number of units sold.

43.  Furthermore, as is born out in the Dennis study, if one were to assume, *arguendo,*
that Defendants would not have lowered the price in concert with demand (indicating that
Defendants priced above the market clearing price), then the economic outcome would be that
many or all of the purchases would not have occurred.  As such, the price premiums found by
Dennis are inherently conservative measures.

44.  It is also an economic perversion for a defendant engaged in a litigation (with
obvious conflict of interest) to simply state that it would never have adjusted its prices or would
not have adjusted them enough so as to meet demand, and therefore damages should be set at
zero or something less than actual economic damages.  If this were permitted, any defendant
could simply postulate its way out of economic damages.

45.  Furthermore, it is retailers that set the price of Benecol that consumers actually pay,
not Johnson & Johnson and McNeil Nutritionals.  While Defendants set the wholesale price of
their Products, the price consumers pay is determined via the retail market.  While Defendants

---

[43] Dennis Report, at para 46.

[44] Dennis Report, at para 44.

[45] Weir Declaration, at para 41.



may argue that they would not have adjusted the price of Benecol to meet consumer demand (a doubtful claim to begin with) retailers most certainly would adjust their prices in response to changes in consumer demand. In fact, retailers are even willing to sell products at prices below marginal cost to meet consumer demand -- this occurs routinely in retail and in other industries. For example, a car dealership with a stock of vehicles, known to have a manufacturing defect, would prefer to take a loss on each vehicle by selling these vehicles to its customers below cost than to sell none at all. Grocers routinely sell damaged/dented products at below cost. Likewise retail groceries would be motivated to sell Benecol at below cost to its customers in response to consumer demand, rather than obtain no revenue at all.

46. In addition, in my calculation of damages I have considered actual market-based retail sales data, which is set in the marketplace by supply and demand. This data "bakes in" the impact of myriad supply factors as they existed throughout the class period. This data also demonstrates that retailers can and do vary the price of Benecol in response to market conditions.

47. I have also considered internal Benecol documents that show gross margins as high as ██████████████████.[46]

**Martin acknowledges that market prices *already* reflect supply factors**

48. Despite Martin's insistence that the Dennis survey does not take into consideration any supply-side factors, time and time again Martin testified that market prices, such as those incorporated into the Dennis survey, reflect <u>both demand and supply factors</u>.

> Q. To what extent are market factors reflected in the market price of a product?
>
> A. That's how market prices are determined, by the economic forces of market demand and market supply, and all the other factors that in turn are effecting those.[47]

---

[46] Deposition of William Twomey, 202:17-19; Plaintiff Deposition Exhibit #33.


ECONOMICS AND
TECHNOLOGY, INC.

Q. Is it your understanding that a market price takes into account market factors or reflects market factors?

A. Yes.

Q. And market price can reflect some supply side factors as well, right?

A. Yes.[48]

\* \* \* \* \* \* \* \* \* \*

Q. Do you see four sentences into that paragraph there's a sentence that states, Economic theory and evidence, however, are clear that market prices are determined by the interaction of both demand side and supply side factors? Do you see that?

A. Yes.

Q. Did you write that sentence?

A. Yes.

Q. Do you still agree that market prices are determined by the interaction of both demand side and supply side factors?

A. Yes. [49]

\* \* \* \* \* \* \* \* \* \*

Q. What kind of supply side factors can be, or are reflected by market price?

A. Economic theory tells us that there are many factors that influence supply, including the costs of producing the product and the marketing that's done for the product, the consumer demand for the product, the competitors that are offering competing products. There's a whole host of factors that affect the supply of a particular product and the price that a supplier would be willing to accept for that product.[50]

---

[47] Martin Martinelli Deposition, at 129. [objections omitted for brevity]

[48] Martin Martinelli Deposition, at 129.

[49] Martin Deposition, at 77.

[50] Martin Martinelli Deposition, at 129-130. [objections omitted for brevity]



\* \* \* \* \* \* \* \* \* \*

Q.   What is a supply side factor?

A.   Any factor that affects the amount of product or the price at which a company is willing to sell that product for.

Q.   So would marketing expenses be a supply side factor?

A.   Yes.

Q.   Would transportation costs to get a good to market be a supply side factor?

A.   Sure, could be.

Q.   Would costs of production be supply side factors?

A.   Yes.

Q.   How about research and development costs?

A.   Can be, yes.[51]

\* \* \* \* \* \* \* \* \* \*

Q.  How does the market price of a product account for the cost of production for that product?

A.  It's one of the factors that a manufacturer would consider in determining the price in which it was willing to sell a product. It's typically, not always the case, but typically the case that a supplier would not be willing to supply a product that it couldn't charge at least as much for in terms of price.[52]

\* \* \* \* \* \* \* \* \* \*

Q.  Do you think it's possible that McNeil would have kept the price of Benecol above the equilibrium market price due to the cost of the products ingredients?

A.  No, the equilibrium market price is the interaction of supply and demand.

---

[51] Martin Deposition, at 77-78.

[52] Martin Martinelli Deposition, at 130.



Q.  That means that to some extent the equilibrium market price reflects both supply and demand side factors?

A.  Sure.[53]

\* \* \* \* \* \* \* \* \* \*

Q.  Do you see in paragraph 20 at the bottom there's subparagraph C?  Do you see that? It says, Market prices are determined by the interaction of these demand and supply processes. Do you see that?

A.  Yes.

Q.  You're talking about actual market prices there; right?

A.  Yes.

Q.  And if we turn the page, there's paragraph 21 at the top; right?

A.  Yes.

Q.  Paragraph 21 says, Because these accepted principles of microeconomics explain that market prices are determined by the interaction of the forces of supply and demand, both supply side and demand side forces must be incorporated into any attempt to estimate a market-based price premium.  Do you see that?

A.  Yes.

Q.  What do you mean by the word "incorporated" in that sentence?

A.  Taken into account, factored in.[54]

49.  This is exactly what Dennis and I have done.  We have factored into the survey the real world market prices that already reflect all of the supply factors identified by Martin herself.

50.  Dennis did such a good job of incorporating real world market prices that he earned compliments of Defendants' expert Reibstein for so doing.

---

[53] Martin Martinelli Deposition, at 205-206. [objections omitted for brevity]

[54] Martin Deposition, at 123-124.


ECONOMICS AND
TECHNOLOGY, INC.

Q.  Okay.  And do you agree that Dr. Dennis was correct to use actual
marketplace price levels at his conjoint design?

A.  I think it is correct to use prices that consumers would face… It would
make sense and I am complimenting Dr. Dennis on using prices that are
actually prices in the market.[55]

51.  Martin and Reibstein's opinions that the Dennis conjoint survey does not take into
account supply-side factors through the inclusion of market-based price point appears to be at
odds with basic economic theory and Martin's own testimony about market supply.

**Martin proposes a model that would allow for fewer units of product to be sold than were
actually sold to the class.**

52.  Contrary to Martin's mischaracterization of my testimony on the matter of the
supply-side, at no point during this litigation have I argued that supply-side factors "need not be
taken into account."[56]  In fact, my first declaration included an extensive discussion of the
supply-side factors Dennis and I considered in our analyses.[57]  Rather than addressing the myriad
supply-side factors that Dennis and I accounted for in our analysis, Martin ignores these factors
and instead attempts to confuse the discussion of the supply-side by essentially reasserting that I
am only analyzing the demand side.[58]

53.  Martin asserts that modeling a supply of units sold to the class contradicts economic,
theory.  But it is Martin who is proposing scenarios that make little economic sense.

54.  Martin misunderstands how the market simulator can be used to incorporate supply
side information.  In my Declaration, I discussed that the supply of Benecol to the class is fixed

---

[55] Reibstein Deposition, at 68.  [objections omitted for brevity]

[56] Martin Declaration, at para 30.

[57] Weir Declaration, at para 30-40; Dennis Report, at para 46-47.

[58] Martin Declaration, at para 30.



as a matter of history. Dennis and I have used the market simulator to model a very precise set of supply consideration. The simulator models the but-for world where the supply of Benecol to the class is fixed as a matter of history. Class members **did** purchase the units of Benecol during the Class period, and I have measured the price premium that Class members paid when they **actually purchased** the Benecol during the Class period. In other words, the supply that is being modeled by Dennis and myself is that which already existed during the class period because there is no other sensible measure of the quantity supplied to the class than what the class actually purchased.

55.   Martin is proposing an analysis where a different outcome could occur. In the scenario, actual class members that purchased Benecol during the class period would in fact not make that purchase. Simulating a scenario where a consumer could undo their purchase of a unit of Benecol and purchase a competing heart healthy spread would be the economic equivalent of giving consumers a full refund. Martin agreed with this premise.

> But if some portion of it is attributable to the label, that means there would be some people -- yes, there are some people that, you know, would not have purchased absent the challenged labeling.
>
> And so no one paid a price premium, but there'd be some people who, if liability is found, would be entitled to, at most, a refund.[59]

56.   While I disagree with Martin that this alternate supply scenario is the correct one to use for calculating price premium damages (how can price premium damages to the class be measured if the quantity of sales being modeled is anything other than what the class actually purchased?) I do agree that in her supply hypothetical, those people that would have never purchased Benecol but-for Defendants' deception, would be economically entitled to a full

---

[59] Martin Deposition, at 112.

ECONOMICS AND
TECHNOLOGY, INC.

refund, and that the use of price premium damages for the entire class is therefore a conservative measure.

**The Martin market price "analysis" is fatally flawed**

57. Martin's simple "Before and After" comparison of prices is inappropriate and provides no information about the effect of removing the Claims, holding all else constant.

58. Martin erroneously asserts that a comparison of prices of Benecol before and after the Claims were removed from the Products' labels is a sufficient method by which to determine the effect of the Claim on the price of the price of the Products.[60] However, just as Courts have generally rejected the concept of determining damages by comparing two products side-by-side without controlling for other factors, it would be inappropriate to compare a product side-by-side "before and after" a change without controlling for other elements of the product or circumstances that may have changed at the same time--which Martin has failed to do here.

59. Furthermore, while Martin's "Before and After" price comparison is fatally flawed, even if one were to take her analysis at face value, the evidence she presents is consistent with a

███████████████████████████████████████████████████

███████████████████████████████████, and a methodology by which that calculation could be made.

60. Below I discuss in detail the flaws of Martin's analysis.

**Martin's pricing "analysis" omits numerous control variables essential to a "Before and After" analysis**

61. Martin asserts that the market prices of Benecol Products reflect the effects of the myriad factors outlined above (e.g., competitive pricing, the actions of others (including pricing,

---

[60] Martin Declaration, at para 42.



product development, packaging), promotional activity, and all general marketing activity). It is

exactly the interaction between this confluence of factors that renders Martin's temporal

"analysis" incapable of measuring the impact of a single factor, namely the labeling change,

without adequate controls for such factors. As Martin admitted in her Declaration: "To

██████████████████████████████████████████████████████████████████

████████████████████████████████████████████ "Plaintiff's experts would need to …

develop a model to explain the market forces that drove any actual decline."[61] Martin has

developed no such model. Instead she simply compared the average price of the Products at one

point in time to the Price of the Products at later time -- this difference in price has no causal

interpretation and cannot be attributed to any of the factors Martin cited but failed to control for,

as well as other factors she failed to consider.

62. Marin's price comparison fails to control for:

- The pricing of any other competing products in the marketplace;

- The actions of other competitors, including product development, and packaging
  changes such as other labeling changes;

- The promotional activities of Benecol;

- The promotional activities of competitors;

- The effects on price of products being put "on sale";

- The effects of advertising; and

- The effects of any and all other marketing efforts of Benecol and competitors.

63. During her deposition, Martin agreed that it would be necessary to control for time-

varying factors in order to isolate the price premium attributable to the Claim(s) using a before

and after price comparison.

---

[61] Martin Declaration, at para 43.



Q.  You just mentioned some factors that would need to be taken into consideration, can you elaborate on what kind of factors you're referring to?

A.  I think I went through this morning, I haven't been asked to do that and I haven't done that. But I think generally speaking, if you want to compare prices at two different points and time you would want to collect data and information about how other things might have been different at those two points and time.[62]

64.  Moreover, Martin also admitted that her analysis does not take into account the above factors.

Q.  Did your analysis take into account the price of competing products?

A.  No, that analysis is really just looking at the price of the Benecol products when the products had the challenged claim on the label and then when they did not.[63]

\* \* \* \* \* \* \* \* \* \*

Q.  Okay. Did your analysis take into the account the market share of competitor products?

A.  No, again the analysis that I conducted looked at the average price of the Benecol products when the challenged claim were on the label and then when they were not.[64]

65.  Martin also admits ▮▮▮▮▮▮▮▮ is not intended to be put forth as an estimate of the price premium ("I have not and would not do so").[65]

---

[62] Martin Martinelli Deposition, at 123.

[63] Martin Martinelli Deposition, at 120-121.

[64] Martin Martinelli Deposition, at 121.

[65] Martin Martinelli Declaration, at para 43.


ECONOMICS AND
TECHNOLOGY, INC.

66. In fact, during her deposition, Martin agreed that her method is incapable of determining the price premium attributable to the Claim(s) in this case. Additionally, she admitted that it is possible ███████████████████████████████████████████████████████ ███████████████████████████████████.

> Q. Do you believe before and after analysis is a reliable method to determine the price premium damages in this case?
>
> A. No. And I'm not putting it forward as a measure of the price premium damages in this case. ████████████████████████████████████ ██████████████████████████████████████████. And so, it may well be if you do a fulsome analysis of that, you conclude that the actual price impact of the labeling change was zero.
>
> Q. You may also conclude that when you account for the marketing that the impact was high, ██████████████████████████████?
>
> A. I think that's that's theoretically possible and you'd want to look to do [that] analysis.[66]

**There is insufficient market data available to "validate" the conjoint results**

67. Martin asserts that Dennis and I should have validated the conjoint results using market data. The problem with this assertion is that there is not sufficient data available in this case to estimate the price premium arising solely from the No Trans Fat claim. As above, Martin herself will not vouch for the market data as an estimate of the price premium. Moreover, Martin has testified that the requisite data is simply unavailable.

> Q. Would you have been able to determine whether there was a price premium attributable to the no trans fat claim solely from the retail sales data you reviewed for the Benecol spreads in this case?

---

[66] Martin Martinelli Deposition, at 245-246.



ECONOMICS AND
TECHNOLOGY, INC.

A.   Okay.  So if I had been asked to do this more fulsome analysis that I
referenced earlier in the deposition, I would need additional information other
than just the retail sales data that has been provided here.[67]

68.   Martin has also put forth so-called alternate methods that she asserts should be
substituted for conjoint, which she calls "RCL."[68] She wrongly asserts that I "ignored" these
approaches.  Setting aside for the moment that these types of models typically measure changes
in sales (total revenue or unit sales) and not changes in price, Martin sets forth a lengthy footnote
discussing the data requirements of these models, and noting that it is often difficult to collect
such data in practice.[69]

69.   As Martin notes, there is insufficient data to run that type of model in this case.

**Reconciling the conjoint with the available market data**

70.   Martin asserts that an economist is required to validate any economic model against
any available market data.  Martin asserts that any disparities must be explained, or the model in
question is *de facto* unreasonable.  While validation is a reasonable aspiration, one must first
consider whether the available market data is even sufficient to serve as a useful benchmark for
the model.  In this case, the market data upon which Martin relies is insufficient.

71.   If there was sufficient data to determine the actual price premium in the case, then
Martin could have very well determined the price premium from the data.  As discussed above,
Martin admits that she is unable to make such a measurement.

72.   If Martin's data is insufficient to determine the price premium, is confounded by
numerous exogenous variables, and is incomplete, how can this data serve as a benchmark for
the price premium estimate?

---

[67] Martin Deposition, at 114.

[68] Martin Declaration, at para 37.

[69] *Id.*, at footnote 28.



73.   The price of Benecol could change over a period of time for multiple reasons.  For example, the price of the Products might increase as a result of the challenged Claims, while at the same time decrease as a result of competitive pressure from other similar spreads.  The net effect of these two forces would show no net change in the shelf price for Benecol, despite the fact that the challenged Claims are indeed resulting in a price premium when all other factors are accounted for.

74.   Martin has also identified a gap in the sales data, during which she is unable to determine what effects take place, and when.[70]  ████████████████████
████████████████████████████████████████████
████████████████████████████████████████  █  ██
████████████████████████████████████████████
████████████████████████████████████████
████████████████

75.   Martin's methodology provides no ability to untangle these factors, and as such cannot provide a reliable market benchmark to be used to evaluate the conjoint results.

76.   Martin relies only on her own *ipse dixet* to suggest that the Dennis 20.8% premium is "beyond the realm."[72]  I, however, compared the conjoint results with other pieces of market data ignored by Martin.

77.   ████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████

---

[70] Martin Declaration, at para 43.

[71] Martin Deposition, 106.

[72] Martin Deposition, at 102.



██████████████████████████████████████████████████
██████████████████████████████████████████████████
██████████████████████████████████.[73]

**Even if the precise price premium is in dispute, there is little doubt that there is a price premium of some magnitude**

78.  This case involves a product that was designed to help lower consumers cholesterol and stay heart healthy, and was labeled as having no trans fat.  In fact, the product does contain trans fat, a substance known to increase cholesterol and cause heart disease.  Just like the widget maker that promises five widgets and only delivers four is plainly deficient and not fulfilling its promise, Benecol entered the market for heart-healthy, cholesterol-lowering spreads and promised no trans fat, and failed to deliver on its promise, instead delivering cholesterol-increasing trans fat.

79.  Martin agrees that the available data does not allow you to rule out the possibility of a price premium of some magnitude.

> Q.  Other than the calculation that Mr. Weir performed of the price premium solely attributed to the no trans fat claim, have you seen any other evidence of price premium calculations in this case concerning the no trans fat claim?
>
> A.  … So, again, all these things together, while I haven't done a fulsome analysis of price premium here, says you can rule out what Mr. Weir did *and everything else points to, you know, a de minimis -- a de minimis price premium*.[74]

80.  On this limited piece of common ground, I agree with Martin.

---

[73] Deposition of William Twomey, 202:17-19; Plaintiff Deposition Exhibit #33.

[74] Martin Deposition, at 52.



## V.  RESPONSE TO SCOTT

81.  Scott performs two surveys.  In the first survey, Scott attempts to measure "purchase intention" using a treatment and control design.  In the second survey, Scott attempts to measure consumer perception about Benecol, including reasons for purchase and experience with the brand.

**Scott's purchase intention survey omits a major driver of purchase: Price**

82.  In any marketing class, students are typically taught the "marketing mix" which is also sometimes called the "5 Ps of Marketing".  The Marketing Mix refers to the various categories that go into the typical marketing strategy: Product, Price, Place, People, and Promotion.  Price is important to marketers/retailers because it is the only part of the mix that impacts revenues and because failure to correctly price the product can drastically impact sales of the product (pricing too high) or leaving money on the table (pricing too low.)

83.  But the pricing of the Benecol products is conspicuously absent from Scott's survey on purchase intention.

> Q.  All right.  Did your survey inform respondents of the retail price of Benecol?
>
> A.  No. [75]

84.  ███████████████████████████████████████████████

████████████████████████████████." [76]  Even Scott's own research identifies price as the most frequently mentioned least-liked feature of Benecol.

---

[75] Scott Deposition, at 106.

[76] *See., e.g.,* MCNEIL0001571; Exhibit 27 to Deposition of Laura Zeno.



85. Scott tries to argue that in her survey design, price would have been equivalent in all of the scenarios, and therefore does not need to be included.[77] But this is the exact source of the problem. In Scott's survey, people are selecting Benecol products without any reference to price, so it is not clear that respondents would have in mind the same price points, or would even be considering price at all. If consumers were told that the Benecol products all cost $5.00, the treatment group that did not see the No Trans Fat claim may very well have been more sensitive to that claim then if the product is perceived as being essential free.

**Scott's purchase intention survey suffers from a flawed sample**

86. Scott claims that her purchase intention survey results are relevant to the class. But the results suggest otherwise. If the results of Scott's survey were typical of the class--who were by definition purchasers of Benecol, and loyal buyers at that[78]--then one would logically expect that the majority of the control group would indicate that they were likely to purchase Benecol.

87. Instead, nearly *two-thirds* of respondents did not indicate a likelihood of purchase.[79] This strongly suggests that Scott's sample is not representative of the class, and is thus not probative of the impact of the No Trans Fat Claim on the purchase intentions of the class.

**Scott's perception survey confirms the relative importance of the No Trans Fat Claim**

88. Scott attempts to describe her Perception survey as confirming that the issue of Trans Fats is of no importance to typical Benecol consumers. But reaching that conclusion requires some sleight of hand.

---

[77] Scott Deposition, at 123.

[78] "They're very, again, loyal to the product." Martin Deposition, at 83.

[79] Scott Declaration, at Exhibit 9-2.

89.   Scott's survey begins with "open ended" questions, and finds that top of mind in consumers are issues such as Benecol being generally healthier, lowering cholesterol, and being heart healthy.  Scott describes this result as being a confirmation that few people care about trans fats.  Open ended questions are notorious for not eliciting all of a consumer's thoughts on a typical issue, or the full detail of their thoughts.  As Plaintiffs allege, trans fats are inherently linked with health, cholesterol, and cardiovascular health.  Trans fats are less healthy, increase cholesterol, and are bad for heart health.  In other words, consumer's could very well express an affinity for the No Trans Fat claim by referring to these general categories.

90.   Scott's perception survey then offers "closed ended" questions that provide consumers with potential responses.  In this section of the survey, Scott discovers, but gives little weight, to the fact that consumers rank No Trans Fats as the second most important reason why consumers might purchase Benecol.  Fully 82.5% of the sample indicated a high level of importance (top two box) of No Trans Fat.  In contrast, only 0.7% indicated that No Trans Fat was not important at all.

91.   A more restrictive closed-ended question that does not let the respondent select all of the reasons that Benecol is important (and instructs consumers that these need not be selected in any particular order) finds that Heart Health, Cholesterol Reduction, and No Trans Fats are the first, second, and fifth most important purchase factors.  No Trans Fat was found here to be twice as important as "Plant Stanol Esters" which Martin has indicated was sufficiently important to be a product differentiator for Benecol.

## VI.  RESERVATION OF RIGHTS

92.   My testimony is based upon the information and data presently available to me. Additional, different and/or updated data including market research data may be obtained in advance of trial.  I therefore reserve the right to amend or modify my testimony.



## VERIFICATION

I declare under penalty of perjury that the foregoing is true and correct to the best of my

knowledge, information, and belief, and that this declaration was executed at Boston,

Massachusetts, this 16th day of November, 2018.

Colin B. Weir

ECONOMICS AND
TECHNOLOGY, INC.

**Exhibit 1**

**Statement of Qualifications**
**of**

**COLIN B. WEIR**

**Statement of Qualifications**

**COLIN B. WEIR**

Colin B. Weir is Vice President at Economics and Technology, Inc. Mr. Weir conducts economic, statistical, and regulatory research and analysis, and testifies as an expert witness. Mr. Weir's work involves econometric and statistical analysis, multiple regression, surveys, statistical sampling, micro- and macroeconomic modeling, accounting and other economic analysis. Such analysis often involves analysis of databases, call detail records, and other voluminous business records. Mr. Weir is familiar with common statistical and econometric software packages such as STATA and Sawtooth Software. Mr. Weir assists with analysis of economic, statistical and other evidence; and preparation for depositions, trial and oral examinations. Mr. Weir has provided expert testimony before federal and state courts, the FCC, and state regulatory commissions, and has contributed research and analysis to numerous ETI publications and testimony at the state, federal, and international levels. Prior to joining ETI, Mr. Weir worked at Stop and Shop Supermarkets as a cash department head, grocery/receiving clerk, and price-file maintenance head.

Mr. Weir's experience includes work on a variety of issues, including: economic harm and damage calculation; liquidated damages provisions; lost profits; false claims; diminution in value; merger/antitrust analysis; Early Termination Fees (ETFs); Late Fees; determination of Federal Excise Tax burden; and development of macroeconomic analyses quantifying the economic impact of corporate actions upon the US economy and job markets.

Mr. Weir has conducted research and analysis in numerous litigation and regulatory matters on behalf of corporate, government and individual clients, including AT&T, MTS Allstream (Canada), The US Department of Justice, Office of the Attorney General of Illinois, Pennsylvania Department of Revenue, Thomas v. Global Vision, (class action litigation, Superior Court, County of Alameda), Ayyad v. Sprint (class action litigation, Superior Court, County of Alameda), Forcellati v. Hylands (class action, U.S. District Court, Central District of California), and Ebin v. Kangadis Foods (class action, U.S. District Court, Southern District of New York).

Mr. Weir holds an MBA with honors from Northeastern University. He also holds a Bachelor of Arts degree *cum laude* in Business Economics from The College of Wooster.

Mr. Weir is a member of the Boston Economic Club, a business member of the Boston Bar Association, serves on the Board of Trustees of the Waring School, and serves as the comptroller for the Sybaris Investment Partnership.

ECONOMICS AND
TECHNOLOGY, INC.

**Publications and Testimony of Colin B. Weir**

Mr. Weir has co-authored the following:

*Interoperability and Spectrum Efficiency: Achieving a Competitive Outcome in the US Wireless Market* (with Lee L. Selwyn) Economics and Technology, Inc., prepared on behalf of United States Cellular Corporation, July 2012.

*The Price Cap LECs' "Broadband Connectivity Plan": Protecting Their Past, Hijacking the Nation's Future* (with Lee L. Selwyn and Helen E. Golding) Economics and Technology, Inc., prepared on behalf of United States Cellular Corporation, September 2011.

*Regulation, Investment and Jobs: How Regulation of Wholesale Markets Can Stimulate Private Sector Broadband Investment and Create Jobs* (with Lee L. Selwyn, Susan M. Gately, and Helen E. Golding) Economics and Technology, Inc., prepared on behalf of Cbeyond, Inc., Covad Communications Company, Integra Telecom, Inc., PAETEC Holding Corp, and tw telecom inc., February 2010.

*Revisiting Us Broadband Policy: How Re-regulation of Wholesale Services Will Encourage Investment and Stimulate Competition and Innovation in Enterprise Broadband Markets*, (with Lee L. Selwyn, Susan M. Gately, and Helen E. Golding) Economics and Technology, Inc., prepared on behalf of MTS Allstream, February 2010.

*Longstanding Regulatory Tools Confirm BOC Market Power: A Defense of ARMIS* (with Lee L. Selwyn, Susan M. Gately, and Helen E. Golding) Economics and Technology, Inc., prepared on behalf of the AdHoc Telecommunications Users Committee, January 2010.

*Choosing Broadband Competition over Unconstrained Incumbent Market Power: A Response to Bell and TELUS* (with Lee L. Selwyn, Susan M. Gately, and Helen E. Golding) Economics and Technology, Inc., prepared on behalf of MTS Allstream, April 2009.

*The Role of Regulation in a Competitive Telecom Environment: How Smart Regulation of Essential Wholesale Facilities Stimulates Investment and Promotes Competition* (with Lee L. Selwyn, Susan M. Gately, and Helen E. Golding) Economics and Technology, Inc., prepared on behalf of MTS Allstream, March 2009.

*Special Access Overpricing and the US Economy: How Unchecked RBOC Market Power is Costing US Jobs and Impairing US Competitiveness* (with Lee L. Selwyn, Susan M. Gately, and Helen E. Golding) Economics and Technology, Inc., prepared on behalf of the AdHoc Telecommunications Users Committee, August 2007.

*The AWS Spectrum Auction: A One-Time Opportunity to Introduce Real Competition for Wireless Services in Canada* (with Lee L. Selwyn and Helen E. Golding) Economics and Technology, Inc., prepared on behalf of MTS Allstream, June 2007.

*Comparison of Wireless Service Price Levels in the US and Canada* (with Lee L. Selwyn) Economics and Technology, Inc., prepared on behalf of MTS Allstream, May 2007.



*Hold the Phone! Debunking the Myth of Intermodal Alternatives for Business Telecom Users In New York* (with Susan M. Gately and Lee L. Selwyn) Economics and Technology, Inc., prepared for the UNE-L CLEC Coalition, August 2005.


Mr. Weir has submitted the following testimony:

**United States District Court, Central District of California,** *Kaylee Browning and Sarah Basile, on behalf of themselves and all others similarly situated, v. Unilever United States Inc.*, Case No. 8:16-cv-02210, on behalf of Bursor & Fisher, P.A., Declaration submitted on October 22, 2018; Deposition on November 1, 2018.

**United States District Court, Southern District of New York,** *Lori Canale, individually, and on behalf of all others similarly situated, v. Colgate-Palmolive Co.,* Case No. 7:16-CV-03308-CS, on behalf of Bursor & Fisher, P.A., Declaration submitted on September 19, 2018.

**Superior Court for the State of California, In and for the County of San Francisco,** *Michelle Gyorke-Takatri and Katie Silver on behalf of themselves and all others similarly situated,v.Nestlé USA, Inc. and Gerber Products Company,* Case No. CGC 15-546850, on behalf of Stanley Law Group, Declaration submitted on September 7, 2018.

**United States District Court, Northern District of Illinois, Eastern Division,** *Ryan Porter and Haarin Kwon, individually and on behalf of all others similarly situated, NBTY, Inc., United States Nutrition Inc., Healthwatchers (DE), Inc., and MET-RX Nutrition, Inc.*, Case No. 15-cv-11459, on behalf of Bursor & Fisher, P.A., Declaration submitted on August 15, 2018; Deposition on October 12, 2018.

**Superior Court of the State of California, For The County of San Francisco,** *Deanna Gastelum and Heather Bryden individually and on behalf of all other persons similarly situated, v. Frontier California Inc.*, Case No. CGC-11-511467, on behalf of Bramson, Plutzik, Mahler and Birkhaeuser; Declaration submitted on July 31, 2018, Declaration submitted August 13, 2018.

**United States District Court, For the Southern District of New York,** *Suzanna Bowling, individually and on behalf of all others similarly situated, v. Johnson & Johnson and McNeil Nutritionals, LLC*, Case No. 1:17-cv-03982-AJN, on behalf of Bursor & Fisher, P.A., Declaration submitted on July 30, 2018, Deposition on September 6, 2018.

**United States District Court, Southern District of New York,** *Anne De Lacour, Andrea Wright, and Loree Moran individually and on behalf of all others similarly situated, v. Colgate-Palmolive Co., and Tom's of Maine Inc.*, Case No. 1:16-cv-08364-RA, on behalf of Bursor & Fisher, P.A., Declaration submitted on June 15, 2018; Deposition on August 28, 2018.



**United States District Court, Northern District of California, San Francisco Division,** *In re: Chrysler-Dodge-Jeep EcoDiesel® Marketing, Sales Practices, and Products Liability Litigation Dorun Bali, et al., v. Fiat Chrysler Automobiles N.V., FCA US LLC, Sergio Marchionne, VM Motori S.p.A., VM North America, Inc., Robert Bosch GmbH, Robert Bosch LLC, and Volkmar Denner*, Case No. MDL 2777-EMC, on behalf of Lieff Cabraser Heimann & Bernstein, Declaration submitted on June 6, 2018, Deposition on July 18, 2018, Reply Declaration submitted on September 4, 2018.

**United States District Court, Northern District of California,** *Stephen Hadley, on behalf of himself, all others similarly situated, and the general public, v. Kellogg Sales Company*, Case No. 5:16-cv-04955-LHK-HRL, on behalf of Law Offices of Jack Fitzgerald, PC, Declaration submitted April 30, 2018, Deposition on May 31, 2018; Reply Declaration submitted June 25, 2018; Declaration submitted on September 20, 2018; Deposition on September 28, 2018.

**United States District Court, Northern District of Illinois, Eastern Division,** *Teresa Elward, Dennis Keesler, Leasa Brittenham, Kathy Beck and Nathaniel Beck, Angelia East, Sarah LaVergne, Tony And Lauren Fitzgerald, Gregory Gray, Bethany Williams, John McLaughlin, Stacy Cisco, and William Ferguson and Cheryl Ferguson, individually and on behalf of all others similarly situated, v. Electrolux Home Products, Inc.*, Case No. 1:15-cv-09882-JZL, on behalf of Greg Coleman Law, Declaration submitted April 20, 2018; Reply Declaration submitted on July 13, 2018; Deposition on August 17, 2018.

**United States District Court for the Northern District of California,** *Jackie Fitzhenry-Russell, an individual, on behalf of herself, the general public and those similarly situated v. The Coca Cola Company, and Does 1-50*, Case No. 5:17-CV-00603-EJD, on behalf of Gutride Safier, LLP, Declaration submitted April 16, 2018; Deposition on October 3, 2018.

**United States District Court for the Southern District of New York,** *Josephine James Edwards, individually and on behalf of all others similarly situated, v. Hearst Communications, Inc.*, Case No. 15-cv-09279-AT, on behalf of Bursor & Fisher, P.A., Declaration submitted April 16, 2018; Deposition on June 7, 2018.

**United States District Court, Northern District of California,** *Jackie Fitzhenry-Russell, Robin Dale, and Gegham Margaryan, as individuals, on behalf of themselves, the general public and those similarly situated, v. Dr. Pepper Snapple Group, Inc., Dr Pepper/Seven Up, Inc., and Does 1-50,* Case No. 5:17-cv-00564-NC (lead); Case No. 5:17-cv-02341-NC (consolidated); Case No. 5:17-cv-04435-NC (consolidated)*, on behalf of Gutride Safier, LLP, Declaration submitted April 9, 2018; Deposition on April 19, 2018; Reply Declaration submitted June 6, 2018.

**United States District Court for the Western District of Texas, Austin Division,** *Sylvia Morris, on behalf of herself and all others similarly situated, v. Modernize Inc.*, Case No. 17:-cv-963-SS, on behalf of Bursor & Fisher, P.A., Declaration submitted March 13, 2018; Deposition on June 14, 2018.



**United States District Court, Northern District of California, San Jose Division,** *In re: Arris Cable Modem Consumer Litigation*, Case No. 17-cv-1834-LHK, on behalf of Schubert Jonckheer & Kolbe, Declaration submitted on March 9, 2018; Reply Declaration submitted April 9, 2018; Deposition on April 11, 2018; Declaration submitted June 13, 2018.

**United States District Court, Southern District of New York,** *In re: Amla Litigation*, Case No. 1:16-cv-06593-JSR, on behalf of Levi & Korsinsky LLP, Declaration submitted on March 5, 2018; Declaration submitted November 14, 2018.

**United States District Court, Eastern District of Michigan,** *Toby Schechner, Barbara Barnes, Laura Bliss, Kathleen Jordan, Kathryn Limpede, Louise Miljenovic, Candace Oliarny, Beverly Simmons, Richard Thome And Mary Ellen Thome, V. Whirlpool Corporation,* Case No. 16-cv-12409-SJM, on behalf of Robbins Geller Rudman & Dowd, LLP, Declaration submitted February 12, 2018; Deposition on May 15, 2018; Reply Declaration submitted May 17, 2018.

**United States District Court, Southern District of California,** *Jose Conde, et al., v. Sensa, et al.*, Case No. 14-cv-51 JLS (WVG), on behalf of Bursor & Fisher, P.A., Declaration submitted February 6, 2018.

**United States District Court, Northern District Of Illinois, Eastern Division,** *Angel Bakov, Julie Herrera, and Kinaya Hewlett, individually and on behalf of all others similarly situated, v.Consolidated World Travel, Inc. d/b/a Holiday Cruise Line, a Florida corporation,* Case No. 15-cv-02980-HDL SEC, on behalf of Bursor & Fisher, P.A., Declaration submitted February 6, 2018; Deposition on April 25, 2018.

**United States District Court, Northern District of Illinois,** *Jennifer Beardsall, Daniel Brown, Jennifer Carlsson, Deborah Cartnick, Amy Connor-Slaybaugh, Phyllis Czapski, Raelee Dallacqua, Autumn Dean, Skye Doucette, Christopher Draus, Gerald Gordon, Alexandra Groffsky, Emma Groffsky, Joyce Ivy, La Tanya James, Michelle Jessop, Joy Judge, Kathy Mellody, Susan Nazari, Megan Norsworthy, Deborah Ostrander, Martina Osley, Dana Phillips, Thomas Ramon, Jr., Nancy Reeves, Matthew Robertson, Shelley Waitzman, Jamilla Wang, and Amber Wimberly, Individually and on Behalf of All Others Similarly Situated, v. CVS Pharmacy, Inc., Target Corporation, Walgreen Co., Wal-Mart Stores, Inc., and Fruit of the Earth, Inc.*, Case No. 1:16-cv-06103, on behalf of Greg Coleman Law, Declaration submitted December 22, 2017; Reply Declaration on May 4, 2018.

**United States District Court, Southern District of New York,** *Jaish Markos, individually and on behalf of all others similarly situated, v. Russell Brands, LLC*, Case No. 16-CV-04362(CS), on behalf of The Sultzer Law Group, Declaration submitted on December 1, 2017, Deposition on January 4, 2018.

ECONOMICS AND
TECHNOLOGY, INC.

**United States District Court, Northern District of California,** *Siera Strumlauf, Benjamin Robles, and Brittany Crittenden, individually and on behalf of all others similarly situated, v. Starbucks Corporation,* Case No. 16-CV-01306-YGR, on behalf of Bursor & Fisher, P.A., Declaration submitted on October 31, 2017, Deposition on December 13, 2017.

**United States District Court, Southern District of California,** *Sheila Dashnaw, William Meier, and Sherryl Jones, individually, and on behalf of all others similarly situated, v. New Balance Athletics, Inc., a corporation; and DOES 1 through 50, inclusive,* Case No. 3:17-cv-00159-L-JLB, on Behalf of The Wand Law Firm, Declaration submitted on September 8, 2017; Deposition on October 5, 2017; Rebuttal Declaration submitted December 11, 2017.

**United States District Court, Central District of California,** *Veronica Brenner, on behalf of herself and all others similarly situated, v. Procter & Gamble Co.*, Case No. 8:16-1093-JLS-JCG, on behalf of Bursor & Fisher, P.A., Declaration submitted September 5, 2017; Deposition on October 10, 2016.

**United States District Court, Eastern District of California,** *Joann Martinelli, individually and on behalf of all others similarly situated, v. Johnson & Johnson And McNeil Nutritionals, LLC*, Case No. 2:15-cv-01733-MCE-DB, on behalf of Bursor & Fisher, P.A., Declaration submitted August 28, 2017, Deposition on December 20, 2017; Reply Declaration submitted on January 5, 2018.

**United States District Court, Northern District of California, San Francisco Division,** *Martin Schneider, Sarah Deigert, Laurie Reese, Theresa Gamage, Tiffanie Zangwill, and Nadia Parikka, Individually and on Behalf of All Others Similarly Situated, v. Chipotle Mexican Grill, Inc.*, Case No. 3:16-cv-02200-HSG, on behalf of Kaplan Fox & Kilsheimer LLP, Declaration submitted August 11, 2017; Deposition on September 22, 2017.

**United States District Court, Southern District of Ohio,** *Tom Kondash, on behalf of himself and all others similarly situated, v. Kia Motors America, Inc., and Kia Motors Corporation*, Case No. 1:15-cv-00506-SJD, on behalf of Gibbs Law Group, LLP, Declaration submitted July 10, 2017, Deposition on November 29, 2017.

**United States District Court, Northern District of Illinois, Eastern Division,** *Ryan Porter and Haarin Kwon, individually and on behalf of all others similarly situated, v. NBTY, Inc., United States Nutrition Inc., Healthwatchers (DE), Inc., and MET-RX Nutrition, Inc.*, Case No. 15-cv-11459, on behalf of Bursor & Fisher, P.A., Settlement Declaration submitted June 22, 2017; Declaration submitted on August 15, 2018; Deposition on October 12, 2018.

ECONOMICS AND
TECHNOLOGY, INC.

**United States District Court, Northern District of California,** *Sandra McMillion, Jessica Adekoya And Ignacio Perez, on Behalf of Themselves and all Others Similarly Situated, v. Rash Curtis & Associates*, Case No. 16-cv-03396-YGR, on behalf of Bursor & Fisher, P.A., Declaration submitted May 30, 2017, Declaration submitted August 25, 2017, Declaration submitted on October 16, 2017; Declaration submitted on August 10, 2018; Declaration submitted on November 6, 2018; Declaration submitted on November 12, 2018.

**United States District Court, Northern District of California,** *Vincent D. Mullins, et al., v. Premier Nutrition Corporation,* Case No. 13-cv-01271-RS, on behalf of Blood, Hurst, & O'Reardon, LLP, Reply Declaration submitted May 19, 2017; Deposition on July 20, 2017.

**United States District Court, Southern District of California,** *Preston Jones and Shirin Delalat, on behalf of themselves, all others similarly situated, and the general public, v. Nutiva Inc.*, Case No. 16-cv-00711 HSG, on behalf of Law Offices of Jack Fitzgerald, PC, Declaration submitted May 9, 2016; Deposition on August 23, 2017; Reply Declaration submitted January 12, 2018; Reply Declaration submitted March 2, 2018.

**United States District Court, Central District of California, Southern Division,** *Billy Glenn, Kathy Warburton, Kim Fama, and Corinne Kane, on behalf of themselves and all others similarly situated, v. Hyundai Motor America And Hyundai Motor Company*, Case No. 15-cv-02052-DOC-KES, on behalf of Gibbs Law Group, LLP, Declaration submitted May 1, 2017; Deposition on July 27, 2017; Reply Declaration submitted on October 2, 2017; Reply Declaration submitted on October 6, 2017; Declaration submitted on March 23, 2018.

**United States District Court, Southern District of California,** *Sherry Hunter, on behalf of herself, all others similarly situated, and the general public, v. Nature's Way Products, LLC, and Schwabe North America, Inc.,* Case No. 3:16-cv-00532-WQH-BLM, on behalf of Law offices of Jack Fitzgerald, PC, Declaration submitted March 24, 2017; Reply Declaration submitted May 26, 2017; Reply Declaration submitted on July 11, 2017.

**United States District Court, Southern District Of New York,** *Joanne Hart, and Sandra Bueno, on behalf of themselves and all others similarly situated, v. BHH, LLC d/b/a Bell + Howell and Van Hauser LLC,* Case No. 1:15-cv-04804-WHP, on behalf of Bursor & Fisher, P.A., Declaration submitted March 16, 2017; Deposition on January 10, 2018; Supplemental Declaration submitted January 30, 2018; Declaration submitted on March 2, 2018; Supplemental Declaration submitted on March 30, 2018.

**United States District Court, Eastern District Of New York, Brooklyn Division,** *Reply All Corp., v. Gimlet Media, Inc.,* Case No. 15-cv-04950-WFK-PK, on behalf of Wolf, Greenfield & Sacks, P.C., Declaration submitted March 15, 2017; Deposition on April 26, 2017.



**United States District Court, Northern District of California,** *James P. Brickman, individually and as a representative of all others similarly situated, v. Fitbit, Inc.*, Case No. 3:15-cv-02077-JD, on behalf of Dworken & Bernstein LPA, Declaration submitted February 28, 2017; Deposition on March 8, 2017.

**United States District Court, Northern District of California,** *Jamie Pettit, an individual, on behalf of herself, the general public and those similarly situated, v. Procter & Gamble Company; and Does 1 Through 50*, Case No. 15-cv-02150-RGS, on behalf of Gutride Safier LLP, Declaration submitted February 14, 2017; Deposition on March 3, 2017; Reply Declaration submitted May 11, 2017.

**United States District Court, Southern District of New York,** *Alan Gulkis, individually and on behalf of all others similarly situated, Zicam LLC and Matrixx Initiatives, Inc.*, Case No. 7:15-cv-09843-CS, on behalf of Bursor & Fisher, P.A., Declaration submitted on February 8, 2017; Deposition on July 14, 2017.

**United States District Court, Central District of California,** *Elisabeth Martin, on behalf of herself, all others similarly situated, and the general public, v. Monsanto Company*, Case No. 16-02168-JFW (SPx), on behalf of the Law Office of Jack Fitzgerald, PC, Declaration submitted February 6, 2017; Deposition on February 9, 2017; Reply Declaration on February 27, 2017.

**United States District Court, Southern District of New York,** *Walt Famular, on behalf of himself and all others similarly situated, v. Whirlpool Corporation*, Case No. 16-cv-00944, on behalf of Bursor & Fisher, P.A., Declaration submitted February 3, 2017, Deposition on August 15, 2017, Rebuttal Declaration on March 20, 2018.

**United States District Court, Central District of California,** *In re: 5-Hour Energy Marketing and Sales Practices Litigation*, Case No. 2:13-ml-02438 PSG, on behalf of Bursor & Fisher, P.A., Declaration submitted September 26, 2016; Reply Declaration submitted October 14, 2016; Deposition on October 27, 2016; Declaration submitted on December 22, 2016; Rebuttal Declaration submitted on March 15, 2017.

**United States District Court, Southern District of Florida,** *Benjamin Hankinson, James Guerra, Jeanette Gandolfo, Lisa Palmer, Donald Anderson, Catherine Long, and Lisa Prihoda, individually and on behalf of others similarly situated, v. R.T.G. Furniture Corp., d/b/a Rooms to Go, RTG America, LLC, The Jeffrey Seaman 2009 Annuity Trust, RTG Furniture Corp. of Georgia, d/b/a Rooms to Go, Rooms to Go North Carolina Corp., d/b/a Rooms to Go, RTG Furniture of Texas, L.P., d/b/a Rooms to Go, RTG Texas Holdings, Inc., and R.T.G. Furniture Corp. of Texas*, Case No. 9:15-cv-81139-COHN/SELTZER, on behalf of Cohen Milstein, Declaration submitted September 1, 2016; Declaration submitted October 3, 2016; Deposition on November 4, 2016; Declaration submitted on January 5, 2017.

ECONOMICS AND TECHNOLOGY, INC.

**Circuit Court Of Cook County, Illinois County Department, Chancery Division,** *Amy Joseph, individually and on behalf of all others similarly situated, Benjamin Perez, individually and on behalf of all others similarly situated, Intervening Plaintiff, v. Monster Inc., a Delaware Corporation, and Best Buy Co., Inc., a Minnesota Corporation*, Case No. 2015 CH 13991, on behalf of Interveners, Declaration submitted August 8, 2016; Supplemental Declaration submitted January 22, 2018.

**United States District Court, Central District of California, Eastern Division,** *Jeff Looper, Michael Bright, Scott Johnson, individuals on behalf of themselves and all others similarly situated, v. FCA US LLC, f/k/a Chrysler Group LLC, a Delaware limited liability company, and DOES 1-100 inclusive*, Case No. 14-cv-00700-VAP-DTB, on behalf of Gibbs Law Group, LLP; Declaration submitted August 7, 2016; Deposition on September 29, 2016.

**United States District Court, Eastern District of California,** *Chad Herron, individually, on behalf of himself and all others similarly situation, v. Best Buy Stores, LP, a Virginia limited partnership*, Case No. 12-cv-02103-TLN-CKD, on behalf of Stonebarger Law, A Professional Corporation; Declaration submitted June 24, 2016; Deposition on July 29, 2016; Supplemental Declaration submitted September 8, 2016.

**United States District Court for the Southern District of Florida,** *Angela Sanchez-Knutson v. Ford Motor Company*, Case No. 14:61344-CIV DIMITROULEAS, on behalf of Kelley Uustal Trial Attorneys; Deposition on June 1, 2016.

**United States District Court, Central District of California,** *Jacqueline Dean, on behalf of herself and all others similarly situated, v. Colgate-Palmolive Co.*, Case No. 5:15-cv-00107, on behalf of Bursor & Fisher, P.A.; Declaration submitted April 29, 2016; Deposition on July 13, 2016; Reply Declaration submitted on May 2, 2017; Declaration submitted on October 2, 2016; Reply Declaration submitted on December 14, 2017.

**United States District Court, District of New Jersey,** *In re: AZEK Decking Marketing & Sales Practices Litigation*, Case No. 12-cv-06627-MCA-MAH, on behalf of Seeger Weiss, LLP; Declaration submitted February 26, 2016; Declaration submitted May 16, 2016; Deposition on July 6, 2016; Reply Declaration submitted August 29, 2016.

**United States District Court. Northern District of California,** *In re: Nest Labs Litigation*, Case No. 5:14-cv-01363-BLF, on behalf of Bursor & Fisher, P.A.; Declaration submitted on January 22, 2016; Deposition on March 2, 2016; Reply Declaration submitted on June 3, 2016.

**United States District Court, Northern District of California,** *Rohini Kumar, an individual, on behalf of herself, the general public and those similarly situated, v. Salov North America Corp.; And Italfoods, Inc.*, Case No. 4:14-cv-02411-YGR, on behalf of Gutride Safier LLP; Declaration submitted on January 19, 2016; Deposition on February 24, 2016; Reply Declaration submitted on May 10, 2016; Declaration submitted on April 11, 2017, Declaration submitted on May 16, 2017.



**United States District Court, Northern District of Ohio, Eastern Division,** *Christopher Meta, On Behalf Of Himself And All Others Similarly Situated v. Target Corporation, et al.*, Case No. 4:14-0832-DCN, on behalf of Tycko & Zavareei, LLP, Declaration submitted January 6, 2016; Deposition on March 15, 2016; Reply Declaration submitted on March 18, 2016.

**United States District Court, District of New Jersey,** *Charlene Dzielak, Shelley Baker, Francis Angelone, Brian Maxwell, Jeffery Reid, Kari Parsons, Charles Beyer, Jonathan Cohen, Jennifer Schramm, and Aspasia Christy on behalf of themselves and all others similarly situated, v. Whirlpool Corporation, Lowe's Home Center, Sears Holdings Corporation, The Home Depot, Inc., Fry's Electronics, Inc., And Appliance Recycling Centers Of America, Inc.,* Case No. 12-cv-0089-KM-JBC, on behalf of Bursor & Fisher, P.A., Declaration submitted December 28, 2015; Deposition on April 22, 2016; Rebuttal Declaration submitted June 10, 2016; Responding Declaration submitted July 6, 2018; Rebuttal Declaration submitted on August 10, 2018.

**United States District Court, District of New Jersey,** *In re: Tropicana Orange Juice Marketing and Sales Practices Litigation,* Case No. 12-cv-7382-WJM-JBC, on behalf of Carella, Byrne, Cecchi, Olstein, Brody & Agnello, PC.; Declaration submitted on November 6, 2015; Deposition on January 28, 2016.

**United States District Court, Northern District of California**, *Scott Koller, an individual, on behalf of himself, the general public and those similarly situated v. Deoleo USA, Inc. and Med Foods, Inc.*, Case No. 3:14-cv-02400-RS, on behalf of Gutride Safier LLP; Declaration submitted on October 29, 2015; Deposition on December 21, 2015; Reply Declaration submitted on April 3, 2017.

**United States District Court, Eastern District Of New York,** *Patrick Hughes and Nafisé Nina Hodjat, individually and on behalf of others similarly situated, v. The Ester C Company; NBTY, Inc.; and Naturesmart, LLC,* Case No. 12-cv-00041-JFB-ETB, on behalf of Reese LLP and WhatleyKallas LLP; Declaration submitted October 22, 2015; Deposition on December 1, 2015; Reply Declaration submitted on January 28, 2016; Surrebuttal Declaration submitted on April 20, 2016; oral testimony and cross examination on September 20, 2016.

**United States District Court, District Of Connecticut,** *Glen Grayson, and Doreen Mazzanti, individually and on behalf of themselves and all others similarly situated, v. General Electric Company*, Case No. 3:13-cv-01799-WWE, on behalf of Izard Nobel LLP; Declaration submitted October 15, 2015; Deposition on November 17, 2015; Rebuttal Declaration submitted March 23, 2016.

**United States District Court, District of New Jersey,** *Lynne Avram, on behalf of herself and all others similarly situated, v. Samsung Electronics America Inc., and Lowe's Home Centers, Inc.*, Case No. 11-cv-6973-KM-MCA, on behalf of Faruqi & Faruqi LLP; Declaration filed July 15, 2015; Deposition September 29, 2015.

ECONOMICS AND
TECHNOLOGY, INC.

**United States District Court, District of Connecticut,** *Heidi Langan, on behalf of herself and all others similarly situated, v. Johnson & Johnson Consumer Companies, Inc.*, Case No. 3:13-cv-01471-RNC, on behalf of Izard Nobel LLP; Declaration filed June 23, 2015; Deposition on July 21, 2015; Reply Declaration filed October 15, 2015.

**United States District Court, Eastern District of California,** *Yesenia Melgar, on behalf of herself and all others similarly situated, v. Zicam LLC, and Matrixx Initiatives, Inc.*, Case No. 2:14-cv-00160-MCE-AC, on behalf of Bursor & Fisher, PA; Declaration filed June 8, 2015.

**United States District Court, Central District of California, Eastern Division-Riverside** *Michael J. Otto, individually, and on behalf of other members of the general public similarly situated, v. Abbott Laboratories, Inc.*, Case No. 12-01411-SVW(DTBx), on behalf of Baron & Budd; Declaration filed May 25, 2015; Deposition on June 2, 2015; Supplemental Declaration filed July 6, 2015.

**United States District Court, Central District of California,** *Russell Minoru Ono, individually and on behalf of others similarly situated, v. Head Racquet Sports USA, a corp. and Head USA Inc.*, Case No. 13-04222-FMO, on behalf of Baron & Budd; Declaration filed April 24, 2015, Deposition on June 30, 2015; Reply Declaration filed July 2, 2015.

**United States District Court, Southern District of Florida,** *Vanessa Lombardo, on behalf of herself and all others similarly situated, v. Johnson & Johnson Consumer Companies and Neutrogena Corporation*, Case No. 13-60536-SCOLA, on behalf of Morgan & Morgan; Declaration filed March 31, 2015.

**United States District Court, Eastern District of New York,** *D. Joseph Kurtz, individually and on behalf all others similarly situated, v. Kimberly-Clark Corporation and Costco Corporation*, Case No. 14-01142-JBW, on behalf of Robbins Geller Rudman & Dowd LLP; Declaration filed February 27, 2015; Rebuttal Declaration filed March 27, 2015.

**United States District Court, Eastern District of New York,** *Anthony Belfiore, on behalf of himself and all others similarly situated, v. Procter & Gamble*, Case No. 14-04090-JBR, on behalf of Wolf Popper LLP; Declaration filed February 27, 2015; Rebuttal Declaration filed April 30, 2015.

**United States District Court, Northern District of California,** *Patrick Hendricks, individually and on behalf of all others similarly situated, v. StarKist Co.*, Case No. 13-0729-YGR, on behalf of Bursor & Fisher, PA; Declaration filed January 20, 2015; Deposition on February 10, 2015; Reply Declaration filed April 7, 2015.

**United States District Court, Northern District of California, San Francisco Division,** *Scott Miller and Steve Leyton, individually and on behalf themselves, the general public and those similarly situated v. Ghirardelli Chocolate Company*, Case No. 12-04936-LB, on behalf of Gutride Safier LLP, Declaration filed January 8, 2015; Reply Declaration filed February 5, 2015.



**United States Bankruptcy Court, Eastern District of New York,** *In re: Kangadis Food Inc., d/b/a The Gourmet Factory, Debtor*, Case No. 14-72649-REG, on behalf of Bursor & Fisher, PA; Declaration filed August 5th, 2014; Oral testimony on November 24, 2014.

**United States District Court, Southern District of New York,** *Joseph Ebin and Yeruchum Jenkins, individually and on behalf of all others similarly situated v. Kangadis Family Management LLC, Aristidia Kangadis a/k/a "Mr. Aris," Andromahi Kangadis a/k/a "Mrs. Mahi," and Themis Kangadis*, Case No. 14-cv-1324-JSR, on behalf of Bursor & Fisher, PA; Declaration filed August 5, 2014; Deposition on October 9, 2014.

**United States District Court, Northern District of California, San Francisco Division,** *Erin Allen, on behalf of herself and all others similarly situated, v. Con Agra Foods, Inc.*, Case No. 13-cv-01279-VC, on behalf of Hagens Berman Sobol Shapiro LLP and The Eureka Law Firm; Declaration submitted August 11, 2014; Deposition on September 30, 2014; Declaration submitted July 9, 2018.

**United States District Court, Eastern District of California,** *Kyle Dei Rossi and Mark Linthicum, on behalf of themselves and those similarly situated, v. Whirlpool Corporation*, Case No. 12-cv-00125-TLN-CKD, on behalf of Bursor & Fisher, P.A.; Declaration filed July 31, 2014, Deposition on August 20, 2014.

**United States District Court, Northern District of Illinois, Eastern Division,** *In re: Southwest Airlines Voucher Litigation.*, Case No. 11-cv-8176, Hon. Matthew Kennelly, on behalf of Siprut PC; Declaration filed June 4, 2014; Oral testimony and cross examination on June 16, 2014.

**United States District Court, Central District of California, Western Division,** *In re: ConAgra Foods, Inc.*, Case No. 11-cv-05379-MMM, MDL No. 2291, on behalf of Milberg LLP and Grant & Eisenhofer, P.A.; Declaration filed May 5, 2014; Deposition on May 23, 2014; Declaration filed June 30, 2014; Declaration filed September 8, 2014; Deposition on September 16, 2014, Declaration filed October 27, 2014.

**United States District Court, Southern District of New York,** *In re: Scotts EZ Seed Litigation*, Case No. 12-cv-4727-VB, on behalf of Bursor & Fisher, PA; Declaration filed March 31, 2014; Deposition on May 21, 2014; Declaration filed on January 8, 2016; Deposition on February 10, 2016; Reply Declaration submitted June 30, 2016; Declaration submitted September 1, 2016; Declaration submitted on October 20, 2016.

**United States District Court, Central District of California,** *Julie Fagan, Michael Fagan, Melissa Pennalatore, Amy Sapeika and Shelley Trinchero, individually and on behalf of all others similarly situated v. Neutrogena Corporation*, Case No. 13-cv-01316-SVW, on behalf of Izard Nobel LLP; Declaration filed March 21, 2014; Deposition on April 3, 2014; Supplemental Declaration filed August 4, 2014; Deposition on August 13, 2014; Declaration filed September 9, 2014.

ECONOMICS AND
TECHNOLOGY, INC.

**United States District Court, Central District of California,** *Enzo Forcellati and Lisa Roemmich, individually and on behalf of all others similarly situated v. Hyland's Inc., Standard Homeopathic Laboratories, Inc. and Standard Homeopathic Company*, Case No. 12-cv-01983-GHK, on behalf of Faruqi and Faruqi; Declaration filed December 13, 2013; Deposition on February 27, 2014.

**United States District Court, Southern District of Florida,** *Adam Karhu, on behalf of himself and all others similarly situated, v. Vital Pharmaceuticals, Inc., d/b/a VPX Sports*, Case No. 13-cv-60768-JIC, on behalf of Thornton, Davis, & Fein, P.A., Declaration filed December 13, 2013; Declaration filed January 6, 2014; Declaration filed March 31, 2014.

**Trial Court of Massachusetts, District of Edgartown,** *Schepici v. JetBlue Airways Corp.*, on behalf of plaintiff; Mediation on December 4, 2013.

**Superior Court of California, County of Alameda,** *In re: Cellphone Termination Fee Cases, Ramzy Ayyad, et al, v. Sprint Spectrum, L.P.*, JCCP No. 4332, Case No. RG03-121510, on behalf of the Executive Committee; Declaration filed September 18, 2013.

**United States District Court, Northern District of California,** *Maria Torres, Gabriel Rojas, and Ian Kerner, individually and on behalf of all others similarly situated v. JC Penney Corporation, Inc.; and JC Penney Company, Inc.,*, Case No. cv-12-01105-RS, on behalf of Bramson, Plutzik, Mahler and Birkhaeuser; Declaration filed September 13, 2013; Deposition on October 2, 2013.

**United States District Court, Southern District of New York,** *Joseph Ebin and Yeruchum Jenkins, individually and on behalf of all others similarly situated v. Kangadis Foods Inc*, Case No. 13-cv-02311-JSR, on behalf of Bursor & Fisher, PA; Declaration filed August 26, 2013; Deposition on October 21, 2013.

**United States District Court, Northern District of California,** *Desiree Moore, on behalf of themselves, the general public, and all those similarly situated, v. Verizon Communications*, Case No. 4:09-cv-01823-SBA, on behalf of David Schachman and Associates PC, Jacobs Kolton Chtd., and Keller Grover, LLP; Declaration filed June 24, 2013.

**American Arbitration Association,** *[Redacted for public inspection]*, on behalf of Claimant; Oral testimony and cross examination on March 1, 2013.

**American Arbitration Association,** *[Redacted for public inspection]*, on behalf of Claimant; Oral testimony and cross examination on February 20, 2013.

**American Arbitration Association,** *[Redacted for public inspection]*, on behalf of Claimant; Oral testimony and cross examination on February 19, 2013.

**American Arbitration Association,** *[Redacted for public inspection]*, on behalf of Claimant; Oral testimony and cross examination on February 13, 2013.

**American Arbitration Association,** *[Redacted for public inspection]*, on behalf of Claimant; Oral testimony and cross examination on February 7, 2013.



**American Arbitration Association,** *[Redacted for public inspection]*, on behalf of Claimant; Oral testimony and cross examination on February 4, 2013.

**American Arbitration Association,** *[Redacted for public inspection]*, on behalf of Claimant; Oral testimony and cross examination on January 24, 2013.

**American Arbitration Association,** *[Redacted for public inspection]*, on behalf of Claimant; Oral testimony and cross examination on December 12, 2012.

**American Arbitration Association,** *[Redacted for public inspection]*, on behalf of Claimant; Oral testimony and cross examination on December 10, 2012.

**American Arbitration Association,** *[Redacted for public inspection]*, on behalf of Claimant; Oral testimony and cross examination on November 28, 2012.

**American Arbitration Association,** *[Redacted for public inspection]*, on behalf of Claimant, Declarations filed October 4, 2012 and November 5, 2012; Oral testimony and cross examination on November 27, 2012.

**American Arbitration Association,** *[Redacted for public inspection]*, on behalf of Claimant, Declaration filed April 16, 2012; Oral testimony and cross examination on May 11, 2012.

**United States District Court, District of Massachusetts,** *Marcy Cruz v. Justin Kagan, Arthur Hegarty, Ronald Teachman, and the City of New Bedford*, Case No. 1:09-cv-11793-RGS, on behalf of Marcy Cruz, Expert Report filed February 28, 2011; Oral testimony and cross examination on December 1, 2011.

**United States District Court, Southern District of New York,** *Bursor & Fisher P.A., v. Federal Communications Commission*, Case No. 1:11-cv-05457-LAK, on behalf of Bursor & Fisher P.A., Declaration filed August 17, 2011.

**United States District Court, District of New Jersey,** *In Re: Sprint Premium Data Plan Marketing and Sales Practices Litigation,* Master Case No. 10-6334 (SDW) MDL No. 2228, on behalf of Thornton, Davis, & Fein, P.A., Declaration filed August 11, 2011.

**United States District Court, Northern District of California,** *Patrick Hendricks, on behalf of himself and all others similarly situated, v. AT&T Mobility LLC,* Case No. C11-00409, on behalf of Bursor & Fisher, P.A., Declaration filed August 7, 2011.

**Federal Communications Commission,** *In the Matter of Applications of AT&T Inc. & Deutsche Telekom AG for Consent to Assign or Transfer Control of Licenses and Authorizations*, WT Docket No. 11-65, on behalf of Butch Watson, Declaration filed June 20, 2011.

**California Public Utilities Commission,** *Pacific Bell Telephone Company d/b/a AT&T California (U1001C) Complainant, vs. O1 Communication, Inc. (U 6065 C), Defendant*, Case No. C.08-03-001, on behalf of the O1 Communications, Inc., Reply Testimony filed November 6, 2009; Oral testimony and cross examination on November 16, 2009.



**Superior Court of California, County of Alameda**, *James Thomas, on behalf of themselves, the general public, and all those similarly situated, v. Global Vision Products, Inc., Anthony Imbriolo, Derrike Cope, David L. Gordon, Powertel Technologies, Inc., Craig Dix, Henry Edelson and Robert Debenedictis,* Case No. RG03-091195, on behalf of the Law Offices Of Scott A. Bursor, Oral testimony and cross examination on November 9, 2009.

**United States District Court, District of New Jersey,** *Judy Larson, Barry Hall, Joe Milliron, Tessie Robb, and Willie Davis, individually and on behalf of all others similarly situated, v. AT&T Mobility LLC f/k/a Cingular Wireless LLC and Sprint Nextel Corporation and Sprint Spectrum L.P. d/b/a Sprint Nextel and Nextel Finance Company, Civ. Act. No. 07-5325 (JLL),* on behalf of PinilisHalpern, LLP and Law Offices of Scott A. Bursor, Declaration filed *under seal* October 19, 2009.

**California Public Utilities Commission,** *Pacific Bell Telephone Company d/b/a AT&T California (U1001C) Complainant, vs. Pac-West Telecomm, Inc. (U 5266 C), Defendant,* Case No. C.08-09-017, on behalf of the Pac-West Telecomm, Inc., Rebuttal Testimony filed May 1, 2009.

**Illinois Commerce Commission,** Illinois Bell Telephone Company Annual Rate Filing for Non-Competitive Services Under an Alternative Form of Regulation, Ill. C. C. Docket No. 08-0249, on behalf of the People of the State of Illinois, Declaration filed May 2, 2008.

**Federal Communications Commission,** Qwest Petition for Forbearance Under 47 U.S.C. §160(c) From Title II and *Computer Inquiry Rules* with Respect to Broadband Services, Petition of AT&T Inc, For Forbearance Under 47 U.S.C. §160(c) From Title II and *Computer Inquiry Rules* with Respect to Broadband Services, Petition of BellSouth Corporation For Forbearance Under 47 U.S.C. §160(c) From Title II and *Computer Inquiry Rules* with Respect to Broadband Services, Petition of the Embarq Local Operating Companies for Forbearance Under 47 U.S.C. §160(c) From Application of *Computer Inquiry* and certain Title II Common Carriage Requirements; WC Docket Nos. 06-125 and 06-147, on behalf of the AdHoc Telecommunications Users Committee, Declaration filed October 9, 2007.

**Superior Court of California, County of Alameda**, *James Thomas, on behalf of themselves, the general public, and all those similarly situated, v. Global Vision Products, Inc., Anthony Imbriolo, Derrike Cope, David L. Gordon, Powertel Technologies, Inc., Craig Dix, Henry Edelson and Robert Debenedictis,* Case No. RG03-091195, on behalf of the Law Offices Of Scott A. Bursor, Declaration filed January 5, 2007; Deposition on November 13, 2007; Oral testimony and cross-examination on December 19, 2007; Oral testimony on January 9, 2008.

Mr. Weir has served as a consultative expert in numerous proceedings that did not result in testimony, and has contributed research and analysis to numerous additional publications and testimony at the state, federal, and international levels.

**Exhibit 2**

**Documents Reviewed**

- Class Action Complaint, filed May 25, 2017.

- Case, Fair & Oster, Principles of Microeconomics, 9th Edition, 2009.

- Expert Report of J. Michael Dennis, Ph.D., July 30, 2018.

- Deposition of Laura Zeno, May 24, 2017, and Exhibits

- Deposition of William Twomey, May 26, 2017, and Exhibits

- Deposition of Sean Belke, May 25, 2017, and Exhibits

- Sawtooth Software technical papers, available online at

http://www.sawtoothsoftware.com/support/technical-papers.

- *When "All Natural" May Not Be*, Analysis Group Forum (Winter 2013).

http://www.analysisgroup.com/assessing_false_advertising_claims.aspx.

- *Applying Conjoint Analysis to Legal Disputes: A Case Study*, Wind, Yoram, *et al.*.

- *Khoday v. Symantec Corp.*, No. 11-180 (JRT/TNL), 2014 WL 1281600, at *10 (March 13, 2014).

- *Sanchez-Knutson v. Ford Motor Company*, Case No. 14-61344-CIV-DIMITROULEAS, Order, October 6, 2015.

- *In re: Lenovo Adware Litigation*, Case no. 15-md-02624-RMW (USDC NDC-SJD) DKT 153 (October 27, 2016).

- *Morales v. Kraft Foods Group, Inc.*, Order Re: Plaintiff's Motion for Class Certification, Case No. 14-cv-04387, Dkt. No. 78 (Kronstadt, J.) (C.D. Cal. Jun. 23, 2015)

- *Guido v. L'Oreal, USA, Inc.*, 2014 WL 6603730, at *5, *10-*14 (C.D. Cal. July 24, 2014)

- *Brown v. Hain Celestial Group, Inc.*, 2014 WL 6483216, at *19 (N.D. Cal. Nov. 18, 2014)

- *Microsoft v. Motorola, Inc.*, 904 F.Supp.2d 1109, 1119-20 (W.D. Wa. 2012)

- *In re Scotts EZ Seed Litig.*, 304 F.R.D. 397, 413-15 (S.D.N.Y. 2015)

- *Dzielak v. Maytag*, 2017 WL 1034197, at *6 (D. NJ. March 17, 2017)

- *TV Interactive Data Corp. v. Sony Corp.*, 929 F. Supp. 2d 1006, 1022 & n.6 (N.D. Cal. 2013)

- *Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121 (9th Cir. 2017)

- *In re Arris Cable Modem Consumer Litig.*, 2018 WL 3820619, at *25-*31 (N.D. Cal. Aug. 10, 2018)

- *Hadley v. Kellogg Sales Co.*, 2018 WL 3954587, at *11-*16 (N.D. Cal. Aug. 17, 2018)

- *In re: Dial Complete Marketing and Sales Practices Litigation*, MDL Case No. 11-md-2263-SM, Opinion No. 2017 DNH 051

- *Getting Started With Conjoint Analysis: Strategies for Product Design and Pricing Research*, Bryan K. Orme, Research Publishers 2014.

- census.gov

- The Kroger Co. 2016 10-K Annual Report

- Publix Super Markets, Inc. 2016 10-K Annual Report

- Safeway Inc. 2015 10-K Annual Report

- SuperValu Inc. 2016 10-K Annual Report

- Ahold Delhaize Annual Report 2016.

- Benecol - Bursor Subpeona HIGHLY CONFIDENTIAL AEO.xlsx

- 2016.02.11 Ex. A - Benecol Regular Labels 2004-2011 (MCNEIL 0000001 - 0000017).pdf

- 2016.02.11 Ex. B - Benecol Light Labels 2004-2011 (MCNEIL 0000018-0000034).pdf

- 2016.02.11 Ex. C - Benecol Regular Labels 1999-2004 (MCNEIL 0000035 - 0000054).pdf

- 2016.02.11 Ex. D - Benecol Light Labels 1999-2004 (MCNEIL 0000055 - 0000070).pdf

- 2016.02.11 Label Dates.PDF

- Benecol Light Labels 2011-2012.pdf

- Benecol Regular Labels 2011-2012.pdf

- MARTINELLI Benecol and Benecol Light Sales Data (2011-2012).pdf

- MARTINELLI Benecol Labels Spreadsheet (2011-2012).pdf

- MARTINELLI Benecol Light Labels Spreadsheet (2011-2012) (2).pdf

- MCNEIL0000071 CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER.xlsx

- MCNEIL0000072-73 CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER.xlsx

- MCNEIL0001300-40.pdf

- MCNEIL0001344-1404.pdf
- MCNEIL0001569-81.pdf
- MCNEIL0005608-09.pdf
- MCNEIL0005609_Confidential.ppt
- MCNEIL0005610_Confidential.xls
- MCNEIL0005622-23.pdf
- MCNEIL0005623_Confidential.xlsx
- MCNEIL0005625_Confidential.pptx
- MCNEIL0005627_Confidential.ppt
- MCNEIL0005628-29.pdf
- MCNEIL0005629_Confidential.xlsx
- MCNEIL0005631_Confidential.pptx
- MCNEIL0005633_Confidential.xlsx
- MCNEIL0005660-61.pdf
- MCNEIL0005661_Confidential.xlsx
- MCNEIL0006017-18.pdf
- MCNEIL0006018_Confidential.xls
- MCNEIL0006044-45.pdf
- MCNEIL0006045_Confidential.xlsx
- MCNEIL0006133_Confidential.xlsx
- MCNEIL0006135_Confidential.xlsx
- MCNEIL0006136_Confidential.xlsx
- MCNEIL0006346_Confidential.xls
- MCNEIL0006376_Confidential.xlsx
- MCNEIL0006385_Confidential.xlsx
- MCNEIL0006417_Confidential.xls
- MCNEIL0006420_Confidential.xlsx

- MCNEIL0006422_Confidential.ppt

- MCNEIL0006422_native.pdf

- MCNEIL0006524_Confidential.xls

- MCNEIL0006545_Confidential.xls

- MCNEIL0006546_Confidential.xls

- MCNEIL0006548_Confidential.xlsx

- MCNEIL0006582-83.pdf

- MCNEIL0006583_Confidential.xls

- MCNEIL0006631-32.pdf

- MCNEIL0006632_Confidential.xlsx

- MCNEIL0006635-36.pdf

- MCNEIL0006636_Confidential.xlsx

- MCNEIL0006647-48.pdf

- MCNEIL0006648_Confidential.xls

- MCNEIL0006656-58.pdf

- MCNEIL0006658_Confidential.xlsm

- MCNEIL0006664-67.pdf

- MCNEIL0006666.ppt

- MCNEIL0006666_Confidential.ppt

- MCNEIL0006667.xls

- MCNEIL0006667_Confidential.xls

- MCNEIL0006743-44.pdf

- MCNEIL0006744_Confidential.xlsx

- MCNEIL0006748-49.pdf

- MCNEIL0006749_Confidential.xls

- MCNEIL0006855_Confidential.xls

- MCNEIL0006862_Confidential.xlsx

- MCNEIL0006869_Confidential.xls

- MCNEIL0006878_Confidential.xlsx

- MCNEIL0006887_Confidential.pptx

- MCNEIL0006906_Confidential.xlsx

- MCNEIL0006907_Confidential.xlsx

- MCNEIL0006908_Confidential.xlsx

- MCNEIL0006909_Confidential.xlsx

- MCNEIL0006910_image.pdf

- MCNEIL0006911_image.pdf

- MCNEIL0006914_Confidential.xlsx

- MCNEIL0006915_Confidential.xlsx

- MCNEIL0006916.pptx

- MCNEIL0006916_Confidential.pptx

- MCNEIL0006917_Confidential.xlsx

- MCNEIL0006921_Confidential.xlsx

- MCNEIL0006927_Confidential.xls

- MCNEIL0006929_Confidential.xlsx

- MCNEIL0006933_Confidential.xlsx

- MCNEIL0006936_Confidential.xlsx

- MCNEIL0006939_Confidential.xlsx

- MCNEIL0006941_Confidential.xlsx

- MCNEIL0006946_Confidential.xls

- MCNEIL0006963_Confidential.xlsx

- MCNEIL0006972_Confidential.xls

- MCNEIL0007520_Confidential.xls

- MCNEIL0011343_Highly Confidential.xls

- MCNEIL0011439.pdf

- MCNEIL0013444.pptx

- MCNEIL0013450_Confidential.pptx

- MCNEIL0013454_Confidential.xls

- MCNEIL0013619_Confidential.xls

- MCNEIL0013729_Confidential.xlsx

- MCNEIL0015120_Highly Confidential.xls

- MCNEIL0016761-16819.pdf

- MCNEIL0020093-96.pdf

- MCNEIL0020892.xls

- MCNEIL0022441.pptx

- MCNEIL0022900-02.pdf

- MCNEIL0022903.xlsx

- MCNEIL0022952.ppt

- MCNEIL0022954.xls

- MCNEIL0022962-67.pdf

- MCNEIL0022994-98.pdf

- MCNEIL0023009.xls

- MCNEIL0023032_Confidential.pptx

- MCNEIL0023070.xlsx

- MCNEIL0023323-27.pdf

- MCNEIL0023349.xlsx

- MCNEIL0023358.pptx

- MCNEIL0024058.ppt

- Deposition of Denise Martin

- Martinelli Deposition of Denise Martin

- Rebuttal Declaration of Denise Martin

- Deposition of David Reibstein

- Rebuttal Report of David Reibstein

- Deposition of Carol Scott

- Report of Carol Scott