**EXHIBIT Q**

```
 1                 UNITED STATES DISTRICT COURT
 2                 SOUTHERN DISTRICT OF NEW YORK
 3
 4        SUZANNA BOWLING,            )
          Individually and on        )
 5        behalf of all others       )
          similarly situated,        )
 6                                    )
                      Plaintiff,      )
 7                                    )
                      vs.            )   No.
 8                                    )   1:17-cv-03982-AJN
          JOHNSON & JOHNSON and      )
 9        McNEIL NUTRITIONALS, LLC,   )
                                      )
10                    Defendants.     )
          ------------------------    )
11
12
13                      November 9, 2018
14                      10:02 a.m.
15
16             Deposition of DENISE N. MARTIN, held at
17        the offices of Bursor & Fisher, P.A., 888
18        Seventh Avenue, New York, New York, before
19        Laurie A. Collins, a Registered Professional
20        Reporter and Notary Public of the State of New
21        York.
22
23
24
25   Pages 1- 155
```

Page 1

1  ████████████████████████████████████

   ████████████████████████████████████

   ███████████████     ██████████████████

   ████████████████████████████████████

   ███████████                              10:33:57

6         So that -- what I glean from that is I

7  wouldn't expect on average that consumers were

8  paying attention to that label particularly.

9         And then I looked at what happened when

10 the claims were removed from the label in 2012,   10:34:14

11 ██████████████████████████████

   ████████████████████████████████████████

   ██████████████████████████████

            ████████████████████████████████

   ███████████████████████████              10:34:36

16 Again, that's another thing that would lead me to

17 believe that consumers don't have much of an

18 impression at all about the no trans fat claim on

19 this product.

20     Q.    Did you also review the report of       10:34:53

21 Dr. Dennis in this case?

22     A.    Yes.

23     Q.    You did do that; right?

24     A.    Yes.

25     Q.    And did you see that he did a survey    10:35:00

                                          Page 26

1     where he asked consumers what their understanding

2     of the no trans fat claim is?  Did you see that?

3          A.    I did see that.

4          Q.    You didn't mention that in your answer,

5     though -- right? -- about what you did to           10:35:18

6     determine, if anything, to understand how

7     consumers interpret the no trans fat claim; right?

8          A.    I thought you were asking me what I

9     personally did, my personal investigation, and I

10    did review Dr. Dennis's work in this matter.        10:35:38

11    Really I focused my review of him on his conjoint

12    analysis rather than his materiality study,

13    although I understand that since then Dr. Scott

14    has submitted a materiality analysis that refutes

15    the findings of Dr. Dennis's.                       10:36:00

16         Q.    Okay.

17               So as part of your work, did you do

18    anything -- well, strike that.

19               Did you interview any consumers to

20    understand how they understood the no trans fat     10:36:18

21    claim in this case as part of your work in this

22    case?

23         A.    I didn't personally conduct interviews,

24    though I did look at transcripts of interviews

25    that were included in the McNeil documents that I   10:36:31

Page 27

1      reviewed where they asked consumers about a number

2      of things that actually did not include

3      trans fats.  They asked them a lot about their

4      understanding of plant stanol esters and the

5      cholesterol-lowering benefits of Benecol.          10:36:51

6                  And my takeaway from that, in

7      conjunction with other findings, is that this is

8      not -- this is not the reason that consumers are

9      buying Benecol.  It's not a point of

10     differentiation, ███████████████████ in        10:37:08

11     consumers' minds particularly.

12          Q.    So you never spoke to a single Benecol

13     consumer directly as part of your work in this

14     case; right?

15          A.    And I would give the same answer, which  10:37:27

16     is I haven't personally conducted interviews.

17     But, as I do routinely, I'm relying on the

18     company's own internal documents and surveys that

19     it conducted.

20                  Again, I think since then I'm also       10:37:43

21     relying on -- or I think would add to my reliance

22     the work of Dr. Scott, because she does ask those

23     questions very directly.  And what she finds is

24     very consistent, it's very supportive of the

25     conclusions that I reached here.                  10:38:02

                                                    Page 28

```
 1      about.
 2           Q.   Did you personally speak with any
 3      McNeil or Johnson & Johnson executives as part of
 4      your work in this case?
 5           A.   I did not.                           10:48:40
 6           Q.   So you never asked any of the McNeil or
 7      Johnson & Johnson executives why the no trans fat
 8      claim was placed on each Benecol package five
 9      times; right?
10                MS. CHANOINE:  Objection, form.       10:49:02
11           A.   Again, the way you're stating that
12      question, it makes it sound like the consumers
13      would see the label five times --
14           Q.   I'm just asking you if you've asked
15      someone that.
16           A.   -- when they looked at the package.
17                MS. CHANOINE:  Counsel, please let --
18           Q.   I'm not talking about what people have
19      sounded or anything like that.  I just want to
20      know did you ever ask -- did you ever ask one of   10:49:20
21      the executives at McNeil or Johnson & Johnson why
22      the no trans fat claim was put on each package of
23      Benecol five times.
24                Did you ask them that or not?
25                MS. CHANOINE:  Objection, form, asked  10:49:33
```

1      reviewed.

2           Q.    Do you think it's fair, however, to

3      consider the results of Dr. Dennis's consumer

4      perception survey when determining what consumers

5      understood the no trans fat claim to mean?        11:25:08

6                MS. CHANOINE:    Objection, form.

7           A.    Again, I'm not here to respond to

8      Dr. Dennis's perception survey particularly.    I

9      know that Dr. Reibstein, you know, did respond to

10     that and finds it to be infirm.    I -- that makes    11:25:21

11     sense to me.    Just in the face of everything else

12     I reviewed, it makes sense that was not reliable

13     by done.    It's inconsistent with the other

14     evidence that I've reviewed.

15          Q.    So what basis do you have to agree with    11:25:53

16     Dr. Reibstein's opinion that Dr. Dennis's consumer

17     perception survey wasn't reliably done?

18          A.    That, again -- I'm not opining about

19     the reliability or not of Dr. Dennis's survey.    I

20     leave that to Dr. Reibstein.    However, his        11:26:25

21     conclusion that it's not reliable is consistent

22     with the other information that I reviewed in the

23     sense that he finds it is -- he finds it is

24     material to consumers -- the label is material to

25     consumers, in fact then measured it as a 20, you    11:26:47

Page 48

```
 1        something Health Balance.
 2            Q.    As part of your work in this case, did
 3        you do anything to attempt to calculate a price
 4        premium solely attributable to the no trans fat
 5        claim on the Benecol packaging?              11:31:47
 6            A.    I didn't do a fulsome estimation of
 7        that.  I did review the estimate put forward by
 8        Mr. Weir and am of the opinion that it's
 9        completely inflated.  All the evidence that I have
10        reviewed indicates that it's inconsistent with a   11:32:18
11        price premium of that magnitude and is consistent,
12        honestly, with the price premium of potentially
13        zero.
14            Q.    Other than the calculation that
15        Mr. Weir performed of the price premium solely     11:32:43
16        attributed to the no trans fat claim, have you
17        seen any other evidence of price premium
18        calculations in this case concerning the no
19        trans fat claim?
20                  MS. CHANOINE:  Objection, form.          11:33:08
21            A.    I disagree with the foundation of that
22        question, which is that Mr. Weir has put forward
23        an estimate of the price premium associated with
24        the challenged claims.  He just hasn't.
25                  It's -- the tool that Dr. Dennis is      11:33:27
```

Page 51

1     using, conjoint survey, is the wrong tool.

2     There's just no circumstance in which that on its

3     own can give an estimate of a price premium.  So I

4     have not -- I can't say that I've seen any

5     evidence of price premium from Mr. Weir.  I          11:33:39

6     haven't.

7

19            So, again, all these things together,

20    while I haven't done a fulsome analysis of price     11:34:25

21    premium here, says you can't rule out what

22    Mr. Weir did and everything else points to, you

23    know, a de minimis -- a de minimis price premium,

24    if any.

25            Q.    Okay.  But you personally did not do a  11:34:39

Page 52

1    price premium calculation in this case; right?

2            MS. CHANOINE:  Objection, form.

3        A.   I would give exactly the same answer

4    that I just gave.

5        Q.   Okay.                              11:34:55

6            Is a calculation of the price drop for

7    the Benecol spread products the same thing as a

8    calculation for the price premium solely

9    attributed to the no trans fat claim, if any?

10           MS. CHANOINE:  Objection, form,      11:35:21

11       incomplete hypothetical.

12       A.   No, I believe additional work would

13   need to be done to assess whether any of that

14   observed change in price is attributable to the

15   label change.  And I'm really not using it for   11:35:39

16   that -- well, I am using it for that purpose, but

17   it's primarily to impeach Mr. Weir; right?

18           He has this real-world market data

19   that's flatly inconsistent with the results that

20   he's picking up and multiplying from Dr. Dennis.   11:35:55

21   And he has no explanation for the difference;

22   right?  I have an explanation:  He's got the wrong

23   tool, you know, he's got a biased survey, his

24   numbers are just -- are just inflated.

25       Q.   What did you mean when you just used   11:36:18

                                            Page 53

1 ████████████████████████████████████

2 ████████████████████████████████████████

3 ██████████████████████████████

4 ████   ████   ██████████████████████

5 ████████████████████████████████████   ████████

6 ████████████████████████████████████████

7 ██████████

8         Q.    Okay.

9              (Pause.)

10        Q.    As part of your work here, did you do        11:42:25

11  anything to determine whether the price of Benecol

12  with the no trans fat claim on the label would

13  have been higher than the price of Benecol without

14  that claim being on the label, holding everything

15  else equal?                                            11:42:43

16             MS. CHANOINE:  Objection, form.

17        A.    And I believe I testified earlier that

18  I have not done sort of a fulsome analysis of

19  that.  I've done enough to know that Dr. --

20  Mr. Weir's use of 20 percent from Dr. Dennis is        11:43:01

21  speculative, unreliable, flawed, wrong, and that

22  what evidence we do have suggests if anything it

23  would be a small fraction of that and may be zero.

24        Q.    So do you believe that there is

25  evidence suggesting that there may be some             11:43:30

Page 57

```
 1          A.    No, I don't believe so.

 2          Q.    In order to draft this report in the

 3     Bowling case, did you start with your report in

 4     the Martinelli case and then save a new document

 5     and revise that report to create this one?        01:13:14

 6              MS. CHANOINE:  Objection, form.

 7          A.    I certainly used some of the same

 8     language from the Martinelli report.  I don't

 9     remember whether I just sort of cut and pasted

10     certain sections from that document or if I        01:13:32

11     started from that document and saved it as a new

12     document.  I think the latter -- the former,

13     sorry, but...

14          Q.    What was your assignment in this case?

15          A.    I was asked to review the damages        01:14:02

16     analysis and methodology proposed by Mr. Weir, who

17     in turn relies on the conjoint analysis done by

18     Dr. Dennis, and to reach an opinion about whether

19     I believed that was a reliable estimate of class-

20     wide damages.                                       01:14:31

21          Q.    Anything else?

22          A.    I think that's the overarching

23     assignment.  And then along the way I went through

24     a number of steps to reach the conclusions that I

25     did.                                                01:14:56
```

Page 76

1          Q.    Could you please turn to page 3 of your

2     report.  Do you have that?

3          A.    Yes.

4          Q.    Can you just take a moment to read to

5     yourself paragraph little A on page 3 and let me       01:15:25

6     know when you're done?

7          A.    Okay.

8                (Pause.)

9          Q.    Do you see four sentences into that

10    paragraph there's a sentence that states, Economic      01:16:21

11    theory and evidence, however, are clear that

12    market prices are determined by the interaction of

13    both demand side and supply side factors?

14                Do you see that?

15         A.    Yes.                                          01:16:38

16         Q.    Did you write that sentence?

17         A.    Yes.

18         Q.    Do you still agree that market prices

19    are determined by the interaction of both demand

20    side and supply side factors?                           01:16:50

21         A.    Yes.

22         Q.    What is a supply side factor?

23         A.    Any factor that affects the amount of

24    product or the price at which a company is willing

25    to sell that product for.                               01:17:15

Page 77

```
 1            Q.   So would marketing expenses be a supply

 2       side factor?

 3            A.   Yes.

 4            Q.   Would transportation costs to get a

 5       good to market be a supply side factor?        01:17:43

 6            A.   Sure, could be.

 7            Q.   Would costs of production be supply

 8       side factors?

 9            A.   Yes.

10            Q.   How about research and development    01:17:54

11       costs?

12            A.   Can be, yes.

13            Q.   Later on in that paragraph you write a

14       phrase "the 'but for' world."  Do you see that?

15            A.   Yes.                                  01:18:28

16            Q.   What is the "but for" world in the

17       context of this case?

18                 MS. CHANOINE:  Objection to form.

19            A.   One in which the challenged labels did

20       not appear on the Benecol products.            01:18:51

21            Q.   Is the "but for" world a hypothetical

22       place?

23                 MS. CHANOINE:  Objection, form.

24            A.   I think that's probably a fair way to

25       describe it.  It's -- my understanding is that  01:19:18
```

Page 78



1   of the Benecol brand name?

2           MS. CHANOINE:  Objection to form.

3       A.

01:27:53

Page 83

1    with the Benecol spreads -- that used the claim no

2    trans fat on their product label?

3         A.    ██████████████████████████

██   ██████████████████████

██   ██████████████████████████  █████████

██   ███████████████████████████

██   ████████████████████████████

██   ████████████████████  ██████████

██   ███████████████████████

██   ████████████████████████████  █████████

██   ████████████████████  █████████

12        Q.    You think that Promise Activ wrote the

13   word "no trans fat" on the label of their product

14   at some point in time?  Is that your testimony?

15        A.    I believe one of the two -- and I don't  01:32:16

16   remember which it was -- added the "no

17   trans fat" -- yes, the words "no trans fat" to its

18   label.

19        Q.    And what's your basis for believing

20   that?                                               01:32:26

21        A.    Seeing labels later on, maybe looking

22   today.  I can't remember.  Just that's my

23   recollection sitting here.

24        Q.    You looked at something today that you

25   can't remember?                                     01:32:38

                                        Page 86

```
1            Q.    Did you make any allowance for or did

2       you consider the results of Dr. Dennis's surveys

3       in the evidence that you reviewed?

4            MS. CHANOINE:  Objection to form.

5            A.    I considered them and found his          01:34:34

6       conjoint survey to be badly flawed and his

7       materiality survey to be inconsistent with the

8       other evidence that I reviewed, and now understand

9       that Dr. Scott has done a different materiality

10      survey and found that the label is not material to  01:34:51

11      consumers' purchase decisions.

12           Q.    But although your understanding is that

13      the results of Dr. Dennis's consumer perception

14      survey is inconsistent with other evidence in the

15      case, do you still make allowance for the results   01:35:10

16      of that survey when you form your opinions?

17           MS. CHANOINE:  Objection, form.

18           A.    I certainly -- again, I'm not opining

19      about his materiality survey.  I leave that to

20      Dr. Reibstein.  But I am opining that -- I          01:35:25

21      certainly considered that, and I am opining that

22      it's inconsistent with the sum and substance of

23      the other data I reviewed.

24                 So it makes sense that Dr. Reibstein

25      has critiques of that and that the survey that Dr.  01:35:47
```

Page 88

```
1        removal of the challenged labeling.  I believe to

2        do that would be a much more complicated exercise.

3        ████████████████████████████████

████     ██████████████████████████████

████     ███████████████████████████████████  ████████

████     ███████████████████████████████████

████     ████████████████████████████████████

████     ███████████████████████

9            Q.   But we already established you did not

10       do the more fulsome analysis; right?              01:56:39

11           A.   I did not, because I did not need to do

12       so to render the opinions that I gave and am

13       giving here, which are the 20.8 percent just

14       cannot be reliable ████████████████████████

████     ███████████████████████████████████  ████████

████     ████████████████████████████████████

████     █████████████████

18           Q.   But you didn't do it; right?

19                MS. CHANOINE:  Objection, asked and

20       answered.                                         01:57:07

21           A.   I can give the same answer.  I will if

22       you like me to.  I've done enough to know that the

23       20.8 percent is not possible -- there's no way

24       that's a reliable estimate; it's grossly

25       inflated -- ██████████████████████████           01:57:18
```

Page 102



```
1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23        A.    That's right.
24        Q.    Do you have any opinion in this case
25   that the percentage in the national retail --        02:03:17
```

Page 106



18          But if some portion of it is

19     attributable to the label, that means there would

20     be some people -- yes, there are some people that,   02:28:38

21     you know, would not have purchased absent the

22     challenged labeling.

23          And so no one paid a price premium, but

24     there'd be some people who, if liability is found,

25     would be entitled to a refund.  That's not the      02:28:50

Page 112

```
 1              Q.    Would you have been able to determine
 2        whether there was a price premium attributable to
 3        the no trans fat claim solely from the retail
 4        sales data you reviewed for the Benecol spreads in
 5        this case?                                      02:30:53
 6              A.    I'm sorry, can you be more specific
 7        about what you're asking, would I have been able
 8        to...
 9              Q.    Determine whether there was a price
10        premium attributable to the no trans fat claim   02:31:09
11        solely from looking at the retail sales data you
12        reviewed for the Benecol spreads in this case.
13              A.    Okay.  So if I had been asked to do
14        this more fulsome analysis that I referenced
15        earlier in the deposition, which, again, I don't   02:31:25
16        believe -- I don't -- I did not need to do the
17        render the opinions I have offered here.  But if I
18        was asked to do that, I would need additional
19        information other than just the retail sales data
20        that has been provided here.                    02:31:41
21              Q.    I want to go down to paragraph 9 in
22        your report.  Do you have that?
23              A.    Yes.
24              Q.    Can you just read that to yourself, and
25        let me know when you're ready to continue.      02:32:04
```

Veritext Legal Solutions
866 299-5127

1     defendants, not by the plaintiffs or defendants

2     themselves.

3          Q.    Okay.

4          A.    And in my experience at NERA, I have

5     been retained more often by counsel for              02:39:37

6     defendants.

7          Q.    What's your best estimate in terms of a

8     percentage split, were you retained by counsel for

9     defendants versus counsel for plaintiffs in your

10    work at NERA?                                         02:40:03

11         A.    Certainly the majority has been for on

12    behalf of counsel for defendants.  I'm not sure I

13    can put a number on it, but it would be probably

14    the large majority.

15         Q.    Okay.                                      02:40:22

16               Like how large?  75 percent?

17         A.    Yes.

18         Q.    More than 75 percent?

19         A.    Maybe.

20         Q.    More than 90 percent?                      02:40:29

21         A.    No.

22         Q.    Somewhere between 75 percent and 90

23    percent of the time?

24         A.    That sounds right.

25         Q.    Retained by counsel for defendants?        02:40:36

                                                    Page 119

1      tracked that, not to my knowledge.

2            Q.    Do you think it's good idea to put

3      stuff like that on NERA's Web site?

4            A.    I guess a good idea for what?

5      Personally I don't --                          02:46:01

6            Q.    For anything.  Do you think it has any

7      merit to post?

8                  MS. CHANOINE:  Objection to form.

9            A.    I would say I get asked about -- every

10     time I've been asked about it, it's always been in  02:46:13

11     a deposition by opposing counsel.  So in that

12     sense I have not found it particularly helpful.

13     Again, I haven't studied any other effects.

14           Q.    Do you have page 11 of your report?  Do

15     you still have that?                            02:46:49

16           A.    Yes.

17           Q.    Do you see in paragraph 20 at the

18     bottom there's subparagraph C?  Do you see that?

19     It says, Market prices are determined by the

20     interaction of these demand and supply processes.  02:47:00

21                 Do you see that?

22           A.    Yes.

23           Q.    You're talking about actual market

24     prices there; right?

25           A.    Yes.                               02:47:08

                                             Page 123

```
 1              Q.    And if we turn the page, there's

 2       paragraph 21 at the top; right?

 3              A.    Yes.

 4              Q.    Paragraph 21 says, Because these

 5       accepted principles of microeconomics explain that    02:47:25

 6       market prices are determined by the interaction of

 7       the forces of supply and demand, both supply side

 8       and demand side forces must be incorporated into

 9       any attempt to estimate a market-based price

10       premium.                                              02:47:43

11              Do you see that?

12              A.    Yes.

13              Q.    What do you mean by the word

14       "incorporated" in that sentence?

15              A.    Taken into account, factored in.        02:47:48

16              Q.    Is it fair to say that Dr. Dennis

17       factored in information about supply side

18       considerations into his conjoint survey by using

19       actual market prices for Benecol in the survey

20       design?                                               02:48:10

21              A.    No, not in the way that's necessary to

22       have the results of that analysis be a price

23       premium.

24              Q.    What do you mean by that?

25              A.    That conjoint survey is a tool that      02:48:37
```

Page 124

```
1        4.80 price is used as a benchmark in his -- in the

2        simulation, and everything else that feeds into

3        that simulation is the results from the consumers'

4        responses.

5                And further I know that even that        02:57:47

6        demand side simulation only works in a certain

7        range of prices.  I understand that it doesn't

8        work if you get below $4.10.  So even as a demand

9        side tool it's not telling us the full -- any kind

10       of full story.                                    02:58:06

11           Q.    Can you please turn to page 13 of your

12       report?  Do you have that?

13           A.    I do.

14           Q.    Okay.

15                Do you see the third sentence down        02:58:19

16       where it says, The historical sales and prices of

17       the products reflect the outcome of particular

18       demand and supply decisions given the specific

19       circumstances that existed at that time?

20                Do you see that?                          02:58:40

21           A.    Yes.

22           Q.    And did you write that?

23           A.    I did.

24           Q.    Do you still agree that historical

25       sales and prices of Benecol reflect the outcome of  02:58:53
```

Page 131

1    demand and supply decisions given circumstances

2    that existed in the actual market?

3              MS. CHANOINE:  Objection to the extent

4         it doesn't actually reflect the wording of the

5         document.                                    02:59:27

6         A.   Yeah, you left out -- you left out a

7    couple of words.  But I am still of the opinion

8    that historical sales and prices of products

9    reflect the outcome of a particular demand -- of

10   particular demand and supply decisions given the   02:59:42

11   specific circumstances that existed at that time.

12        Q.   And when I'm talking about

13   circumstances and points in time, you're talking

14   about circumstances and points in time in the

15   actual marketplace, in the real world; right?       02:59:58

16        A.   Yes.  And I guess --

17        Q.   Not a hypothetical world; right?

18        A.   What Mr. -- Dr. Dennis and Mr. Weir are

19   doing is a hypothetical world; right?  They are

20   saying what if consumer demand or consumer          03:00:17

21   willingness to pay were to be reduced by 20

22   percent.

23              Again, I don't think that's a realistic

24   number for all sorts of reason.  But that's a

25   hypothetical.  What would hypothetically happen to  03:00:33

                                              Page 132

1      action case to proffer a class-wide damages

2      methodology?

3          A.    I think I responded earlier that, yes,

4      I have been retained by plaintiffs' counsel in

5      class actions.  I have done work on those matters.  03:36:45

6      I have not had -- they settled before it came to

7      testimony, so I haven't -- I think you used the

8      word "proffer."  I haven't proffered testimony in

9      those.

10         Q.    Okay.  But you've been retained by        03:37:04

11     counsel for plaintiffs in class action lawsuits,

12     and as part of those retentions you were, you

13     know -- you created a report that set forth a

14     class-wide damages model.  That's what I'm asking,

15     have you done that, have you ever done that.        03:37:28

16         A.    I've certainly done analysis.  I don't

17     believe it's come to -- I don't believe it's come

18     to the point where I've had to submit a report.

19     Those cases have settled before testimony was

20     required, either live or in written form.  I may    03:37:48

21     have created a draft, but I have not actually

22     submitted written testimony or given oral

23     testimony in those cases.

24         Q.    Okay.  So you've never submitted a

25     report to a court where you were an expert for      03:38:02

                                                    Page 150

```
1        plaintiffs in a class action where you set forth a

2        damages framework for a putative class; is that

3        right?

4             A.   Yes, that's right.

5                  (Pause.)                              03:39:24

6                  MR. MARCHESE:  I don't have any further

7             questions.  Thank you.

8        EXAMINATION BY

9        MS. CHANOINE:

10            Q.   I just have one to go into.           03:39:32

11                 Dr. Martin, do you recall Mr. Marchese

12       asking you about how you went about drafting the

13       report you submitted in this case?

14            A.   Yes.

15            Q.   Do you recall him asking the role of   03:39:51

16       the Martinelli report when you drafted the report

17       in this case?

18            A.   Yes.

19            Q.   At one point you testified about the

20       phrase "cutting and pasting."  Do you remember    03:40:11

21       testifying to that?

22            A.   Yes, I do.

23            Q.   Can you explain what you meant by that?

24            A.   There are obviously certain

25       commonalities in this case and in the Martinelli  03:40:23
```

Veritext Legal Solutions
866 299-5127