**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

SUZANNA BOWLING, individually and on behalf of all others similarly situated,

                        Plaintiff,

     v.

JOHNSON & JOHNSON and McNEIL NUTRITIONALS, LLC

                  Defendants.

Civil Action No. 1:17-cv-03982-AJN

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION TO EXCLUDE THE EXPERT TESTIMONY OF DR. DOUGLAS L. NGUYEN, DR. CAROL A. SCOTT, DR.  DAVID J. REIBSTEIN, AND DR. DENISE N. MARTIN**

Dated:  November 16, 2018

**BURSOR & FISHER, P.A.**

Scott A. Bursor
Joseph I. Marchese
888 Seventh Avenue
New York, NY 10019
Telephone: (646) 837-7150
Facsimile:  (212) 989-9163
E-Mail: scott@bursor.com
         jmarchese@bursor.com

**BURSOR & FISHER, P.A.**

Frederick J. Klorczyk III
Neal J. Deckant
1990 North California Blvd., Suite 940
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
E-Mail:  fklorczyk@bursor.com
         ndeckant@bursor.com

*Attorneys for Plaintiff*

TABLE OF CONTENTS

PAGE(S)

I.  INTRODUCTION ...................................................................................................... 1

II.  LEGAL STANDARD .............................................................................................. 1

III.  MOTION TO STRIKE DR. DOUGLAS L. NGUYEN .......................................... 2

    A.  Summary Of Dr. Nguyen's Report ............................................................. 2

    B.  Dr. Nguyen's Testimony Is Not Relevant, As Plaintiff Bowling's
    Medical History Has Nothing To Do With Any Claims, Defenses,
    Or Class Certification Considerations ......................................................... 3

    C.  Dr. Nguyen's Testimony Is Not Reliable And Is Not Based On
    Sufficient Data, As He Did Not Examine Plaintiff Bowling, Take
    Her Medical History, Or Review Any Of Her Medical Records ................ 5

    D.  Dr. Nguyen's Report Is Defective, Per Rule 26(a)(2)(B)(iv)-(vi) ............. 6

IV.  MOTION TO STRIKE DR. CAROL A. SCOTT ..................................................... 6

    A.  Summary Of Dr. Scott's Report ................................................................. 6

    B.  Dr. Scott's Testimony Is Neither Relevant Nor Reliable, As She
    Never Attempted To Calculate A Price Premium For The
    Challenged Misrepresentations ................................................................... 9

    C.  Dr. Scott's Testimony Is Neither Relevant Nor Reliable, As Her
    Surveys Fail To Reflect Marketplace Realities ....................................... 10

    D.  Dr. Scott's Testimony Is Neither Relevant Nor Reliable, As She
    Improperly Coded The Responses To Survey Questions ........................ 10

    E.  Dr. Scott's Testimony Is Neither Relevant Nor Reliable, As Her
    Surveys Suffer From Numerous Methodological Defects ...................... 12

V.  MOTION TO STRIKE DR. DAVID J. REIBSTEIN .............................................. 13

    A.  Summary Of Dr. Reibstein's Report ........................................................ 13

    B.  Dr. Reibstein Is A Former Johnson & Johnson Consultant Who
    Was Wined And Dined In Preparation For His Deposition ..................... 14

    C.  Dr. Reibstein's Testimony Is Neither Relevant Nor Reliable, As
    He Never Attempted To Calculate A Price Premium For The
    Challenged Misrepresentations, Did Not Review Any Sales Data,
    And Is Not Offering Any Opinion Regarding Damages ......................... 15

i

D.      Dr. Reibstein's Testimony Is Neither Relevant Nor Reliable, As He Is Admittedly Wrong That Plaintiff's Experts Failed To Consider "Supply-Side Factors" ............................................................. 17

VI.     MOTION TO STRIKE DR. DENISE N. MARTIN ........................................ 19

A.      Summary Of Dr. Martin's Background And Her "Copied And Pasted" Report ....................................................................................... 19

B.      Dr. Martin's Testimony Is Neither Relevant Nor Reliable, As She Never Attempted To Calculate A Price Premium For The Challenged Misrepresentations ........................................................... 21

C.      Dr. Martin's Testimony Is Neither Relevant Nor Reliable, As She Is Admittedly Wrong That Plaintiff's Experts Failed To Account For "Supply-Side" Considerations ...................................................... 22

D.      Dr. Martin's Analysis Of Benecol Retail Sales Data Is Not Relevant Or Reliable, As She Admitted That Her Findings Of A Drop In Sales Price Is Not The Same As A Price Premium Analysis ............................................................................................... 23

VII.    CONCLUSION .......................................................................................... 25

# TABLE OF AUTHORITIES

**PAGE(S)**

## CASES

*Amorgianos v. Nat'l R.R. Passenger Corp.*,
   303 F.3d 256 (2d Cir. 2002) .......................................................................... passim

*Baker v. Urban Outfitters, Inc.*,
   254 F. Supp. 2d 346 (S.D.N.Y. 2003) ......................................................................... 1

*Belfiore v. Procter & Gamble Co.*,
   311 F.R.D. 29 (E.D.N.Y. 2015).............................................................................. 4, 5

*Daubert v. Merrell Dow Pharm., Inc.*,
   509 U.S. 579 (1993) ................................................................................................. 1

*Ebin v. Kangadis Food Inc.*,
   297 F.R.D. 561 (S.D.N.Y. 2014)............................................................................. 4

*Ebin v. Kangadis Food Inc.*,
   2013 WL 6504547 (S.D.N.Y. Dec. 11, 2013) ....................................................... 3

*Goldemberg v. Johnson & Johnson Consumer Companies, Inc.*,
   8 F.Supp.3d 467 (S.D.N.Y. 2014) .......................................................................... 4

*In re Amla Litig.*,
   320 F. Supp. 3d 578 (S.D.N.Y. 2018) ..................................................................... 4

*In re Scotts EZ Seed Litig.*,
   304 F.R.D. 397 (S.D.N.Y. 2015)............................................................................. 4

*Koenig v. Boulder Brands, Inc.*,
   995 F. Supp. 2d 274 (S.D.N.Y. 2014) ..................................................................... 4

*Kumho Tire Co., Ltd. v. Carmichael*,
   526 U.S. 137 (1999) ............................................................................................. 1, 3

*Singleton v. Fifth Generation, Inc.*,
   2016 WL 406295 (N.D.N.Y. Jan. 12, 2016) .......................................................... 3

## STATUTES

N.Y. G.B.L. § 349 .......................................................................................................... 4

## RULES

Fed. R. Civ. P. 26(a)(2)(B) ........................................................................................... 6

Fed. R. Evid. 702 .................................................................................................. 1, 2, 5

## I.     INTRODUCTION

Plaintiff Suzanna Bowling hereby moves to strike:  (i) the September 19, 2018 Expert Report of Dr. Douglas L. Nguyen (Dkt. 57-12) (the "Nguyen Report"), (ii) the September 20, 2018 Expert Report of Dr. Carol A. Scott (Dkt. 57-13) (the "Scott Report"), (iii) the September 20, 2018 Rebuttal Expert Report of Dr. David J. Reibstein (Dkt. 57-20) (the "Reibstein Report"), and (iv) the September 20, 2018 Rebuttal Declaration of Dr. Denise N. Martin (Dkt. 57-19) (the "Martin Report"), together with all corresponding testimony.

## II.    LEGAL STANDARD

The party seeking to introduce expert testimony "bears the burden of establishing its admissibility by a preponderance of the evidence."  *Baker v. Urban Outfitters, Inc.*, 254 F. Supp. 2d 346, 353 (S.D.N.Y. 2003).  Federal Rule of Evidence 702 allows expert testimony if:

> (a) the expert's … specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

In evaluating expert testimony under this standard, the court acts as a gatekeeper to "ensur[e] that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand."  *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993).

The reliability inquiry envisioned by *Daubert* is "a flexible one," *id.* at 594, and the factors to be considered "depend[] upon the particular circumstances of the particular case at issue."  *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 150 (1999).  The Second Circuit has emphasized that courts should focus on "the indicia of reliability identified in Rule 702, namely, (1) that the testimony is grounded on sufficient facts or data; (2) that the testimony 'is the product of reliable principles and methods'; and (3) that 'the witness has applied the principles

1

and methods reliably to the facts of the case.'" *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 265 (2d Cir. 2002) (quoting Fed. R. Evid. 702).  This "flexible *Daubert* inquiry gives the … court the discretion needed to ensure that the courtroom door remains closed to junk science while admitting reliable expert testimony." *Id.* at 267.

## III.    MOTION TO STRIKE DR. DOUGLAS L. NGUYEN

### A.    Summary Of Dr. Nguyen's Report

Dr. Nguyen is a practicing physician and Associate Clinical Professor of Medicine at the University of California-Irvine Medical Center, with active board certifications in Internal Medicine and Gastroenterology.  *See* Nguyen Report at 1.  In his expert report, based <u>solely</u> on a review of Plaintiff Bowling's deposition testimony, Dr. Nguyen offers certain "medical opinions" regarding Ms. Bowling's experiences consuming Benecol.  *Id.*  In doing so, Dr. Nguyen notes that "no medical records were available for Ms. Suzanna Bowling," nor did he perform a medical examination of Ms. Bowling.  *Id.*

████████████████████████████████

████████████████████████████████████

██████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████

██████████████████

████████████████████████████████████

████████████████████████████████████



**B.    Dr. Nguyen's Testimony Is Not Relevant, As Plaintiff Bowling's Medical History Has Nothing To Do With Any Claims, Defenses, Or Class Certification Considerations**

Dr. Nguyen's testimony is completely irrelevant to any claim, defense, or class certification consideration at issue in this matter.  Plaintiff – like all class members – was injured at the time of purchase when she paid a price premium for Benecol solely attributable to the "No Trans Fat" claim.  *See* Dkt. 53 at Ex. B, Bowling Dep. at 261:2-25.  Stated otherwise, ███████████████ ████████████████████████████, but rather because the "No Trans Fat" claim was false and she was charged too much.  *Id.* at 151:6-25; *see also* Compl. ¶ 5 ("… Plaintiff Bowling paid a tangible increased cost for Benecol Spreads, which were worth less than represented because Benecol Spreads do, in fact, contain trans fats ….").

New York courts recognize the type of injury Ms. Bowling is claiming because "[t]he deception is the false and misleading label, and the injury is the purchase price."  *Ebin v. Kangadis Food Inc.*, 2013 WL 6504547, at *5 (S.D.N.Y. Dec. 11, 2013) (emphasis added); *see also, e.g.*, *Singleton v. Fifth Generation, Inc.*, 2016 WL 406295, at *11 (N.D.N.Y. Jan. 12, 2016) ("It is well-established that paying a premium for a product can constitute an actual injury under

3

N.Y. G.B.L. § 349."); *Koenig v. Boulder Brands, Inc.*, 995 F. Supp. 2d 274, 288-89 (S.D.N.Y. 2014) (collecting cases).

As Judge Rakoff recently explained, such an inquiry into Plaintiff Bowling's medical history – ██████████████████████████████ – is totally irrelevant to claims that seek "price premium" damages:

> It may be that some class members would have been willing to purchase the product for the same price even if they knew the scalp protector did not work. But that does not matter. If there is a price premium, then every purchaser of the kit paid more than they otherwise would have, so every purchaser was injured. A purchaser's individual experience after purchasing the product or idiosyncratic ex ante valuation does not matter.
>
> For exactly this reason, courts regularly certify classes alleging § 349 violations when the injury was payment of a price premium. *See, e.g., Belfiore v. Procter & Gamble Co.*, 311 F.R.D. 29, 62 (E.D.N.Y. 2015); *Goldemberg v. Johnson & Johnson Consumer Companies, Inc.*, 8 F.Supp.3d 467, 481 (S.D.N.Y. 2014); *In re Scotts EZ Seed Litig.*, 304 F.R.D. 397, 414 (S.D.N.Y. 2015). The New York 23(b)(3) class therefore remains certified as to its NYGBL claim for statutory damages.

*In re Amla Litig.*, 320 F. Supp. 3d 578, 592-93 (S.D.N.Y. 2018) (emphasis added); *see also Ebin v. Kangadis Food Inc.*, 297 F.R.D. 561, 571-72 (S.D.N.Y. 2014) (finding "price premium" damages model "obviate[d] the problems of which defendant complains," namely that "individualized mini-trials must be held to determine each class member's actual damages").

Here, "either all consumers purchased ['No Trans Fat' products] that [did], in fact, [contain trans fats], or none did. In this way, the case is more akin to *Ebin*, 297 F.R.D. at 569, where plaintiff sought to certify a damages class of purchasers of a product labeled '100% olive oil,' which was actually pomace. Individualized inquiries were unnecessary. The product was not what it said it was. All class members, even those who 'actively wanted to buy pomace instead of 100% pure olive oil' suffered an injury: they 'paid too much for it.'" *Belfiore*, 311 F.R.D. at 69 (emphasis added).

4

Accordingly, Dr. Nguyen's expert report has no bearing on any issue in the case. It is totally irrelevant and will not help the trier of fact. It should be stricken.

### C. Dr. Nguyen's Testimony Is Not Reliable And Is Not Based On Sufficient Data, As He Did Not Examine Plaintiff Bowling, Take Her Medical History, Or Review Any Of Her Medical Records

Dr. Nguyen's report states that "no medical records were available for Ms. Suzanna Bowling." Nguyen Report at 1. Rather, as is noted in his list of "Material[s] Reviewed," the opinions expressed in Dr. Nguyen's opinions are based <u>solely</u> on the "[d]eposition transcript [of Ms. Bowling] dated August 24, 2018." *Id.* No other documents or authority are discussed anywhere in Dr. Nguyen's report. *Id.* Nonetheless, Dr. Nguyen states that "I applied the same analytical technique to the medical I formation [sic] available to me as I would with any patient in my clinical practice, based on my training, experience, and medical judgment and made to a medical degree of certainty." *Id.* at 1-2.

However, Dr. Nguyen did not actually perform a medical examination of Plaintiff Bowling. *Id.* Dr. Nguyen never took Ms. Bowling's medical history. *Id.* Dr. Nguyen did not review any of Ms. Bowling's medical records, take any vitals or measurements, or ask her any medical questions. *Id.* ███████████████████████████████████████

███████████████████ *Id.* In fact, Dr. Nguyen has never spoken to Ms. Bowling. *Id.* ███████

████████████████████████████████████████████████████

███████████████████████████████████████████

In lieu of a competent medical examination – including a review of Plaintiff Bowling's medical history and records – Dr. Nguyen's testimony is not "based on sufficient facts or data" that would be relied upon by a physician in providing medical advice. *See* Fed. R. Evid. 702. Similarly, Dr. Nguyen's testimony is not "the product of reliable principles and methods." *Id.*;

*see also Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 267 (2d Cir. 2002).  The
Court should not admit the testimony of a physician who has never examined his "patient."

### D.    Dr. Nguyen's Report Is Defective, Per Rule 26(a)(2)(B)(iv)-(vi)

Federal Rule of Civil Procedure 26(a)(2)(B) provides that expert disclosures "must be
accompanied by a written report – prepared and signed by the witness – if the witness is one
retained or specially employed to provide expert testimony in the case or one whose duties as the
party's employee regularly involve giving expert testimony."  Such reports "must contain,"
among other items:

> (iv) the witness's qualifications, including a list of all publications
> authored in the previous 10 years;
>
> (v) a list of all other cases in which, during the previous 4 years,
> the witness testified as an expert at trial or by deposition; and
>
> (vi) a statement of the compensation to be paid for the study and
> testimony in the case.

Fed. R. Civ. P. 26(a)(2)(B).[1]

Dr. Nguyen failed to comply with Rule 26(a)(2)(B)(iv)-(vi), as these items are totally
absent from his report.[2]  Accordingly, Dr. Nguyen's report is defective and should be stricken.

## IV.   MOTION TO STRIKE DR. CAROL A. SCOTT

### A.    Summary Of Dr. Scott's Report

Dr. Scott is a Professor of Marketing Emeritus at the Anderson Graduate School of
Management at UCLA and is a founding partner at Crossfield Associates, a litigation analysis

---

[1] Defendants are unambiguously offering Dr. Nguyen's opinions as expert testimony.  *See*
9/20/18 Orr Decl. ¶ 13 ("Attached hereto as **Exhibit L** and filed under seal under the Protective
Order is a true and correct copy of the <u>expert report of Dr. Douglas L. Nguyen</u> in Opposition to
Plaintiffs Motion for Class Certification.") (Dkt. 57) (bold in original; underlining added).

[2] Dr. Nguyen's report states that he has "published more than 130 peer reviewed publications,
abstracts, and book chapters."  Nguyen Report at 1.  However, Dr. Nguyen's report does not
include a *curriculum vitae*, nor does he identify even a single publication.  *See* Fed. R. Civ. P.
26(a)(2)(B)(iv).

and support firm.  Scott Report ¶ 1.  Defendants retained Dr. Scott to "determine whether or not the 'No Trans Fat' claim on the front of packages of Benecol spread affect the likelihood that consumers would purchase the product or consumers' perceptions of health-related benefits of the product."  *Id.* ¶ 2.  Additionally, Dr. Scott was further asked to "investigate and analyze the reasons why Benecol purchasers first purchased and continue to purchase the product."  *Id.*

Dr. Scott endeavored to accomplish these tasks through two consumer surveys.  The first survey, "Survey A," is based on an "experimental design" that "is related to the materiality issue."  Klorczyk Reply Decl. Ex. R, Scott Dep. at 25:21-24.  Specifically, respondents were "shown one of three images of the Benecol package and then [were] asked to indicate how likely it is they would purchase the product, using a scale of '1' to '7.'"  Scott Report ¶ 16.  These "three images" of the Benecol packaging were randomized, such that "one-third of the sample for Survey A was assigned to see a Benecol package" with the "No Trans Fat" claim, another one-third saw a hypothetical package with a "0g Trans Fat" claim substituted for the "No Trans Fat" claim, and the final one-third saw a package with no such claims.  *Id.* ¶ 17.  Then, respondents were asked "to indicate the degree to which they believed the product was characterized by six attributes," on a scale of "1" to "7."  *Id.* ¶ 16.

Dr. Scott found that respondents to "Survey A" who "saw the 'No Trans Fat' claim on the front of the package were not significantly more likely to [respond that they either 'definitely would buy this product' or 'probably would buy this product'] than those who saw either the '0g trans fats' claim."  *Id.* ¶ 20.  Dr. Scott also concluded that "there was no significant differences in the percent of consumers who indicated that the product they were shown" has health-related benefits.  *Id.* ¶ 24.  That said, Dr. Scott found that "[s]ignificant differences were observed across the three groups for characteristics" that are "not related to health."  *Id.*  For example, "the 'No

Trans Fat' label group was more likely to believe that the product was 'expensive' (66.8%) than the no claim group (52.4%)." *Id.*

The second survey, "Survey B," is a so-called "consumer perception survey." Klorczyk Reply Decl. Ex. R, Scott Dep. at 26:11-13. There, respondents were given "open-ended question[s] in which they were asked to write in their own words what it was that made them decide to first purchase Benecol." Scott Report ¶ 28. Respondents were then "asked to rate their experience with Benecol using a '1' to '7' scale." *Id.* Lastly, respondents were asked "to examine a list of 17 reasons" why some consumers might purchase Benecol," "indicate [each] attribute or characteristic's importance to them," and rate them on a scale of 1 to 7. *Id.* Respondents were also asked "to select up to four of the attributes as ones being most important." *Id.*

Dr. Scott found that the respondents to "Survey B" most commonly referenced a "general health claim[]" in response to the open-ended question as to why they first purchased Benecol, with 22.8% of respondents providing such a response. *Id.* ¶ 33. Thereafter, the next most frequent responses were "about heart health," at 8.4%, followed by "the product being good for cholesterol levels." *Id.* Likewise, in response to an open-ended question prompting respondents to "write in the most important reason(s) why they continue to purchase the product," "general health related reasons again were mentioned most frequently" at 37.3, followed by "taste" at 29.9% and "cholesterol related reasons" at 22.4%. *Id.* Next, in response to an open-ended question as to "the feature(s) that they like most and the feature(s) they liked least about Benecol," the "most frequently mentioned positive features were related to taste (20.1%), 'heart health' (16.1%), lowering cholesterol (14.8%), and general 'health' (10.7%)." *Id.* ¶ 36. Lastly, when provided with a closed-ended question prompting respondents to review the list of 17

product attributes, "'taste', 'no trans fats', 'good for my heart', and 'product helps to lower or reduce cholesterol levels' all were rated either a '6' or '7' by approximately 80% of respondents (85.6%, 82.6%, 81.9%, and 81.5% respectively)." *Id.* ¶ 40.  Thus, Dr. Scott concluded that "when reminded about trans fats, most consumers rated trans fats as very important to them." *Id.*

> ### B.  Dr. Scott's Testimony Is Neither Relevant Nor Reliable, As She Never Attempted To Calculate A Price Premium For The Challenged Misrepresentations

As discussed above and in Plaintiff's Motion for Class Certification (Dkt. 38), Plaintiffs are seeking "price premium" damages.  *See supra* § III.B; *see also* 7/30/18 Plf.'s Br. at 23-24. However, Dr. Scott conceded that she never attempted to calculate "price premium" damages attributable to the presence or absence of the challenged representations at issue:

> Q.   Okay.  In connection with your consumer surveys in this matter, did you calculate the price premium associated with the presence or absence of the challenged claims at issue on the packaging of Benecol?
>
> A.   I did not determine if there is a price premium and did not calculate any value if there is one.
>
> Q.   Okay.  Do you know if there's a price premium associated with the presence or absence of the challenged claims on the packaging of Benecol?
>
> A.   I have no opinion about that.

Klorczyk Reply Decl. Ex. R, Scott Dep. at 27:15-28:3 (objections omitted).  This omission is telling, given that Dr. Scott has prepared similar consumer surveys in other matters to assess the existence of a price premium associated with a particular product feature.  *See id.* at 53:3-19.

Similarly, Dr. Scott made clear that she was not offering any opinion regarding:  (i) the surveys performed by Dr. Dennis in this matter, *id.* at 29:16-18; (ii) the expert testimony and opinions of Dr. Dennis, *id.* at 29:19-22; (iii) the expert testimony and opinions of Mr. Weir, *id.* at 29:23-30:1; (iv) whether Plaintiff's theory of damages matches her allegations, *id.* at 30:2-10; (v) whether a class should be certified, *id.* at 32:6-8; or (vi) whether Plaintiff has any unique claims

or defenses, *id.* at 33:20-34:10.  Likewise, Dr. Scott testified that she did not conducted any

analysis of Benecol sales data, *id.* at 33:9-11, and she is not offering any opinions as an expert

economist, *id.* at 33:6-8.

**C.    Dr. Scott's Testimony Is Neither Relevant Nor Reliable, As Her Surveys Fail To Reflect Marketplace Realities**

Dr. Scott's surveys are not reflective of marketplace realities.  Most significantly, Dr.

Scott failed to inform respondents of the price of Benecol:

> Q.    … All right.  Did your survey inform respondents of the retail price of Benecol?
>
> A.    No.
>
> Q.    Okay.  Is price discussed anywhere in your survey?
>
> A.    Is price assessed?
>
> Q.    Strike that, actually.  Have you seen any evidence that anyone bought Benecol without being notified as to the price of the product?
>
> A.    I haven't seen any evidence one way or the other.
>
> …
>
> Q.    Well, supermarkets do post prices; right?
>
> A.    Sure.

*Id.* at 106:18-107:4, 107:19-20.  Even Dr. Scott's colleague, Dr. Reibstein, concedes that having

actual marketplace prices in consumer surveys increases realism and familiarity for respondents.

*See* Klorczyk Reply Decl. Ex. S, Reibstein Dep. at 67:14-16.

**D.    Dr. Scott's Testimony Is Neither Relevant Nor Reliable, As She Improperly Coded The Responses To Survey Questions**

During her deposition, Dr. Scott explained that the responses to her survey questions are

"coded" by Dave Bentley, a non-employee subcontractor of her consulting firm, Crossfield

Associates.  However, Mr. Bentley's work was not performed pursuant to "any written

procedures or guidelines:"

> Q.    And who is Dave Bentley?

10

> A.    Dave Bentley is a subcontractor.  He's an analyst that we often use and Dave does a variety of analytical jobs for us.
>
> Q.    And Mr. Bentley is not an employee of CrossField Associates; is that right?
>
> A.    That's correct.
>
> Q.    Okay.  And what work has Mr. Bentley conducted on this matter?
>
> A.    I believe Mr. Bentley is the analyst who takes the first crack at coding the verbatim responses.
>
> …
>
> Q.    Okay.  Was Mr. Bentley's work guided by any written procedures or guidelines?
>
> A.    I don't believe so.

Klorczyk Reply Decl. Ex. R, Scott Dep. at 21:17-22:3, 89:1-3.

Unsurprisingly, there are numerous errors in Mr. Bentley's coding.  First, despite trans fats being linked to raising LDL ("bad" cholesterol) and lowering HDL ("good" cholesterol), the open-ended responses discussing cholesterol were not "coded" as being relevant to "trans fats." *See* Compl. ¶ 27 ("Consumption of trans fat increases LDL-C ('bad' cholesterol) [and] decreases HDL-C ('good' cholesterol) …."); *see also* Klorczyk Reply Decl. Ex. R, Scott Dep. at 82:7-11 ("Q.  Did you see the allegation in the class action complaint that consumption of trans fats can raise LDL and lower HDL?  Did you see that allegation?   A.  I don't remember seeing that.").

Second, responses indicating "heart health" were not coded as being relevant to "trans fats:"

> Q.    Do you think that considerations of heart health, specifically, may be linked to trans fats?
>
> A.    I don't see any evidence of that.
>
> Q.    Actually, can you take a look at Exhibit 4, which is the labeling of Benecol.  It's right there (indicating).  And do you see on – you can just take a look at the first page of Exhibit 4.  Do you see on the top of the tub of Benecol, there's that logo of a heart with a circle around it –
>
> A.    Right.

Q.      – that says "no trans fats"?  Now, given the picture of a
        heart with a circle around it in connection with the "no
        trans fat" label, does that inform any opinion as to whether
        heart health is linked to the "no trans fat" claim?

A.      No … not particularly.

Q.      "No"?  Why not?

A.      Well, a heart can be happy.  A heart can mean positive.  It
        doesn't have to mean your heart.  I don't see that.  And I
        don't – I didn't ask consumers about that connection, but I
        don't – if you look across all the responses to both studies,
        I don't see any evidence that people were thinking about
        trans fat.

Q.      Did you endeavor to study the topic?

A.      No. …

Klorczyk Reply Decl. Ex. R, Scott Dep. at 79:23-81:7 (objections omitted).

### E.      Dr. Scott's Testimony Is Neither Relevant Nor Reliable, As Her Surveys Suffer From Numerous Methodological Defects

Dr. Scott's survey contains numerous other procedural and methodological defects.

Initially, Dr. Scott did not conduct a "pre-test" to determine whether respondents had issues

completing the survey or were confused by any questions.  *See id.* at 85:11-13 ("Q.  Did you

conduct a pretest in connection with your survey in this matter?  A.  I did not conduct a

traditional pretest, no.").

Additionally, Dr. Scott did not know whether there were any respondents from New York

in her sample.  *See id.* at 119:25-120:3 ("Q.  Do you know whether New York was included as

one of the 41 states?  A.  I don't recall.  I'm assuming so, but I don't recall.").

As for her sample group, Dr. Scott inexplicably excluded respondents who were using

mobile phones.  *Id.* at 93:8-10 ("Q.  Now, you had excluded respondents who were using mobile

phones; right?  A.  That's correct."); *id.* at 93:24-94:5 ("Q.  Okay.  And was your concern that

the zoom function would not work on mobile devices?  A.  It's not so much that, it's that, just,

mobile phones typically don't have that great a resolution …."); *id.* at 95:14-17 ("Q.  Would it

surprise you that a Samsung Galaxy S7 actually has a higher pixel resolution that a 1080P

computer monitor?  A.  I have no idea.").[3]  These exclusions serve to remove a significant

portion of potential respondents, as approximately 42.8% of domestic Internet traffic in the U.S.

originates from a mobile device.[4]

## V.   MOTION TO STRIKE DR. DAVID J. REIBSTEIN

### A.   Summary Of Dr. Reibstein's Report

As discussed in Plaintiff's Motion for Class Certification (Dkt. 38), Plaintiff retained a

consumer survey expert, Dr. J. Michael Dennis, to "design (in consultation with plaintiff's

damages expert, Mr. Colin Weir), conduct, and report on a consumer survey to measure the

market price premium, if any, solely attributable to the challenged claims 'No Trans Fat' and

'No Trans Fatty Acids' displayed on the packaging of the Benecol Spreads."  *See* 7/30/18 Dennis

Report ¶ 15 (Dkt. 37).  This survey, called a "choice-based conjoint study," which has "been

generally accepted and commonly used in market research" since "at least the 1990s," verified

that "Benecol commanded a 20.8% price premium that was solely attributable to the No Trans

Fat claim."  *Id.* ¶ 29; 7/30/18 Plf.'s Br. at 19 (Dkt. 38).

In turn, Defendants retained Dr. Reibstein, a Professor of Marketing at the Wharton

School of Business at the University of Pennsylvania, to "evaluate whether the surveys

conducted by Dr. Dennis can be relied upon to measure the 'price premium' associated with the

'No Trans Fat' and 'No Trans Fatty Acids' claims."  Reibstein Report ¶¶ 2, 12.  Additionally,

_____

[3] If a respondent is found to be using a cell phone, respondents were not given an opportunity to continue or take the survey on a desktop computer.  *See id.* at 129:23-130:2 ("Q.  If a would-be respondent attempts to take the survey on his or her cell phone, is the respondent given an opportunity to retake the survey on another device?  A.  No.").

[4] *See Percentage of Mobile Device Website Traffic in the United States From 1st Quarter 2015 to 3rd Quarter 2018*, Statista, https://www.statista.com/statistics/683082/share-of-website-traffic-coming-from-mobile-devices-usa/

Dr. Reibstein was further asked to "review and analyze the opinions in the declaration submitted by Mr. Weir ('Weir Declaration') as they relate to the opinions offered by Dr. Dennis." *Id.* ¶ 2.

Among other criticisms, Dr. Reibstein first opines that "a conjoint survey is unnecessary because relevant marketplace data exist." *Id.* ¶ 5.[5] Specifically, "Defendants removed the challenged claims beginning in 2012 without changing the formulation of Benecol," which purportedly "allows for comparison of sales and prices with and without the challenged claims." *Id.* ¶ 5.[6] Second, Dr. Reibstein contends that Dr. Dennis' conjoint survey "suffers from a number of design flaws," namely that "Dr. Dennis omits important purchase drivers for many consumers," such as "efficacy, physician recommendation, taste, consistency, and brand." *Id.* ¶ 6. Third, Dr. Reibstein argues that Dr. Dennis' conjoint survey fails to account for so-called "supply-side factors" in that such a survey "can provide an estimate of changes in demand …, but in itself, a conjoint survey fails to provide evidence of how the seller or its competitors would respond." *Id.* ¶ 7.

### B.   Dr. Reibstein Is A Former Johnson & Johnson Consultant Who Was Wined And Dined In Preparation For His Deposition

Dr. Reibstein is a former consultant for Defendant Johnson & Johnson.  *See* Klorczyk Reply Decl. Ex. S, Reibstein Dep. at 50:14-17 ("Q.  Okay.  Have you been hired by Johnson &

---

[5] However, Dr. Reibstein's colleague, Dr. Martin, the economist, admits that she cannot determine the price premium through such an analysis of marketplace data.  *See* Klorczyk Reply Decl. Ex. Q, Martin Dep. at 53:5-17 ("Q.  Okay.  ███████████████████████████ ████████████████████████████████  A.  No, I believe additional work would need to be done to assess whether any of that observed change in price is attributable to the label change.  And I'm really not using it for that – well, I am using it for that purpose, but it's primarily to impeach Mr. Weir; right?  …") (objections omitted).

[6] Dr. Martin also admitted that she only performed a ██████████ analysis, which is not the same exercise as a price premium analysis.  *See* Klorczyk Reply Decl. Ex. Q, Martin Dep. at 114:1-20.

Johnson in a consulting capacity outside of litigation?  A.  Yes, I have.")  Johnson & Johnson is

paying Dr. Reibstein $1,200 an hour for his services in this case.  *See id.* at 82:4-6.  Furthermore,

immediately prior to his deposition, Johnson & Johnson's lawyers treated Dr. Reibstein to an

expensive dinner, complete with appetizers, Caesar salad, ribeye steak, and white and red wine –

all free of charge.  *See id.* at 9:12-11:9.

> **C.  Dr. Reibstein's Testimony Is Neither Relevant Nor Reliable, As
> He Never Attempted To Calculate A Price Premium For The
> Challenged Misrepresentations, Did Not Review Any Sales
> Data, And Is Not Offering Any Opinion Regarding Damages**

Dr. Reibstein admitted that the conjoint methodology is "commonly utilized" to

determine "consumer preferences" for products and their component features:

> Q.    Sure.  Do you agree that choice based conjoint surveys are
>       a standard and accepted techni[que] in marketing research,
>       for quantifying consumer preferences for products?
>
> A.    For consumer attributes for products.
>
> Q.    You agree with that?
>
> A.    I do agree with that, that it's commonly utilized.

*Id.* at 85:8-18 (objections omitted); *see also id.* at 84:15-23 (testifying that "choice based

conjoint surveys" were "developed at the Wharton School at the marketing department").[7]

In this matter, however, Dr. Reibstein never attempted to calculate the "price premium"

solely attributable to the presence or absence of the "No Trans Fat" claim at issue:

> Q.    Did you do anything as part of your work in this case to try
>       to calculate whether there was a price premium solely
>       attributable to the no trans fat claim?
>
> A.    I did not.  That was not part of my assignment that I was
>       given.
>
> …

---

[7] *See also id.* at 37:22-24 ("Q.  When properly implemented, does a conjoint study have a known error rate?  A.  It does.  …)".

Q.      Okay.  I want to ask, do you have any opinion in this case
        about whether there was a price premium solely attributable
        to the no trans fat claim?

A.      As you asked me previously, that was not what my
        assignment was and I formed no opinion on that.

*Id.* at 26:9-14, 27:4-12 (objections omitted).

Similarly, Dr. Reibstein never reviewed any sales data in connection with his report:

Q.      Do you know anything about whether there was less
        volume[] sold after the no trans fat claim was removed
        from the Benecol label?

A.      I have not specifically looked at that data ….

…

Q.      And that's your – what empirical data specifically are you
        referring to?

A.      I believe there's the availability of some IRI data which
        indicates that the prices from McNeil did not change during
        that time period.

Q.      And did you analyze that data personally?

A.      I did not.

Q.      Okay.  So you didn't do anything yourself to analyze that
        data, right?

A.      I did not.  I was asked to review the Dennis report, as I
        stated in the first paragraph in my report.

*Id.* at 28:23-29:3, 29:22-30:9.  Dr. Reibstein also used methodologies not commonly accepted in

the field to purportedly test the validity of Dr. Dennis' conjoint results.  *See id.* at 110:15-21 (Dr.

Reibstein testifying that his "summation methodology" is not "commonly done").

Likewise, Dr. Reibstein never endeavored to study how consumers would understand the

"No Trans Fat" claim, and he has no opinions regarding any such understanding:

Q.      Do you have any opinions about how consumers
        understood the no trans fat claim in this case?

A.      I haven't conducted any study on that, that is not an area
        that I particularly focus on is people's understanding of
        trans fat or other nutritional components.  So the answer is,
        no.

*Id.* at 33:24-34:6.

Accordingly, Dr. Reibstein plainly testified that he is not offering any opinion about damages. *See id.* at 58:2-5 ("Q.  Do you have any opinion about damages in this case?  A.  No, I do not.  With the exception – well, no, I do not.  No, I do not.").

Furthermore, Dr. Reibstein testified that he did not fully read Mr. Weir's damages report:

> Q.      You didn't think it was important to read Mr. Weir's entire
>         report?
>
> A.      I did not read all of Mr. Weir's report.
>
> Q.      Okay.  Is it, because you just didn't think it was important
>         to do that?
>
> A.      I did not read of it [sic] and so I was very focused in what it
>         is that I was doing.

*Id.* at 90:4-13 (objections omitted).[8]

### D.     Dr. Reibstein's Testimony Is Neither Relevant Nor Reliable, As He Is Admittedly Wrong That Plaintiff's Experts Failed To Consider "Supply-Side Factors"

In his report, Dr. Reibstein criticizes Dr. Dennis for purportedly failing to consider "supply-side factors" as part of his survey:

> [I]n order to ascertain how prices for Benecol would have differed
> in the "but-for" marketplace, it is essential to assess how the
> market for Benecol would have evolved had the challenged claims
> not been included with the product.  Market prices are determined
> by the intersection of supply and demand.  A well-designed
> conjoint survey can provide an estimate of changes in demand
> (consumer willingness-to-pay) but it alone cannot account for
> supplier responses (manufacturer decisions, competitive response).
> A proper analysis of this "but-for" market price must consider the
> impact of the challenged claims not only on consumer demand for
> the product, but also on supply-side factors in the "but-for"
> marketplace.

---

[8] *See also id.* at 90:15-22 ("Q.  Okay.  How do you know there wasn't something in the portion of Mr. Weir's report that actually pertained to what you were doing if you didn't read it?  How do you know what you don't know?  A.  So A, hopefully someone would have pointed that out to me, but B, he may have had some other things to say about what it is that I had done.").

Reibstein Report ¶ 73 (emphasis added).  However, Dr. Reibstein is admittedly wrong – Dr.

Dennis plainly accounted for supply-side factors.

Initially, Dr. Dennis incorporated real-world pricing data into his conjoint survey.  Dr.

Reibstein agrees with this approach:

> Q.      Okay.  And do you agree that Dr. Dennis was correct to use
> actual marketplace price levels at his conjoint design?
>
> A.      I think it is correct to use prices that consumers would face.
> I will recognize that in the reality, there was also a variety
> of prices that consumers did pay.  They often got two for
> one coupons and other prices beyond that, but to your
> point, it would make sense and I am complimenting Dr.
> Dennis on using prices that you would want to use prices
> that are actually prices in the market.
>
> Q.      Small patch of common ground.
>
> A.      Indeed.

Klorczyk Reply Decl. Ex. S, Reibstein Dep. at 68:8-23.

Moreover, as Dr. Reibstein admits, this real-world pricing data is subject to both supply-

side and demand-side factors.  *See id.* at 101:12-16 ("Q.  Do you agree that real world market

prices are subject to supply side factors, as well as, demand side factors?  A.  I do believe that

they can be [a]ffected by both.").  These supply-side factors include, among other considerations,

costs for production, research and development, and transportation:

> Q.      All right.  Do you agree that real world prices take into
> account the cost of production?
>
> A.      That's part of what's embedded in there.
>
> Q.      Okay.  Do you agree that real world prices take into
> account research and development cost?
>
> A.      Hopefully.
>
> Q.      I didn't hear what you said.
>
> A.      I said, hopefully, yes.
>
> …
>
> Q.      Do you agree that real world prices take into account
> transportation cost?

18

> A.   Real world prices at that time under that condition take into
> consideration transportation costs.

*Id.* at 102:11-24, 103:22-104:4 (objections omitted).

Accordingly, Dr. Reibstein is admittedly wrong that Dr. Dennis' conjoint survey failed to consider supply-side considerations. The original conjoint design took into account supply-side considerations by, among other things, using real-world market pricing for Benecol. *See* Dennis Report ¶ 47. Such testimony from Dr. Reibstein is not relevant, reliable, or helpful.

## VI.   MOTION TO STRIKE DR. DENISE N. MARTIN

### A.   Summary Of Dr. Martin's Background And Her "Copied And Pasted" Report

Dr. Martin is the Managing Director of NERA Economic Consulting, who frequently serves as a defense-side expert. *See generally* Martin Report at Exhibit A (*curriculum vitae*). Dr. Martin has been retained in over 200 class action matters, where she has overwhelmingly served as an expert for the defendants. *See* Martin Report ¶ 14 ("At NERA, I have been retained as an economic expert on more than 200 class actions …."). Of these engagements, Dr. Martin estimates that she was retained to offer testimony for defendants in a "large majority" of matters, which she estimates to be between 75% and 90%. *See* Klorczyk Reply Decl. Ex. Q, Martin Dep. at 119:7-14 ("Q.  What's your best estimate in terms of a percentage split, were you retained by counsel for defendants versus counsel for plaintiffs in your work at NERA?  A.  Certainly the majority has been for on behalf of counsel for defendants.  I'm not sure I can put a number on it, but it would be probably the large majority."); *see also id.* at 119:22-24 ("Q.  Somewhere between 75 percent and 90 percent of the time?  A.  That sounds right."). In her 200 class action cases, Dr. Martin has never submitted a report setting forth a damages framework for the plaintiffs. *See id.* at 150:24-151:4 ("Q.  Okay.  So you've never submitted a report to a court where you were an expert for plaintiffs in a class action where you set forth a damages

framework for a putative class; is that right?  A.  Yes, that's right.").  Here, Dr. Martin's report

serves to respond and rebut the reports and testimony submitted by Plaintiff's experts, Mr. Weir

and Dr. Dennis.  *See* Martin Report ¶ 1.

In this case, Dr. Martin did not speak to any Benecol consumers.  *See* Klorczyk Reply

Decl. Ex. Q, Martin Dep. at 28:12-16 ("Q.  So you never spoke to a single Benecol consumer

directly as part of your work in this case; right?  A.  And I would give the same answer, which is

I haven't personally conducted interviews.").  Likewise, Dr. Martin did not speak to any Johnson

& Johnson executives.  *See id.* at 36:2-5 ("Q.  Did you personally speak with any McNeil or

Johnson & Johnson exeuctives as part of your work in this case?  A.  I did not.").

Moreover, Dr. Martin's report is "copied and pasted" from a report she submitted in

another case, in opposition to class certification in *Martinelli v. Johnson & Johnson, et al.*, Case

No. 2:15-cv-01733-MCE-DB (N.D. Cal.).  *See id.* at 76:2-13 ("Q.  In order to draft this report in

the *Bowling* case, did you start with your report in the *Martinelli* case and then save a new

document and revise that report to create this one?  A.  I certainly used some of the same

language from the *Martinelli* report.  I don't remember whether I just sort of cut and pasted

certain sections from that document or if I started from that document and saved it as a new

document.  I think the latter – the former, sorry, but ….") (objections omitted).  As part of her

"copy and paste" exercise, Dr. Martin even failed to remove references to experts who served in

*Martinelli*, but not in this case.  *See id.* 14-23 ("Q.  What is the typo?  A.  I referenced the reports

of Dr. Isaacson and Dr. Swain, and they were the survey experts in the *Martinelli* case that I

testified I had worked on in California.  …  I'm not relying on the reports of Dr. Isaacson or Dr.

Swain in this matter.").

20

**B.      Dr. Martin's Testimony Is Neither Relevant Nor Reliable, As
She Never Attempted To Calculate A Price Premium For The
Challenged Misrepresentations**

In her deposition, Dr. Martin was clear that she has no opinions regarding the "consumer

perception" component of Dr. Dennis' surveys.  *See id.* at 48:18-20 ("I'm not opining about the

reliability or not of Dr. Dennis's survey."); *see also id.* at 88:18-20 ("I certainly – again, I'm not

opining about his materiality survey.  I leave that to Dr. Reibstein.").  Instead, Dr. Martin

testified that she "focused [her] review of [Dr. Dennis' report and testimony] on his conjoint

analysis rather than his materiality study."  *Id.* at 27:11-12.

Even so, Dr. Martin has never attempted to calculate a "price premium" in this matter.

She has never analyzed whether the price of Benecol would have been higher with the "No Trans

Fat" claim compared to without it:

> Q.      As part of your work here, did you do anything to
> determine whether the price of Benecol with the no trans
> fat claim on the label would have been higher than the price
> of Benecol without that claim being on the label, holding
> everything else equal?
>
> A.      And I believe I testified earlier that I have not done sort of
> a fulsome analysis of that.  …

*Id.* at 57:10-19 (objections omitted).  Indeed, Dr. Martin admitted that she "cannot rule out … a

*de minimis* price premium, if any."  *Id.* at 52:19-24 ("So, again, all these things together, while I

haven't done a fulsome analysis of price premium here, says you can rule out what Mr. Weir did

and everything else points to, you know, a *de minimis* – a *de minimis* price premium, if any.").

Such testimony is neither relevant, reliable, nor helpful to the trier of fact.  This is a

"price premium" case, but Dr. Martin never attempted to determine the price premium at issue.

### C.   Dr. Martin's Testimony Is Neither Relevant Nor Reliable, As She Is Admittedly Wrong That Plaintiff's Experts Failed To Account For "Supply-Side" Considerations

Dr. Martin's opinions boil down to the false contention that the conjoint study relied upon by Mr. Weir "is a demand-side tool that only takes into account consumer preferences," meaning that it "does not incorporate any information about the supply-side and whether or how McNeil would have modified its production, marketing or pricing of these products absent the challenged claims."  But that criticism is wrong for the reasons discussed above, in the context of Dr. Reibstein's report.  *See supra* § V.D.  Namely, Dr. Dennis incorporated real-world market retail pricing data into his survey, which include, among other considerations, costs for production, research and development, marketing, and transportation.  *See supra.*

During her deposition, Dr. Martin agreed that market prices – such as the pricing data incorporated into Dr. Dennis' survey – are "determined by the interaction of the[] demand and supply processes:"

> Q.   Do you see in paragraph 20 at the bottom there's subparagraph C?  Do you see that?  It says, Market prices are determined by the interaction of these demand and supply processes.  Do you see that?
>
> A.   Yes.
>
> Q.   You're talking about actual market prices there; right?
>
> A.   Yes.
>
> Q.   And if we turn the page, there's paragraph 21 at the top; right?
>
> A.   Yes.
>
> Q.   Paragraph 21 says, [b]ecause these accepted principles of microeconomics explain that market prices are determined by the interaction of the forces of supply and demand, both supply side and demand side forces must be incorporated into any attempt to estimate a market-based price premium. Do you see that?
>
> A.   Yes.

Klorczyk Reply Decl. Ex. Q, Martin Dep. at 123:17-124:12. Dr. Martin also agreed that real-world pricing data "reflect the outcome of particular demand and supply decisions." *See id.* at 131:14-132:11 ("… I am still of the opinion that historical sales and prices of products reflect the outcome of a particular demand – of particular demand and supply decisions given the specific circumstances that existed at that time.").

More specifically, Dr. Martin agreed (as did Dr. Reibstein, *see supra*) that such data includes considerations relating to marketing expenses, transportation costs, costs of production, and research and development costs:

> Q.   What is a supply side factor?
>
> A.   Any factor that affects the amount of product or the price at which a company is willing to sell that product for.
>
> Q.   So would marketing expenses be a supply side factor?
>
> A.   Yes.
>
> Q.   Would transportation costs to get a good to market be a supply side factor?
>
> A.   Sure, could be.
>
> Q.   Would costs of production be supply side factors?
>
> A.   Yes.
>
> Q.   How about research and development costs?
>
> A.   Can be, yes.

*Id.* at 77:22-78:12.

As such, Dr. Martin's testimony is demonstrably false (even by her own admission) that Dr. Dennis' conjoint survey failed to take into account supply-side considerations.

**D.    Dr. Martin's Analysis Of Benecol Retail Sales Data Is Not Relevant Or Reliable, As** ███████████████████

███████████████████████████████████████

███████████████████████████████████████



However, this analysis is heavily flawed.

…

Q.   Would you have been able to determine whether there was
     a price premium attributable to the no trans fat claim solely
     from the retail sales data you reviewed for the Benecol
     spreads in this case?

A.   I'm sorry, can you be more specific about what you're
     asking, would I have been able to …

Q.   Determine whether there was a price premium attributable
     to the no trans fat claim solely from looking at the retail
     sales data you reviewed for the Benecol spreads in this
     case.

A.   Okay.  So if I had been asked to do this more fulsome
     analysis that I referenced earlier in the deposition, which,
     again, I don't believe – I don't – I did not need to do to
     render the opinions I have offered here.  But if I was asked
     to do that, I would need additional information other than
     just the retail sales data that has been provided here.

Klorczyk Reply Decl. Ex. Q, Martin Dep. at 53:5-17, 114:1-20 (objections omitted).

Accordingly, Dr. Martin's analysis of sales data is admittedly not the same as a "price premium analysis."  Thus, her testimony is not relevant, reliable, or helpful to the trier of fact.

## VII.   CONCLUSION

For the reasons set forth above, Plaintiff respectfully requests that the Court enter an order excluding the testimony and expert reports of Dr. Douglas L. Nguyen, Dr. Carol A. Scott, Dr. David J. Reibstein, and Dr. Denise N. Martin.

Dated:  November 16, 2018

Respectfully submitted,

**BURSOR & FISHER, P.A.**

By:     */s/ Joseph I. Marchese*
           Joseph I. Marchese

Scott A. Bursor
Joseph I. Marchese
888 Seventh Avenue
New York, NY 10019
Telephone: (646) 837-7150
Facsimile:  (212) 989-9163
E-Mail: scott@bursor.com
           jmarchese@bursor.com

**BURSOR & FISHER, P.A.**

Frederick J. Klorczyk III
Neal J. Deckant
1990 North California Blvd., Suite 940
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile:  (925) 407-2700
E-Mail:  fklorczyk@bursor.com
           ndeckant@bursor.com

*Attorneys for Plaintiff*