# EXHIBIT W

# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

SUZANNA BOWLING, individually and
on behalf of others similarly situated

                              Plaintiff,

v.

JOHNSON & JOHNSON and McNEIL
NUTRITIONALS, LLC,

                            Defendants.

Civil Action No. 1:17-cv-03982-AJN

## REBUTTAL DECLARATION OF DR. DENISE N. MARTIN

**September 20, 2018**

# TABLE OF CONTENTS

I.    SUMMARY OF ASSIGNMENT AND CONCLUSIONS ................................................. 2

II.   QUALIFICATIONS ........................................................................................... 9

III.  DOCUMENTS RELIED UPON ........................................................................ 10

IV.  THE ALLEGED "PRICE PREMIUM" ESTIMATES ON WHICH MR. WEIR RELIES ARE FUNDAMENTALLY FLAWED AND UNRELIABLE ............................... 11

   A.  Conjoint Analysis is a Demand Side Tool That Does Not and Cannot Estimate Any "Price Premium" Damages to Consumers ........................................................ 11

   i.   Economic theory explains that prices are determined by the interaction of demand and supply ........................................................................................................... 11

   ii.  Conjoint analysis is a demand-side tool that only takes into account consumer preferences ............................................................................................................ 12

   iii.  Mr. Weir's assertion that the supply side must remain fixed in determining the "but for" price contradicts economic theory ................................................................ 16

   iv.  A positive willingness to pay for an attribute often does not translate into a price premium ............................................................................................................... 17

   v.  Mr. Weir's purported "price premium" is just the estimated willingness to pay differential for one consumer; estimates for other consumers vary widely ......................... 18

   B.  Economic Models that Simulate Both the Demand Side and the Supply Side Exist but Are Ignored by Mr. Weir .................................................................................... 19

   C.  Mr. Weir's Proposed Damages Model Also Suffers from All the Other Flaws Embedded in Dr. Dennis' Conjoint Survey ............................................................ 21

   D.  The Only Available Market Evidence Contradicts Mr. Weir's Assumption of a 20.8% "Price Premium" Associated with the Challenged Labeling ..................................... 23

   E.  If a Reduction in Willingness to Pay Would Have Led to a Reduced Quantity, Not a Reduced Market Price, "Price Premium" Damages Are Simply the Wrong Remedy .......... 28

V.   CONCLUSION ............................................................................................... 29

## I. SUMMARY OF ASSIGNMENT AND CONCLUSIONS

1.      In connection with the above-captioned matter, I was asked by counsel for Johnson & Johnson and McNeil Nutritionals, LLC ("McNeil" or "the Company") to evaluate the opinions offered in the Declaration of Colin B. Weir (the "Weir Declaration"), as well as by Mr. Weir in his deposition ("Deposition of Colin Weir").  To estimate alleged damages to purchasers of Benecol brand products between 2008 and 2011 (the putative class period), Mr. Weir multiplies percentage "price premium" estimates presented in the Declaration and Expert Report of J. Michael Dennis (the "Dennis Report") by aggregate Benecol sales during this period.  These "price premium" damages estimates purportedly measure additional amounts consumers paid for the Benecol products because of the "No Trans Fats" or "No Trans Fatty Acids" labels that allegedly would not have been paid had the claims not been on the labels.  I was asked to evaluate whether Mr. Weir's proposed formulaic approach will yield a reliable estimate either of any aggregate damages owed to the putative class of purchasers of Benecol products or of damages to any individual class member.

2.      On the basis of my education and experience, as well as my review and analysis of the Dennis Report, the Weir Declaration, the Deposition of Colin Weir, the Rebuttal Expert Report of Dr. David Reibstein ("Reibstein Report"), as well as other documents and data produced in this matter and the similar *Martinelli* matter pending in the Northern District of California, I have concluded that the alleged "price premium" estimates from the Dennis Report that Mr. Weir proposes to use to estimate alleged damages are not a reliable estimate of the actual price premiums (if any) that may have been paid by consumers.  There are two broad bases for my conclusion:

a)  First, conjoint analysis does not and cannot estimate any market price premium associated with a product attribute. It is simply the wrong statistical tool. As explained in the very treatises relied on by Mr. Weir and Dr. Dennis, even a properly designed and executed conjoint analysis accounts only for the demand side of the market, yielding an estimate of willingness to pay. Economic theory and evidence, however, are clear that market prices are determined by the interaction of both demand-side and supply-side factors. While claiming to have "discussed" the supply-side of the market with Dr. Dennis, Mr. Weir has done no empirical analysis of the way prices of Benecol were determined in the actual marketplace during the proposed class period and whether they depended at all on the "No Trans Fats" or "No Trans Fatty Acids" labeling. By relying solely on a demand-side consumer survey, both he and Dr. Dennis have ignored how McNeil's strategic decisions regarding production, marketing and pricing would have differed (if at all) in the but-for world absent the challenged labels. Moreover, labeling the conjoint result a "price premium" does not change the fact that it is actually the difference in the willingness to pay estimated for a single individual. As Dr. Reibstein notes, considerable variability exists around this valuation, so even assuming it were a reliable estimate of the willingness to pay for that individual, it will overstate/understate the value for virtually every other consumer.

b)  In addition, as explained more fully in the Reibstein Report, Dr. Dennis' conjoint survey is otherwise not well-designed and instead suffers from methodological flaws that render the results unreasonable and unreliable.

3

- One significant flaw in the survey design is the failure to include brand in the choice sets shown to consumers.[1] Benecol brand products were unlike competitor products in that they contained plant stanol esters.[2] To the extent consumers relied on the brand name "Benecol" as a proxy for these beneficial ingredients, Dr. Dennis' survey cannot distinguish the effect of the "No Trans Fats" or "No Trans Fatty Acids" from the effect of the Benecol brand. Such an omission is particularly problematic here as consumers reported using the Benecol brand in their purchase decisions, having been advised by their physicians to do so or seeing a news article or segment about the brand's cholesterol lowering benefits.[3]

- Numerous other flaws in the conjoint survey are detailed in the Reibstein Report.

- These flaws in Dr. Dennis' survey will translate directly into Mr. Weir's alleged damages estimate since his formula is simply to multiply Dr. Dennis' percentage price premia by the sales of Benecol brand products.

3.    Further, according to accepted academic and practitioner sources, best practices in any estimation is to compare and validate the results against available empirical data to test

---

[1]    Reibstein Report, ¶ 57, ¶¶ 67-71.

[2]    *See, e.g.,* Deposition of Jennifer Strouse, June 14, 2017 (pp. 130-131, 163, 178-179); Deposition of Laura Zeno, May 24, 2017 (pp. 124, 171, 174); Exhibits 31, 33-36 to Deposition of Laura Zeno; Deposition of Sean Belke, May 25, 2017 (pp. 33-34); and Deposition of William Twomey, May 26, 2017 (pp. 96-97).

[3]    *See, e.g.,* Exhibit 27 of Laura Zeno Deposition - Results of Phone Interviews with Benecol Consumers, 2000 (MCNEIL0001306-MCNEIL0001310).

their reasonableness and reliability.[4]

4.

---

[4]  *See, e.g., Best Practices in Quantitative Methods,* edited by Jason Osborne, Sage Publications, 2008 and *Reference Manual on Scientific Evidence,* Reference Guide on Statistics, David H. Kaye and David A. Freedman, Third Edition, 2011. *See also, Doing Survey Research: A Guide to Quantitative Methods,* Peter M. Nardi. Second Edition, Pearson, 2006.

[5]  *See,* Deposition of Sean Belke, pp. 136-137, describing the timing of the label changes.

[6]  *See,* Declaration of Elizabeth Steele in support of Defendants Johnson & Johnson and McNeil Nutritionals, LLC's Opposition to Plaintiff's Motion for Class Certification ("Steele Declaration"), ¶ 21.

[7]  MARTI_EREV001_00004940.xls (2011 data); Confidential document production from IRI, received by Neal J. Deckant, Bursor & Fisher, P.A. "Benecol – Bursor Subpeona [*sic*] HIGHLY CONFIDENTIAL AEO.xlsx" (2012 data).

[8]  At several points in his deposition, Mr. Weir falsely asserts that I put this difference forward as an estimate of a "price premium." *See,* Deposition of Colin Weir, p. 59 at 17-21, p. 74 at 6-10.  I did not and would not do so; to the contrary, I find no evidence this observed change price is attributable to the label change.



---

9    MARTI_EREV001_00006082.xlsx (2009 data); MARTI_EREV001_00004940.xls (2010, 2011 data).

10   Confidential document production from IRI, received by Neal J. Deckant, Bursor & Fisher, P.A. "Benecol – Bursor Subpeona [*sic*] HIGHLY CONFIDENTIAL AEO.xlsx" (2012 data).  *See,* Exhibit 31 of Laura Zeno Deposition (MCNEIL0023239) for a list of factors affecting trends in Benecol sales.

5.   █████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████ █ ████████████

████████████████████████████████████████████████████████

███████████████████████████████████████████████

██████████ █ █████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████

6.   ████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████

7.    As noted above and detailed below, I investigated Mr. Weir's 20.8% "price premium" and concluded that this inconsistency with real world market data can be explained by two fundamental flaws: (a) the "price premium" from the conjoint is not an estimate of any but-for market price, but instead is a willingness to pay measure that is divorced from the

---

[11]   *See, e.g.,* Deposition of Jennifer Strouse, June 14, 2017 (pp. 53, 54-55); and Deposition of Sean Belke, May 25, 2017 (pp. 63, 66).

[12]   Exhibits 4-5 of Elizabeth Steele Deposition (MCNEIL0000001-MCNEIL00034).

[13]   ████████████████████████████████████████████████████

supply side or competitive structure of the market; thus, it is unsurprising that it generates an estimate that looks nothing like the actual prices observed in the marketplace; and (b) as detailed by Dr. Reibstein, the results from Dr. Dennis' conjoint analysis are inflated even insofar as estimating a willingness to pay given the additional flaws in the survey.

8.    Finally, Mr. Weir testified that quantity, rather than price, may have adjusted or did adjust when the challenged claims came off the label.[14]  He provides no empirical support for this assertion. ████████████████████████████████████████████
████████████████████████    ████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████

9.    Further, from the perspective of economics, if it is the case that quantity, rather than price, would have changed had the challenged claims not been on the labels, "price premium" damages are simply the wrong remedy.  Those consumers who would have continued to purchase absent the challenged claims at the same price would be unharmed and deserving of no damages.  Those consumers who would have decided not to purchase absent the challenged claims may be harmed; however, individualized review would be needed to identify those consumers.  It is precisely because both quantity and price may adjust with a

---

[14]    Weir Report, ¶ 32.  Deposition of Colin Weir, p. 53, 10-20.

[15]    Weir0022 - Sales data - CONFIDENTIAL.xlsx (2011 data); Confidential document production from IRI, received by Neal J. Deckant, Bursor & Fisher, P.A. "Benecol – Bursor Subpeona [*sic*] HIGHLY CONFIDENTIAL AEO.xlsx" (2012 data).

reduction in the willingness to pay that it is necessary to model both the demand side and the supply side to understand whether the but for price would have been different absent the challenged claims and whether price premium damages are appropriate.

10.    In sum, Mr. Weir relies entirely on the willingness to pay estimated for a single respondent as an estimate of the "price premium" that allegedly existed during the proposed class period. He does not model the supply side of the Benecol market despite the fact that any estimate of a market price must be determined by both supply and demand. This fundamental problem is compounded by design and implementation errors in the survey itself. By making use of results generated using the wrong tool as the primary input into his proposed damages model, he generates results that are inconsistent with the available market price data on the Benecol brand products sold with and without the challenged labeling. Clearly, the output from his model cannot be used to generate a reliable estimate of any alleged "price premium" damages.

## II.  QUALIFICATIONS

11.    I am a Managing Director at NERA Economic Consulting ("NERA") and have been with the firm since 1991.

12.    Before joining NERA, I earned a B.A. in Economics from Wellesley College and an M.A. and Ph.D., also in Economics, from Harvard University. My undergraduate and graduate education included coursework in microeconomics, statistics and econometrics, including conjoint survey and Bayesian methods. Prior to attending Harvard, I served as an Assistant Economist at the Federal Reserve Bank of New York and as an Economic Consultant at Urban Systems Research & Engineering/Economica.

13.    While at Harvard, I taught classes in microeconomics, industrial organization

and statistics to undergraduate and graduate students, and was awarded the Danforth Prize for Teaching. Microeconomics includes consumer theory, which explains how individuals make decisions, including which products to buy given the attributes embodied in them and the prices at which they are offered. Microeconomics also includes producer theory or industrial organization, which explains how firms make decisions, including what products to sell, with which attributes and at what prices.

14.    At NERA, I have been retained as an economic expert on more than 200 class actions, including consumer class actions, securities class actions and employment class actions. In the course of these assignments, I am frequently asked to analyze issues related to class certification and damages, including whether a particular formulaic method can be used to estimate damages on a class-wide basis. I frequently work with large datasets involving pricing and sales data. I routinely use and have provided testimony regarding the application of statistical and econometric techniques, including conjoint analysis and Bayesian methods.

15.    My C.V., including my most recent 4 years of testimony and 10 years of publications, is included as **Exhibit A**.

16.    NERA is being compensated for my services in this matter at $900 per hour. Other NERA consultants assisted me in this engagement have billing rates less than $900 per hour. No part of NERA's compensation depends on the outcome of this litigation. Throughout this report, I have used the terms "I" and "my" to refer to work performed by me and/or others under my direction.

## III.  DOCUMENTS RELIED UPON

17.    A complete list of the documents I relied upon is provided in **Exhibit B**.

## IV.   THE ALLEGED "PRICE PREMIUM" ESTIMATES ON WHICH MR. WEIR RELIES ARE FUNDAMENTALLY FLAWED AND UNRELIABLE

18.     Mr. Weir's proposed formulaic estimate of alleged damages relies critically on alleged "price premium" estimates generated using the results from a conjoint survey conducted by Dr. Dennis. Mr. Weir asserts that these results indicate that the market price of the Benecol brand products absent the challenged labeling would have been 20.8% lower.

19.     For the reasons detailed below, I concluded that these alleged "price premiums" do not and cannot measure the actual market price premiums (if any) associated with the challenged labeling.

### A.   Conjoint Analysis is a Demand Side Tool That Does Not and Cannot Estimate Any "Price Premium" Damages to Consumers

#### i.   *Economic theory explains that prices are determined by the interaction of demand and supply*

20.     Every introductory economic textbook includes the following fundamental tenets:

a) Demand is determined by preferences of consumers. Consumers value products because of the various attributes they embed and, given their budgets and the available prices for products and substitute products, determine what they would be willing to pay for a given product.

b) Supply is determined by producers. Producers consider the costs of bringing each product to market (including, *e.g.,* input goods, manufacturing, distribution and marketing) and, in a differentiated market, also how competing products are priced/marketed, setting prices to maximize profits.

c) Market prices are determined by the interaction of these demand and supply processes.

11

21.     Because these accepted principles of microeconomics explain that market prices are determined by the interaction of the forces of supply and demand, both supply-side and demand-side forces must be incorporated into any attempt to estimate a market-based "price premium."

### ii.  *Conjoint analysis is a demand-side tool that only takes into account consumer preferences*

22.     Dr. Dennis and Mr. Weir purport to be estimating the difference between the actual market price that consumers paid for Benecol brand product and the market price they would have paid absent the challenged labeling (the "but-for" market price.)  However, their method for generating this differential—a conjoint survey that asked participants to make hypothetical choices between different sets of product attributes, at different prices—accounts only for subjective consumer preferences (the demand side) and does not account for other factors affecting the products' market price (the supply side).  Indeed, by design, the conjoint analysis does not incorporate any information about the supply side and whether or how McNeil would have modified its production, marketing or pricing of these products absent the challenged claims.

23.     It is important to recognize that this criticism does not go to the design or implementation of the survey.  Instead, conjoint analysis is simply the wrong tool to answer a question about market price.  Even if well-designed and well-executed, which I understand Dr. Dennis's survey is not, a conjoint survey is a *demand-side* tool,  at best providing an estimate of how consumers' willingness to pay might change with a labeling change.  It does not and cannot provide an estimate of the price that the Benecol products would have commanded in the market absent the challenged claims.

24.     Mr. Weir asserts that his proposed method accounts for the supply side because it relies on actual sales data and because Dr. Dennis offered price choices in his survey that were informed by historical price data. This assertion is false. The historical sales and prices of the products reflect the outcome of particular demand and supply decisions given the specific circumstances that existed at that time. If one circumstance changed—in particular, the challenged labeling—and consumers' willingness to pay and therefore their demand for the products at a given price were, in fact, lower, the change in the market price, if any, would not be determined solely by this demand shift. Instead, whether the demand shift changed the market price would depend upon McNeil's pricing strategy, which, in turn, would depend on its costs, competitive strategy and responses by competitors. Dr. Greg Allenby, an accepted academic authority in conjoint analysis, makes this point clearly, cautioning:

> "[A] conjoint survey, in and of itself is not adequate to form the basis for equilibrium firm profit calculations. Not only must we calibrate demand for products, but we must also compute industry equilibria. This requires measures of costs, a demand system not only for the focal product but also for the major competing products, and an equilibrium concept." [16]

> "[T]he WTP [(willingness to pay)] cannot be [a] measure[] of the market value of a product feature…. The WTP… measure[] utilize[s] only demand-side information and [is] independent of costs or the competitive structure of the industry… The [measure] assumes that firms will not alter prices in response to a change in the set of products in the marketplace as the feature is [changed.]" [17]

> WTP… [is] purely demand-based…and [does] not take into account changes in prices and costs as the feature is enhanced and a new industry equilibrium is achieved. [18]

---

[16]    Allenby, Greg, Jeff Brazell, John R. Howell and Peter E. Rossi, "Valuation of Patented Product Features," *Journal of Law and Economics*. Vol. 57, No. 3 (August 2014), p. 630.

[17]    Ibid., p. 647, 649.

[18]    Ibid., p. 650.

25.     Indeed, the very treatises that both Dr. Dennis and Mr. Weir cite as purported evidence of the reliability of conjoint surveys in this context also clearly state this limitation and caution against trying to use the tool to predict market shares and price sensitivity to particular product attributes:

> "[C]onjoint utilities cannot account for many real world factors that shape market shares, such as length of time on the market, distribution, out-of-stock conditions, advertising, effectiveness of sales force, and awareness. Conjoint analysis predictions also assume that all relevant attributes that influence share have been measured. Therefore, the share of preference predictions usually should not be interpreted as market shares, but as relative indications of preference. Divorcing oneself from the idea that conjoint simulations predict market shares is one of the most important steps to getting value from a conjoint analysis study and the resulting simulator. While external-effect factors can be built into the simulation model to tune conjoint shares of preference to match market shares, we suggest avoiding this temptation if at all possible. No matter how carefully conjoint predictions are calibrated to the market, the researcher may one day be embarrassed by differences that remain."[19]

26.     The manual for Sawtooth Software similarly explains:

> "A market simulator lets you input multiple products and place them in simulated competition one with another…The choice simulator focuses on the demand of the marketing equation."[20]

27.     Mr. Weir asserts that he and Dr. Dennis "discussed" supply side factors in developing and implementing the conjoint survey.   However, his exercise seems limited to having drawn up a list of a few potential supply side factors.  There is no evidence that either expert has conducted any economic analysis of the supply side of the market for Benecol brand

---

[19]   Orme, Bryan K., *Getting Started with Conjoint Analysis: Strategies for Product Design and Pricing Research, Third Ed.* Research Publishers LLC (2014), p. 108.

[20]   *See,* Sawtooth Software's website at https://www.sawtoothsoftware.com/help/lighthouse-studio/manual/index.html?hid_typicalquestions html (accessed September 17, 2018).

products or how prices were actually set by McNeil and its retailers (and, certainly, neither expert has produced such an analysis).

28.     It is not possible to make conjoint analysis, a demand side tool, magically account for the supply side of the market by "reviewing" real-world data and/or showing respondents prices that resemble those found in the market, as Mr. Weir also suggests. It is standard practice for price attributes in conjoint surveys to be based on market prices. Even if the prices shown to respondents in the survey are in the range of market prices, however, the survey results are generated solely from the subjective preferences that respondents report for the various product attributes around those price points. These results, then, are not a reflection of the market prices that would have prevailed for the Benecol brand products absent the alleged mislabeling, but an estimation of how *consumers' willingness to pay* for such a product would change without the labeling.

29.     It is important not to be misled by certain nomenclature used in Plaintiff's experts' reports. While Mr. Weir asserts that "the use of Hierarchical Bayes regression provides for, amongst other factors, the ability to estimate better market-level results from a conjoint survey," he fails to acknowledge that this regression technique is being run solely on consumers' choice responses to hypothetical purchase decisions in a survey. As such, the regression is necessarily only analyzing the demand side of that market. The regression contains no data on supply factors such as production costs, distribution structure, or competitive strategy. As a result, his "price premium" estimates are divorced from the supply side of the market and cannot be used to estimate how the market prices for Benecol brand products would have changed, if at all, absent the challenged claims.

### iii. _Mr. Weir's assertion that the supply side must remain fixed in determining the "but for" price contradicts economic theory_

30.     In paragraphs 36 and 37, Mr. Weir asserts that supply side considerations need not be taken into account in determining the "price premium" because the "real world" prices that consumers of Benecol brand products paid "already reflect the supply side factors then extant in the marketplace" and that "the quantity of the Products supplied is a known quantity, and fixed as a matter of history." Further, Mr. Weir apparently believes that he does not need to undertake a supply side analysis because the quantity of the product sold during the class period is known and to model how it might have been different to estimate a "but for" market price would be an "economic perversion" that, in his opinion, would allow defendants to avoid liability.[21] Mr. Weir is mistaken. In making these statements, he is conflating two issues. Empirically, the quantity of products sold historically can be ascertained, and this quantity was determined in the market as a function of supply and demand conditions that existed at the time. But Mr. Weir is additionally positing that his model will estimate the prices at which Benecol brand products would have been sold in the market absent the challenged claim, based solely on the estimated change in the consumer willingness to pay as measured by Dr. Dennis's survey. This assertion is false: market prices are determined by the interaction of choices made by firms, as well as consumers. Accordingly, market prices may not change with a shift on the "demand" side, such as the one Dr. Dennis purports to identify in his survey. By setting up a hypothetical in which he only allows one side of the market to shift—the demand side—he cannot hope to accurately estimate any "price premium" associated with the challenged claim.

31.     It is not the case, as Mr. Weir asserts, that such supply side modeling would

---

[21]     Weir Declaration, ¶ 33.

allow Defendants to avoid liability. If the price of the products with the challenged claims was actually higher than it otherwise would have been, economic models exist that could take into account both demand-side and supply-side changes and allow estimation of the but-for price. Any price premium that resulted from this exercise could then be awarded to all consumers during the alleged class period.

### iv. *A positive willingness to pay for an attribute often does not translate into a price premium*

32.     It is easy to understand why finding that some portion of consumers were *willing to pay* a positive premium for a product attribute does not mean a price premium will actually occur in the market. For example, we could conduct a conjoint survey on soft drinks and find that some consumers were willing to pay $0.50 more for "cola" flavored drinks than for those with a "black cherry" flavor. Yet, even when manufacturing costs differ, single-serving beverages are often "line priced" by manufacturers so that the market prices *do not* differ by the beverage flavor. Attempting to use the willingness to pay results from a conjoint survey to conclude that consumers who purchased a black cherry soda mislabeled as cola had "price premium" damages of $0.50 would clearly be in error. Despite the estimated difference in the willingness to pay on the demand side, the resulting market price would have been exactly the same. As Sedjo and Swallow explain:

> "A major finding is that there are reasonable circumstances in which some portion of consumers is willing to pay a price premium but a premium (price differential) will not arise in the market. An implication of the findings is that even if surveys that indicate that consumers are willing to pay a premium are correct, this is not a sufficient condition to generate a premium in the market."[22]

---

[22]     *See,* p. 282 of Sedjo, Roger A. and Stephen K. Swallow. (2002) "Voluntary Eco-Labeling and the Price

The fact that McNeil did not adjust the list price of the Benecol brand products when the challenged claims were removed from the label is evidence that, regardless of any willingness to pay for the challenged claims by consumers, it did not factor into pricing decisions made by McNeil.

     v.   **_Mr. Weir's purported "price premium" is just the estimated willingness to pay differential for one consumer; estimates for other consumers vary widely_**

33.     Finally, while Mr. Weir mislabels the result from Dr. Dennis' simulation a "price premium," it is actually the willingness to pay differential estimated for one individual. In a stylized exercise, Dr. Dennis aims to determine the price points at which an equal share of survey participants would choose a cheaper product with the alleged misrepresentation or would choose a more expensive product without it, holding everything else constant.[23] The differential estimated by Dr. Dennis's "simulation," then, will reflect the preferences of the "median" consumer in his study—the consumer at the 50th percentile who is just indifferent between the two products at that differential.

34.     Dr. Reibstein's analysis of this data shows that the estimated willingness to pay differentials for other survey respondents varied widely. For example, while Dr. Dennis estimates the willingness to pay for the "No Trans Fat" claim for the median respondent is $1.00, Dr. Reibstein showed that, for approximately half of respondents to Dr. Dennis' survey, the willingness to pay for the "No Trans Fat" claim varied from $0.30 to $2.30.[24] Moreover,

---

Premium." *Land Economics*, 78(2): 272-284.

[23]    Although Dr. Dennis's market simulation analysis also allows respondents to select neither product (*i.e.*, the "outside option"), his "price premium" is calculated by balancing the share of preference of respondents who would select one of the two hypothetical products.

[24]    Reibstein Report, ¶ 106.

Dr. Reibstein found that 48 respondents to Dr. Dennis' survey actually preferred the absence of the "No Trans Fat" claim over its inclusion on the label, and 37 respondents preferred the absence of the "No Trans Fatty Acids" claim over its inclusion on the label.[25] Clearly, these respondents were not harmed by the alleged misrepresentation.

35.     Mr. Weir improperly labels the willingness to pay of the median consumer a "price premium." Doing so masks wide variability in the willingness to pay of other survey respondent. For any individual class member who is not part of the survey population, it is impossible to know—without individualized proceedings—where he or she falls along the diverse range of preferences that make up the population as a whole. Such demonstrated variability means that, in this case, any subjective measure of damages put forward by Plaintiffs will fail to accurately measure damages on a class-wide basis.

36.     The facts about conjoint analysis are incontrovertible. To estimate any "price premium" associated with the challenged claims, conjoint analysis is the wrong tool. At best, it only estimates the change to the demand side of the market, generating a willingness to pay measure that in this case varies widely across respondents. To estimate any price premium, it is also necessary to model the supply side of the market. Neither Mr. Weir nor Dr. Dennis does so, rendering Mr. Weir's "price premium" damages unreliable.

### B. Economic Models that Simulate Both the Demand Side and the Supply Side Exist but Are Ignored by Mr. Weir

37.     While the conjoint analysis relied on by Mr. Weir is a purely demand-side tool, economic models designed to calculate such "but-for" market prices exist. Such models are

---

[25]     Reibstein Report, Exhibit 11.

used to analyze the competitive effects of mergers, for example, including whether pricing of a product would be affected by a merger. These tools, called "discrete choice models," can allow economists to model how changing one product attribute would affect both the demand for and supply of that product, generating an estimate of the but for market price. Examples of these types of methodologies include the Random Coefficients Logit ("RCL") model, which is an empirical tool that is commonly used to apply the discrete choice modeling framework to observed market sales data of products.[26] Rather than considering only how changes to a product affect consumer preferences, the goal of such models is to estimate how product attributes, including the price of the product, affect *sales* of the product, thereby taking into effect *the impact on both demand and supply*. In addition to sales for the product in question, then, use of such models also requires data and analysis of sales/market shares for other products in the market.[27] Consequently, implementing the RCL requires several types of detailed market data.[28]

---

[26] This approach was popularized by a 1995 article by Berry, Levinsohn and Pakes that applied the technique to the market for automobiles in the United States. *See*, Berry, S., J. Levinsohn, and A. Pakes. 1995. "Automobile Prices in Market Equilibrium." *Econometrica* 63: 841-890. *See*, also, *e.g.*, Nevo, A. 2011. "Empirical Models of Consumer Behavior." *Annual Review of Economics* 3: 51-75.

[27] *See, e.g.*, Nevo, A. "A Practitioner's Guide to Estimation of Random-Coefficients Logit Models of Demands," *Journal of Economics & Management Strategy*, Volume 9, Number 4, Winter 2000, 513-548.

[28] In particular, estimation of an RCL model requires:

- Data on prices, sales volumes, and important product characteristics must be collected for each product of interest for several different time periods and/or geographic areas. In designing the study and collecting the data, researchers must take care to include the correct set of products that consumers are choosing between. Furthermore, the researcher must account for differences in the set of products available to consumers in different time periods or geographic areas.

- Because prices at any point in time are determined by a combination of supply and demand factors, care must be taken to distinguish between movements in price and quantity that are driven by changes in supply conditions and thus move along a demand curve as opposed to those that are driven by changes in demand conditions and thus move along a supply curve. One technique for overcoming this problem is the identification of "instrumental variables," which are, *e.g.*, factors that affect supply conditions for a product, but do not directly affect demand for the product. Separate instrumental variables are needed for each product. In practice, identifying and collecting instrumental variables or each product is often difficult.

38.     While proper application of the RCL model to reliable data can provide a prediction about the impact on price of a change in a product attributes, such a model will only tell a portion of the story given strategic behaviour by other firms in the market.  If a change in demand has an impact on product price of the offering for one firm, then, in turn, other firms may respond by changing the price of their own products until a new equilibrium is reached.  To estimate market equilibrium prices in such circumstances, an economic model of competition among suppliers should be combined with the results from the RCL.[29]

39.     In other matters, Dr. Dennis has acknowledged that analyses that consider changes on the supply side exist but that he did not conduct such an analysis.[30]  To my knowledge, Mr. Weir has not acknowledged the existence of such models.

## C.  Mr. Weir's Proposed Damages Model Also Suffers from All the Other Flaws Embedded in Dr. Dennis' Conjoint Survey

40.     As summarized in the Isaacson Report and the Swain Report, Dr. Dennis' conjoint survey suffers from other serious methodological flaws that render its results unreliable.[31]  Each of these flaws carries over into Mr. Weir's estimation of alleged "price premium" damages.  Specifically:

---

- Third, the predictive performance of the tool can be enhanced by collecting data on the distribution of demographic characteristics for each time period and geographic area in the data sample.

[29]  A good model of competition requires an economist to collect information—or at least to make explicit assumptions—on several factors such as the nature of competition between firms (*e.g.,* whether firms compete on price, quality, advertising, or other factors), the current costs of each firm and how these costs vary with output, and whether changes in prices would provide incentives for new firms to enter the market or for existing firms to exit the market.

[30]  *See, e.g.,* Deposition Transcript of J. Michael Dennis, August 29, 2017, in *Jones et al. v. Nutiva,* in which Dr. Dennis testified, "I think I explained it's difficult to predict what the market price would be.  Because that's the dance between consumers and sellers.  What I can rely on and attest to is the survey which is making your prediction of what the consumer preferences and utilities would be in that scenario." p. 213.

[31]  Reibstein Report, ¶¶ 6-10.

a) Dr. Dennis fails to include "brand" as an attribute in his conjoint study, which causes two concerns.[32] First, the absence of brand is inconsistent with what consumers would see in the marketplace at time of purchase. Treatises on conjoint survey design make clear that the choice sets shown to consumers should, as closely as possible, reflect real-world product choices to generate reliable estimates of relative preference.[33] Second, by failing to include brand, Dr. Dennis' survey did not separate the willingness to pay for the challenged claim from any willingness to pay for the Benecol brand name. By failing to include brand in his conjoint survey, Dr. Dennis is capturing consumer preferences for a generic product with and without "No Trans Fat" or "No Trans Fatty Acids" labels, and thus did not isolate consumers' willingness to pay/preferences for these labels apart from their willingness to pay for Benecol's brand. This omission is critical here, particularly given that the internal documents indicate that consumers purchased Benecol brand products because their doctors recommended it as being good for their cholesterol level or because they saw a news article or segment about the product, rather than because they understood the benefits of the plant stanol esters ingredient.[34]

b) The survey participants do not match the definition of class members because: (i) they may not have purchased Benecol brand products at all or may not have purchased them during the proposed class period; (ii) they were all 50 years old or

---

32   *See, e.g.,* Reibstein Report, ¶ 57, ¶¶ 67-71.

33   *See, e.g.,* Orme (2014), Chapter 3.

34   *See, e.g.,* Exhibit 27 of Deposition of Laura Zeno, "Phone Interviews with Benecol customers, 2000," [MCNEIL0001306-1310].

older, while there is no restriction on age in the proposed class definition; and (iii) the survey was nationwide while the class may be restricted to purchasers in New York.[35]

    c) The format for the conjoint survey does not represent realistic marketplace conditions.[36]

    d) The survey had other methodological flaws, including leading questions and a flawed survey design that leads to inflated estimates for various attributes.[37]

41. Because he uses the results from Dr. Dennis' conjoint survey analysis as presented, Mr. Weir has not offered (and, indeed, cannot offer) any corrections of the infirmities in the survey. Consequently, each of these flaws transfer directly from the flawed survey output into Mr. Weir's proposed formulaic measure of alleged damages, which is the simple multiplication of the "price premiums" estimated by Dr. Dennis and the sales dollars of Benecol brand products. Even if Dr. Dennis were to revise his survey to address certain of the identified flaws, the fact that it is the wrong statistical tool will continue to plague any revision.

### D. The Only Available Market Evidence Contradicts Mr. Weir's Assumption of a 20.8% "Price Premium" Associated with the Challenged Labeling

42. According to accepted academic and practitioner sources, best practices in conjoint analysis is to compare and validate the results against available market data to test their reasonableness and reliability.[38] Mr. Weir fails to conduct such a test for the survey results that

---

[35] "First, I determined the study's target population as U.S. adult residents age 50 and over who had purchased a cholesterol-lowering spread in the past ten years…" Dennis Report, p. 6.

[36] Reibstein Report, ¶¶ 48-49, ¶¶ 58-60.

[37] Reibstein Report, ¶¶ 98-99, ¶¶ 118-119.

[38] *See, e.g., Best Practices in Quantitative Methods,* edited by Jason Osborne, Sage Publications, 2008 and *Reference Manual on Scientific Evidence,* Reference Guide on Statistics, David H. Kaye and David A.

form the cornerstone of his damages estimate. █████████████████████████████

██████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████ █ ██████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

███████████████████████ █ ████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████

██████████████████████████

43.   █████████████████████████████████████████████████

████████████████████████████ █ ████████████████████████████████████████

█████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

---

Freedman, Third Edition, 2011.

[39] *See,* Deposition of Sean Belke, pp. 136-137, describing the timing of the label changes.

[40] Steele Declaration, ¶ 21.

[41] MARTI_EREV001_00004940.xls (2011 data); Confidential document production from IRI, received by Neal J. Deckant, Bursor & Fisher, P.A. "Benecol – Bursor Subpeona [*sic*] HIGHLY CONFIDENTIAL AEO.xlsx" (2012 data).

[42] *See,* Deposition of Colin Weir, p. 59 at 17-21, p. 74 at 6-10.



43    MARTI_EREV001_00006082.xlsx (2009 data); MARTI_EREV001_00004940.xls (2010, 2011 data).

25



44  Confidential document production from IRI, received by Neal J. Deckant, Bursor & Fisher, P.A. "Benecol – Bursor Subpeona [*sic*] HIGHLY CONFIDENTIAL AEO.xlsx."

45  *See,* Exhibit 31 of Laura Zeno Deposition (MCNEIL0023239) for a list of factors affecting trends in Benecol sales.

46  Exhibits 4-5 of Elizabeth Steele Deposition (MCNEIL0000001-MCNEIL00034).

47

[REDACTED].

45.     While relying on this same contemporaneous market data for the sales figures used in his estimation of alleged "price premium damages," Mr. Weir has elected to dismiss this real world market data because other market factors or "circumstances may have changed." The tools of economics are designed to allow measurement of such market factors but, once again, Mr. Weir is either unaware of such tools or chooses not to bring them to the Court's attention.

46.     [REDACTED]

---

[REDACTED]

Exhibit 28 of Laura Zeno Deposition (MCNEIL0001577).

[48]    Deposition of Colin Weir, p. 59 at 17-21, p. 74 at 6-10.

██████████████████████████████████████████████

███████████████████████████████████. At a minimum, examination of this

market data should have caused Mr. Weir to investigate Dr. Dennis' estimate further. I

conducted such an investigation and, similar to Dr. Reibstein, concluded that the estimates

from Dr. Dennis' conjoint analysis are unreliable as estimates of any "price premium"

attributable to the challenged claims.

### E. If a Reduction in Willingness to Pay Would Have Led to a Reduced Quantity, Not a Reduced Market Price, "Price Premium" Damages Are Simply the Wrong Remedy

47.　　Mr. Weir also asserts that if McNeil had not lowered its prices then "the

economic outcome would be that many or all of the purchases would not have take [sic] place at

all."[49] He offers absolutely no evidence to support this assertion and, again, it is inconsistent

with economic theory, as well as available market evidence. ███████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

█████████

48.　　In making his observation about a potential reduction in purchases, however, Mr.

Weir seems to be acknowledging that McNeil might decide to hold its price constant in the face

of a reduced willingness to pay. If so, it is clear that no "price premium" existed, demonstrating

that his proffered "price premium" damages method is unreliable. If the product had been sold

---

[49]　　Weir Declaration, ¶ 32.

without the label and the result would have been a change in quantity, rather than a change in price, "price premium" damages are simply the wrong remedy. It would not be the case that all consumers overpaid on account of the challenged claims, as Plaintiff's theory presumes. Instead, those consumers who would have continued to purchase the product absent the challenged claims at the same price would necessarily be unharmed and are deserving of no damages. Any consumers who would have decided not to purchase the product absent the challenged labeling at the same price may be harmed. However, individualized review would be required to identify those consumers.

49. The fact that quantity, rather than price, may adjust in response to a change in consumers' willingness to pay is precisely why it is necessary to model the supply side of the market to reach a determination about the impact (if any) of the challenged claims on the price of the Benecol brand products.

## V. CONCLUSION

50. Based on my expertise and my review of the evidence in this matter, it is my opinion that the formulaic approach proposed by Mr. Weir will not generate a reliable estimate of aggregate damages to putative class members or to any individual class member. His formula rests critically on flawed estimates from a conjoint survey of the willingness to pay for the challenged labeling of a single respondent. As a result of these flaws, the estimated "price premiums" generated by Dr. Dennis and relied upon by Mr. Weir bear no relationship to observed market price data for the products with and without the challenged labeling. These estimates cannot be used as a reliable estimate of price premium damages (if any) owed to putative class members.

51.     While certain flaws in the survey could potentially be corrected, at least one fundamental flaw would remain. Conjoint survey is a demand-side tool that, at best, can yield estimates of consumer preferences and willingness to pay for product attributes. It does not and cannot take into account the supply side response and so does not and cannot yield an estimate of any "price premium."

52.     My opinions and conclusions as expressed in this report are to a reasonable degree of professional certainty. My work is ongoing and I respectfully reserve the right to update my opinions based on any additional material that becomes available to me.

------------------------

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that I am competent to testify to the facts contained in this report if called as a witness.

Executed this 20th day of September 2018, in New York, NY.

Denise N. Marc

Denise N. Martin

# DENISE NEUMANN MARTIN

## Managing Director

## Education

**Harvard University**
Ph.D., Economics, 1991
M.A., Economics, 1988

**Wellesley College**
B.A., *magna cum laude*, Economics and French, 1985
Honors: Phi Beta Kappa

## Professional Experience

**NERA Economic Consulting**

| | |
|---|---|
| 2001- | Managing Director |
| 1998-2000 | Vice President |
| 1994-1997 | Senior Consultant |
| 1991-1993 | Senior Analyst |

**Harvard University**

1986-1990  Teaching Fellow, Department of Economics
Taught courses in Microeconomics and Industrial Organization at the graduate and undergraduate levels. Assisted senior honors candidates with theses. Awarded Danforth Prize in Teaching.

1986-1990  Research Associate, Department of Economics
Projects included an investigation of the timing of international horizontal mergers, an evaluation of the effect of generic entry into the pharmaceutical market, and a comparison of technical efficiency across countries.

**Urban Systems Research and Engineering/Economica, Inc.**

1987-1988  Economic Consultant
Consulted on all aspects of government agency projects, including proposals and the design of survey instruments.  Provided economic forecasts and technical support.

**Federal Reserve Bank of New York**
1985-1986    Assistant Economist, International Financial Markets
Analyzed Eurobond markets, interest rate swap markets, and US commercial banks' balance sheets.

## Testimony (4 years)

Rebuttal Declaration before the United States District Court for the Northern District of California, in *Jackie Fitzhenry-Russell v. The Coca Cola Company; and DOES 1-50*, 2018.

Rebuttal Report before the United States District Court Central District of California, in *David Spacone v. Elmer's Products, Inc., a Delaware Corporation; and DOES 1-10, inclusive*, 2018.

Deposition and Rebuttal Report before the United States District Court Central District of California, in *Stephen Wilson v. Odwalla, Inc., a California Corporation; The Coca Cola Company, a Delaware Corporation; and DOES 1-10, inclusive*, 2018.

Testimony and Deposition before the United States District Court Southern District of New York, in *Effat S. Emamian v. Rockefeller University*, 2018.

Deposition, Rebuttal and Supplemental Declarations, in *Preston Jones and Shirin Delalat, et al. v. Nutiva, Inc.*, before the U.S. District Court, Northern District of California, 2017/2018.

Supplemental and Rebuttal Declarations before the United States District Court Eastern District of California, in *Joann Martinelli, et al., v. Johnson & Johnson and McNeil Nutritionals,* LLC, 2017/2018.

Rebuttal Declaration before the United States District Court Southern District of New York, in *Jaish Markos, et al., v. Russell Brands, LLC*, 2018.

Affidavit, in *Dara Fresco vs. Canadian Imperial Bank of Commerce*, Ontario Superior Court of Justice, 2017.

Testimony, Deposition and Expert Reports, before the Circuit Court of Cook County, Illinois County Department, Chancery Division in the matter of *John Crane, Inc. v. Allianz, et al.*, 2015/2016/2017.

Deposition and Declaration, before the United States Court District of South Carolina Greenville Division in *Myriam Fejzulai and Monica Moore, et al. v. Sam's West, Inc.; Sam's East Inc.; and Wal-Mart Stores, Inc.*, 2017.

Declaration, before the United States Court Central District of California in *Morgan Chikoski, et al. v. Sam's West, Inc.; Sam's East Inc.; and Wal-Mart Stores, Inc.,* 2017.

Rebuttal Reports, before the United States District Court Western District of Missouri, Western Division, *In Re: Simply Orange, Orange Juice Marketing & Sales Practices Litigation*, 2016.

Expert Report and Declarations, before the United States District Court for the Northern District of California, in the matter of *Senne, et al. vs. Office of the Commissioner of Baseball, et al.*, 2016.

Expert Report, before the Superior Court of the State of California County of Santa Clara, in the matter of *In Re: FireEye, Inc. Securities Litigation*, 2016.

Affidavit, before the State of Wisconsin Circuit Court Milwaukee County, in *Harley-Davidson, Inc., v. Hartford Accident and Indemnity Company, et al.*, 2016.

Deposition and Rebuttal Report, before the United States District Court Northern District of Ohio Eastern Division, in the matter of *Christopher Meta, et al., v. Target Corporation, et al.*, 2016.

Declarations and Deposition, before the United States District Court for the Central District of California Western Division, in the matter of *In Re NJOY, Inc. Consumer Class Action Litigation*, 2015/2016.

Deposition and Expert Report, in the Court of Common Pleas of Lucas County Ohio in the matter of *Certain Underwriters at Lloyd's London, et al., v. Allstate Insurance Co., et al.*, 2015.

Deposition, Expert, Supplemental, and Rebuttal Reports, In the North Carolina Superior Court for Mecklenburg County, in *Radiator Specialty Group v. Arrowood Indemnity Company, et al.*, 2015.

Deposition, Expert, and Rebuttal Reports, In the United States District Court Western District of Pennsylvania, in *The Goodyear Tire & Rubber Company v. Travelers Casualty and Surety Company and Travelers Indemnity Company*, 2015.

Expert and Rebuttal Reports, In the United States District Court Eastern District of New York, in *D. Joseph Kurtz, et al. vs. Kimberly-Clark Corporation and Costco Wholesale Corporation*, 2015.

Deposition and Expert Report, In the United States District Court Northern District of California San Francisco Division, in *Betty Dukes, et al. v. Wal-Mart Stores, Inc.*, 2015.

Deposition and Expert Report, In the United States District Court Southern District of Florida (Fort Lauderdale Division), in *Zenovdia Love, et al. v Wal-Mart Stores, Inc.*, 2015.

Expert Report, In the United States Bankruptcy Court for the District of Delaware, *In Re: Blitz U.S.A., Inc., et al.*, 2014.

## Publications and Presentations (10 years)

"Trends in Wage and Hour Settlements: 2013 Update," (co-author) NERA Monograph, November 2013.

"Trends in Wage and Hour Settlements: 2012 Update," (co-author) NERA Monograph, March 2013.

"Trends in Wage and Hour Settlements: 2011 Update," (co-author) NERA Monograph, March 2012.

"Recent Trends in Wage and Hour Settlements," (co-author) NERA Monograph, March 2011.

"Data in Wage and Hour Litigation: What to Do When You Have it and What to do When You Don't," (co-author) NERA Monograph, November 2010.

"Get in the Game: The Latest News and Developments in Wage and Hour Litigation," presented at the *4th Annual Section of Labor and Employment Law Conference,* Chicago, IL, November, 2010.

"Why Daubert Makes Sense at Class Certification Under Title VII," (co-author) published in *Law 360*, July 2010.

"The Economic Impact of New MMSEA Regulations," (co-author) published in *Law360,* April 2010.

"The Economic Implications of Medicare Section 111 Reporting Requirements" presented at the *Asbestos Litigation Conference*, Beverly Hills, CA, February 2010.

"Class Certification in Wage and Hour Litigation: What Can We Learn from Statistics?" (coauthor) NERA Monograph, November 2009.

"Wage and Hour: Advanced Topics in Litigation," presented at Law Seminars International conference on Litigating Employment Class Actions, April 2009.

"Implications of the Fair Pay Act for Statistical Analysis in Wage Discrimination Suits," (coauthor) NERA Monograph, March 2009.

"The Use of Economic Analysis in Predatory Lending Cases: Application to Subprime Loans," (co-author) NERA Monograph, November 2008.

September 2018

**Exhibit B**

**Materials Relied Upon**

- Class Action Complaint, Suzanna Bowling, Individually and on behalf of all others similarly situated, Plaintiff, vs. Johnson & Johnson and McNeil Nutritionals, LLC, Defendants, United States District Court for the Southern District of New York, Case No. 1:17-cv-03982-AJN, May 25, 2017.

- Declaration of Colin B. Weir, July 30, 2018.

- Declaration and Expert Report of J. Michael Dennis, Ph.D., July 30, 2018.

- Rebuttal Expert Report of David Reibstein, September 20, 2018.

- Declaration of Elizabeth Steele, September 20, 2018.

- Deposition Transcript of Colin B. Weir, September 6, 2018.

- Deposition Transcript of John Michael Dennis, Ph.D., September 5, 2018.

- Deposition Transcript of J. Michael Dennis, August 29, 2017, in *Jones et al. v. Nutiva 3-16-CV-00711-HSG*.

- Deposition transcript of Suzanna Bowling, August 24, 2018.

- Deposition transcript of Elizabeth Steele, May 23, 2017, and exhibits.

- Deposition transcript of Laura Zeno, May 24, 2017, and exhibits.

- Deposition transcript of Sean Belke, May 25, 2017.

- Deposition transcript of William Twomey, May 26, 2017.

- Deposition transcript of Jennifer Strouse, June 14, 2017.

- Allenby, Greg, Jeff Brazell, John R. Howell and Peter E. Rossi, "Valuation of Patented Product Features," *Journal of Law and Economics.* Vol. 57, No. 3 (August 2014)

- Aviv Nevo, "A Practitioner's Guide to Estimation of Random-Coefficients Logit Models of Demands," *Journal of Economics & Management Strategy,* Volume 9, Number 4, Winter 2000, 513-548.

- Aviv Nevo, "Empirical Models of Consumer Behavior." *Annual Review of Economics*, 2011, 3: 51-75.

- Berry, S., J. Levinsohn, and A. Pakes. 1995. "Automobile Prices in Market Equilbrium." *Econometrica* 63: 841-890.

- Federal Judicial Center and National Research Council. *Reference Manual on Scientific Evidence.* 3rd ed. Washington DC: National Academies Press, 2011]

- Nardi, Peter M. *Doing Survey Research: A Guide to Quantitative Methods,* Edition, Pearson, 2006.

- Orme, B.K. (2014) *Getting Started with Conjoint Analysis: Strategies for Product Design and Pricing Research, Third Ed.* Research Publishers LLC.

- Sedjo, Roger A. and Stephen K. Swallow. (2002) "Voluntary Eco-Labeling and the Price Premium." *Land Economics*, 78(2): 272-284.

- *Best Practices in Quantitative Methods,* edited by Jason Osborne, Sage Publications, 2008.

- "Typical Questions for Choice Simulators." *Sawtooth Software*, www.sawtoothsoftware. com/help/lighthouse-studio/manual/index.html?hid_typicalquestions.html, accessed September 17, 2018.

- Electronic Data:

    - MARTI_EREV001_00004940.xls

    - MARTI_EREV001_00006082.xlsx

    - Confidential document production from IRI, received by Neal J. Deckant, Bursor & Fisher, P.A. "Benecol - Bursor Subpeona HIGHLY CONFIDENTIAL AEO.xlsx"

    - Weir0022 - Sales data - CONFIDENTIAL.xlsx

# Exhibit C

## Monthly Sales Dollars and Average Retail Price
### Benecol and Benecol Light
### January 1, 2008 - December 31, 2016



Total Sales    Weir Estimated Sales    ARP