# EXHIBIT DD

## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

SUZANNA BOWLING, individually and
on behalf of others similarly situated

                      Plaintiff,

v.

JOHNSON & JOHNSON and McNEIL
NUTRITIONALS, LLC,

                      Defendants.

Civil Action No. 1:17-cv-03982-AJN

## REPLY DECLARATION OF DR. DENISE N. MARTIN

### December 12, 2018

1

# TABLE OF CONTENTS

I.     Summary of Assignment and Conclusions .................................................3

II.    Qualifications.........................................................................................6

III.   Documents Considered ...........................................................................7

IV.    Plaintiff's Reply Declarations Do Not and Cannot Change the Fact that
       Stand-Alone Conjoint Analysis Do Not and Cannot Estimate Any Price
       Premium...............................................................................................8

       A.    Use of "Market-Based" Price Points and a "Market Simulator" Does Not
             Change the Fact that Conjoint Analysis is a Demand Side Tool that Does
             Not Consider Supply-Side Responses So at Best Estimates Willingness to
             Pay, Not Price..........................................................................8

       B.    According to Economic Theory, the Willingness to Pay of the "Marginal
             Consumer" for the Challenged Claims Is Not Generated by Conjoint
             Analysis and, in Any Event, Would Not Equal the But-For Price Differential.9

       C.    Evidence from Dr. Dennis' Own Survey Shows that a Positive Willingness to
             Pay Need Not Translate into a Price Premium .................................10

V.     Correcting Mr. Weir's Counterfactual Hypothetical Confirms that His
       "Price Premium" Estimates Are Contradicted by Market Evidence ..............11

VI.    Data Needed to Reliably Estimate Any Price Premium Is Not in the Record
       and May No Longer Be Available Due to the Passage of Time ........................13

VII.   If Quantity Versus Price Would Have Adjusted Absent the Challenged
       Claims, Plaintiff's "Price Premium" Theory is Wrong from Perspective of
       Economics ...........................................................................................13

## I.      Summary of Assignment and Conclusions

1.      In connection with the above-captioned matter, I was asked by counsel for Johnson & Johnson and McNeil Nutritionals, LLC ("McNeil" or "the Company") to evaluate opinions offered in the Reply Declarations of J. Michael Dennis and Colin Weir (the "Dennis Reply Declaration" and "Weir Reply Declaration," respectively) that relate to my testimony.

2.      To a large degree, the Dennis and Weir Reply Declarations reiterate the same flawed defenses offered in their earlier reports for their use of conjoint analysis to estimate a purported "price premium" attributable to the "No Trans Fats" and "No Trans Fatty Acids" claims on the labels of the Benecol brand products.[1]  I responded to these purported defenses in my earlier report.[2]

3.      The issue of whether a stand-alone conjoint survey can be used to estimate any price premium associated with the challenged claims should not be up for debate.  Every treatise I have seen on conjoint analysis describes the output as a measure of willingness to pay, expressly cautioning it cannot be used to estimate market prices.[3]  The one *Law360* article

---

[1]   *See*, Declaration and Expert Report of J. Michael Dennis, July 30, 2018 ("Dennis Declaration") and Declaration of Colin B. Weir, July 30, 2018 ("Weir Declaration").

[2]   *See*, Rebuttal Declaration of Dr. Denise N. Martin, September 20, 2018 ("Martin Rebuttal Declaration").

[3]   *See*, for example, Allenby, Greg, Jeff Brazell, John R. Howell and Peter E. Rossi, "Valuation of Patented Product Features," *Journal of Law and Economics*. Vol. 57, No. 3 (August 2014):

   [A] conjoint survey, in and of itself is not adequate to form the basis for equilibrium firm profit calculations. Not only must we calibrate demand for products, but we must also compute industry equilibria.  This requires measures of costs, a demand system not only for the focal product but also for the major competing products, and an equilibrium concept (p.630).

   [T]he WTP [(willingness to pay)] cannot be [a] measure[] of the market value of a product feature…. The WTP… measure[] utilize[s] only demand-side information and [is] independent of costs or the competitive structure of the industry…  The [measure] assumes that firms will not alter prices in response to a change in the set of products in the marketplace as the feature is [changed] (p. 647, 649).

   "WTP… [is] purely demand-based…and [does] not take into account changes in prices and costs as the feature is enhanced and a new industry equilibrium is achieved," (p. 650).

   *See, also*, Orme, Bryan K., *Getting Started with Conjoint Analysis: Strategies for Product Design and Pricing*

that Dr. Dennis and Mr. Weir point to in support of their assertion that conjoint analysis can be used to estimate a "price premium" is taken out of context. The misinterpretation of this article is referenced in subsequent articles, including one with the same co-author as the *Law360* article.[4] That conjoint analysis cannot estimate a price premium is not a matter of opinion but one of economics.

    4. Below, I respond to the Dennis and Weir Reply Declarations only where I believe further clarification would assist the trier of fact. Specifically, I explain:

      a. That Dr. Dennis' use of "market-based" price points and a "market simulator" does not change the fact that conjoint analysis is a demand-side tool that does not

---

*Research, Third Ed.* Research Publishers LLC (2014):

> [C]onjoint utilities cannot account for many real world factors that shape market shares, such as length of time on the market, distribution, out-of-stock conditions, advertising, effectiveness of sales force, and awareness. Conjoint analysis predictions also assume that all relevant attributes that influence share have been measured. Therefore, the share of preference predictions usually should not be interpreted as market shares, but as relative indications of preference. Divorcing oneself from the idea that conjoint simulations predict market shares is one of the most important steps to getting value from a conjoint analysis study and the resulting simulator. While external-effect factors can be built into the simulation model to tune conjoint shares of preference to match market shares, we suggest avoiding this temptation if at all possible. No matter how carefully conjoint predictions are calibrated to the market, the researcher may one day be embarrassed by differences that remain (p.108).

*See, also*, Sawtooth Software's website at https://www.sawtoothsoftware.com/help/lighthouse-studio/manual/index html?hid_typicalquestions html, accessed September 17, 2018:

> A market simulator lets you input multiple products and place them in simulated competition one with another…The choice simulator focuses on the demand of the marketing equation.

*See, also*, Sedjo, Roger A. and Stephen K. Swallow. (2002) "Voluntary Eco-Labeling and the Price Premium." *Land Economics*, 78(2): 272-284:

> A major finding is that there are reasonable circumstances in which some portion of consumers is willing to pay a price premium but a premium (price differential) will not arise in the market. An implication of the findings is that even if surveys that indicate that consumers are willing to pay a premium are correct, this is not a sufficient condition to generate a premium in the market.

[4] *See*, Allenby, Greg, Peter E. Rossi, Lisa Cameron, and Yikang Li. "Computing Damages in Products Mislabeling Cases: Plaintiffs' Mistaken Approach in Briseno v. ConAgra," 45 *Products Safety & Liability Reporter* 208, 2017. *See, also*, Tomlin, Jonathan and Robert Zeithammer. "Product Labeling Class Actions –Identifying the 'Con' in Conjoint Surveys," *Bloomberg Law*, November 1, 2018.

consider the supply-side response so, at best, estimates consumers' willingness to pay.

b. That according to economic theory, conjoint analysis does not and cannot estimate the willingness to pay of the marginal consumer in the but-for world absent the challenged claims.

c. 

d.

e. Additional data would be necessary to implement an alternative approach that takes into account both supply and demand side factors to generate a reliable estimate of any price premium.  For example, detailed product-level data regarding the prices and sales of the Benecol products and competing products would be required.  Such data certainly existed at a point in time from IRI.  To my knowledge, however, there is no data with this level of detail within the

documents that the parties produced during discovery. Moreover, I understand that IRI only retains it sales and pricing data for a limited number of years, so it is unclear whether additional disaggregated data still exist for the period 2008 to 2011. The reason that certain data needed to generate a reliable estimate of any price premium may not be available is the passage of time from the end of the alleged class period in 2011 and the filing of Plaintiff's complaint in 2017.[5]

f.   That if quantity rather than price would have fallen absent the challenged labeling, as Mr. Weir posited in his deposition and references in his Reply Declaration, Plaintiff's "price premium" measure of damages is wrong from the perspective of economics and is inconsistent with their theory of liability, *e.g.*, the theory that all consumers overpaid so that price premium damages are an appropriate remedy.

## II.    Qualifications

5.     I am a Managing Director at NERA Economic Consulting ("NERA") and have been with the firm since 1991.

6.     Before joining NERA, I earned a B.A. in Economics from Wellesley College and an M.A. and Ph.D., also in Economics, from Harvard University. My undergraduate and graduate education included coursework in microeconomics, statistics and econometrics, including conjoint survey and Bayesian methods. Prior to attending Harvard, I served as an Assistant Economist at the Federal Reserve Bank of New York and as an Economic Consultant at Urban Systems Research & Engineering/Economica.

---

[5]    Class Action Complaint, Suzanna Bowling, Individually and on behalf of all others similarly situated, Plaintiff, vs. Johnson & Johnson and McNeil Nutritionals, LLC, Defendants, United States District Court for the Southern District of New York, Case No. 1:17-cv-03982-AJN, May 25, 2017.

7.      While at Harvard, I taught classes in microeconomics, industrial organization and statistics to undergraduate and graduate students, and was awarded the Danforth Prize for Teaching.  Microeconomics includes consumer theory, which explains how individuals make decisions, including which products to buy given the attributes embodied in them and the prices at which they are offered.  Microeconomics also includes producer theory or industrial organization, which explains how firms make decisions, including what products to sell, with which attributes and at what prices.

8.      At NERA, I have been retained as an economic expert on more than 200 class actions, including consumer class actions, securities class actions and employment class actions. In the course of these assignments, I am frequently asked to analyze issues related to class certification and damages, including whether a particular formulaic method can be used to estimate damages on a class-wide basis.  I frequently work with large datasets involving pricing and sales data.  I routinely use and have provided testimony regarding the application of statistical and econometric techniques, including conjoint analysis and Bayesian methods.

9.      My C.V., including my most recent 4 years of testimony and 10 years of publications, is included as **Exhibit A**.

10.     NERA is being compensated for my services in this matter at $900 per hour. Other NERA consultants assisted me in this engagement have billing rates less than $900 per hour.  No part of NERA's compensation depends on the outcome of this litigation.  Throughout this report, I have used the terms "I" and "my" to refer to work performed by me and/or others under my direction.

### III.     Documents Considered

11.     A complete list of the documents I considered in preparing this declaration is

7

provided in **Exhibit B**.

**IV.  Plaintiff's Reply Declarations Do Not and Cannot Change the Fact that Stand-Alone Conjoint Analysis Do Not and Cannot Estimate Any Price Premium**

12.  With respect to their purported defense of using conjoint survey to estimate any "price premium," the Weir and Dennis Reply Declarations largely reiterate points made in their earlier reports, which I addressed in the Martin Rebuttal Declaration.  Below, I comment on two assertions made by Plaintiff's experts where I believe further elaboration would assist the trier of fact.

**A.  Use of "Market-Based" Price Points and a "Market Simulator" Does Not Change the Fact that Conjoint Analysis is a Demand Side Tool that Does Not Consider Supply-Side Responses So at Best Estimates Willingness to Pay, Not Price**

13.  Mr. Weir misleadingly asserts, "Dr. Dennis and I made sure to include market-based price points and alternative product selections to simulate a marketplace outcome for the Benecol Products."[6] Dr. Dennis similarly asserts that "[t]he market simulator that I used to calculate the price premium also incorporates the market-based price points for the price attributes based on actual real-world prices that consumers paid for the Defendants' products and for competing products."[7]  The fact that the price points shown to participants in their survey bear some relationship to market prices does not mean Plaintiff's experts have taken the "supply side" into account, somehow transforming these flawed estimates of willingness to pay into "price premiums."  There is no disagreement among anyone except Plaintiff's experts that the estimates that emerge from the "market simulator" remain measures of willingness to pay. In addition to the citations included in footnote 3 above, Keith Chrzan (who recently co-

---

[6]  Reply Declaration of Colin B. Weir, November 16, 2018 ("Weir Reply Declaration"), ¶24.

[7]  Reply Declaration of J. Michael Dennis, Ph.D., November 16, 2018 ("Dennis Reply Declaration"), ¶28.

authored a book with Bryan Orme, founder of the Sawtooth Software relied upon by Dr. Dennis and Mr. Weir to analyze the survey results) explains emphatically:

> [Y]ou could measure WTP [Willingess to Pay] with simulations. Simulate the product without the attribute benefit you want to measure (*i.e.*, the attribute is absent or is present at its less desirable state) and at the lowest price in your range. Then have that product compete with a version of the product that HAS the benefit. Adjust the price on the second product upwards until you get a 50/50 share split. ***This is the share-equalizing price and is yet another measure of WTP***.[8]

14. Those knowledgeable about the appropriate uses of conjoint analysis, including those who created the very software on which Plaintiff's experts are relying, understand and caution that its output—even after the "market simulation"—remains a willingness to pay measure.

**B. According to Economic Theory, the Willingness to Pay of the "Marginal Consumer" for the Challenged Claims Is Not Generated by Conjoint Analysis and, in Any Event, Would Not Equal the But-For Price Differential**

15. Dr. Dennis and Mr. Weir also misleadingly assert that the conjoint analysis somehow identifies the willingness to pay of the "marginal consumer" and therefore generates an estimate of the "price premium" associated with the challenged claims.[9] Again, from the perspective of economics, this assertion is false. Their reference to a *Law360* article in purported support of the assertion was subsequently refuted directly by one of its co-authors, Lisa Cameron. Dr. Cameron explains: "[I]t is important to remember that consumer valuations of [a] misrepresented feature are not the same as the market price premium associated with the

---

[8] *See*, Sawtooth Software's website at https://sawtoothsoftware.com/forum/17220/how-calculate-the-willingness-pay-for-attribute-levels-cbc *(Emphasis added)*, accessed December 11, 2018.
[9] Dennis Reply Declaration, ¶31; Weir Reply Declaration, ¶26.

alleged misrepresentation." Dr. Cameron reiterates that conjoint surveys "do not take into account cost and other market forces such as the nature of competition among suppliers," and therefore a price premium "cannot be determined by consumers' valuation of the accused feature alone."[10]

16.    A more recent piece further warns that "[t]he marginal consumer's willingness to pay is generally not equal to a price premium," observing that the *Law360* article had been "misinterpreted."[11] That is, even if we were to accept for the sake of argument that conjoint could measure the willingness to pay of the marginal consumer for the challenged claims, given the nature of the market for the Benecol brand products—one in which firms price strategically—that willingness to pay may have no impact on price.

### C.  Evidence from Dr. Dennis' Own Survey Shows that a Positive Willingness to Pay Need Not Translate into a Price Premium

17.    ██████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████    ████████████████████████

---

[10]   Allenby, Greg, Peter E. Rossi, Lisa Cameron, and Yikang Li. "Computing Damages in Products Mislabeling Cases: Plaintiffs' Mistaken Approach in Briseno v. ConAgra," 45 *Products Safety & Liability Reporter* 208, 2017.

[11]   Tomlin, Jonathan and Robert Zeithammer. "Product Labeling Class Actions –Identifying the 'Con' in Conjoint Surveys," *Bloomberg Law*, November 1, 2018.

[12]   I used Dr. Dennis's "market simulator" to test respondents' preferences for "Light" versus "Regular" versions of a cholesterol-lowering spread containing plant sterol esters (the supplemental ingredient in Benecol products). Replicating Dr. Dennis's analysis (outlined in Dennis Declaration, ¶¶ 48-50), which purportedly calculates the "market price premium" for the products at issue, I find that a product analogous to Benecol Light (*i.e.*, an 8 ounce container, with plant stanol esters, a vegetable oil percentage of 39%, and including the claims "No Trans Fat," "Light," "Proven to Reduce Cholesterol" and "50% Less Calories Than Butter") should command a 37.5% "price premium" over a product analogous to Benecol "Regular" (*i.e.*, an 8 ounce container, with plant stanol esters, a vegetable oil percentage of 55%, and including the labels "No Trans Fat" and "Proven to Reduce Cholesterol," but without the other two claims present on the "light" version of the product).

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████  See **Exhibits C, D, and E.**

18.     Dr. Dennis' estimated willingness to pay for Light over Regular of $1.80—
approximately 40% of the average retail price of the products—bears no relationship to the
prices charged for these products in the market.  Given this contradiction, accepting the validity
of the estimates from the conjoint for the sake of argument only, there is no reason to believe
the estimated willingness-to-pay of 20.8% for the "No Trans Fat" label translated into a market
price differential either.  All of the other evidence I have reviewed indicates to the contrary.

## V.     Correcting Mr. Weir's Counterfactual Hypothetical Confirms that His "Price Premium" Estimates Are Contradicted by Market Evidence

19.     ███████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

██████████████████████████████████████

██████████  █████████████████████████████████

---

13   *See*, Declaration of Elizabeth Steele in Support of Defendants Johnson & Johnson and McNeil Nutritionals, LLC's Opposition to Plaintiff's Motion for Class Certification ("Steele Declaration"), ¶ 21.
14   *Ibid*.
15   *See*, Martin Rebuttal Declaration, ¶ 43.

."[16]

20.     In an attempt to resurrect his flawed measure, Mr. Weir offers a counterfactual hypothetical. Specifically, he asserts that "the price of the Products might increase as a result of the challenged Claims, while at the same time decrease as a result of competitive pressure from other similar spreads."[17] That is, he posits that competitive pressures might be masking a price premium.

21.     This hypothetical is inconsistent with the actual circumstances of Benecol brand products sales and labeling. If Plaintiff's theory is true, any price premium would have been removed in early 2012, when the challenged claims were removed from the label—that is, the price should have fallen by 20.8% at this time. The competitive pressures in the market at that time were *also* negative, as evidenced by McNeil's internal documents and by the decline in sales from 2008 through 2011 and beyond.[18] That is, any effect of competitive pressures at this time was depressing sales and keeping product prices at or below historical levels. If anything, then, had the challenged claims been material to consumers and accurately measured by the 20.8% price premium estimated by Dr. Dennis and relied upon by Mr. Weir, the observed change in price when the label was removed would have been *equal to or more than 20.8%*. Instead, the opposite is true. Plaintiff's estimate and hypothesis are flatly contradicted by market evidence.

---

[16]   *See*, Martin Rebuttal Declaration, ¶¶ 7-8.
[17]   *See*, Weir Reply Declaration, ¶ 73.
[18]   *See*, MARTI_EREV001_00006082.xlsx, MARTI_EREV001_00004940.xls, Confidential document production from IRI, received by Neal J. Deckant, Bursor & Fisher, P.A. "Benecol – Bursor Subpeona [*sic*] HIGHLY CONFIDENTIAL AEO.xlsx" (2012 data). *See*, Exhibit 31 of Laura Zeno Deposition (MCNEIL0023239) for a list of factors affecting trends in Benecol sales.

**VI. Data Needed to Reliably Estimate Any Price Premium Is Not in the Record and May No Longer Be Available Due to the Passage of Time**

22.     Mr. Weir misleadingly asserts that I testified there was insufficient market data available to properly estimate any price premium using the method that I offered as a reliable alternative to the inappropriate conjoint tool.[19]  It is correct that detailed product-level data on the sales and prices of the Benecol brand products and competing products would be needed in any reliable model of a price premium.  This data certainly existed and would have been available from IRI at a point in time.  However, my understanding is that no data with this level of detail exist within the documents that the parties produced during discovery.  Moreover, I understand that IRI only retains its sales and pricing data for a limited number of years, so it is unclear whether additional disaggregated data still exist for the period 2008 to 2011 given the amount of time that has transpired.  The reason that certain data needed to generate a reliable estimate of any price premium may not be available, then, is the passage of time from the end of the alleged class period in 2011 and the filing of Plaintiff's complaint in 2017.

23.     No basis exists to rely on flawed estimates of willingness to pay, particularly given that Plaintiff did not even attempt to gather data to conduct a reliable estimation of any price premium and the available evidence indicates such estimation is likely to show no premium existed.

**VII. If Quantity Versus Price Would Have Adjusted Absent the Challenged Claims, Plaintiff's "Price Premium" Theory is Wrong from Perspective of Economics**

24.     In a further attempt to explain why the price of the Benecol brand products did not fall by 20.8% when the challenged claims were removed from the labels, Mr. Weir posited

---

[19]     *See,* Weir Reply Declaration, ¶¶ 67-69.

that quantity, rather than price, may have adjusted.[20]  Accepting for the sake of argument that the challenged claim was material to some consumers, such a quantity adjustment would be consistent with economic theories of consumer preferences and behavior.  Consumers purchase products if the expected value (or "utility") to them is greater than the purchase price.[21]  For any consumers who assigned value to the challenged claims, the value of the product would have been reduced absent those claims.  For certain consumers, this reduction in value would cause the total value of the product to fall below the market price, so would have changed their decision about whether to purchase.  If there is no impact on market price associated with the challenged claims, only those consumers who would have changed their purchase decision have suffered any economic damages.  To return them to the position they would have been in absent the alleged wrongdoing, they should receive their purchase price less whatever value was received from the product actually purchased.  Individualized review would be required both to identify which consumers would not have purchased absent the challenged claims and to estimate whatever value they received.

25.     Importantly, all other consumers—those who would have continued to purchase absent the challenged claims—are necessarily undamaged.  They purchased the products at a price that did not embed a price premium and would have paid the same price absent the challenged claims.

26.     If the but-for world is one in which quantity rather than price would have adjusted absent the challenged claims, then, Plaintiff has put forward the wrong theory (let

---

[20]   *See*, Deposition of Colin B. Weir, September 6, 2018, p. 53.
[21]   *See, e.g.*, Gregory Mankiw, Principles of Microeconomics, 7th Edition, 2014, Chapter 4.

alone model) of damages. If the prices of the Benecol brand products would have been the same absent the challenged claims, but some consumers would not have purchased so the quantity sold would have been lower, it is simply not the case that all consumers overpaid by some "price premium."

\* \* \* \* \* \* \*

My opinions and conclusions as expressed in this report are to a reasonable degree of professional certainty. My work is ongoing and I respectfully reserve the right to update my opinions based on any additional material that becomes available to me.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that I am competent to testify to the facts contained in this report if called as a witness.

Executed this 12th day of December 2018, in New York, NY.

Denise N. Marl

Denise N. Martin

15

# Exhibit A

# DENISE NEUMANN MARTIN
## Managing Director

## Education

**Harvard University**
Ph.D., Economics, 1991
M.A., Economics, 1988

**Wellesley College**
B.A., *magna cum laude*, Economics and French, 1985
Honors: Phi Beta Kappa

## Professional Experience

**NERA Economic Consulting**
2001-         Managing Director

1998-2000     Vice President

1994-1997     Senior Consultant

1991-1993     Senior Analyst

**Harvard University**
1986-1990     Teaching Fellow, Department of Economics
Taught courses in Microeconomics and Industrial Organization at the graduate
and undergraduate levels. Assisted senior honors candidates with theses. Awarded
Danforth Prize in Teaching.

1986-1990     Research Associate, Department of Economics
Projects included an investigation of the timing of international horizontal
mergers, an evaluation of the effect of generic entry into the pharmaceutical
market, and a comparison of technical efficiency across countries.

**Urban Systems Research and Engineering/Economica, Inc.**

1987-1988    Economic Consultant
Consulted on all aspects of government agency projects, including proposals and the design of survey instruments. Provided economic forecasts and technical support.

**Federal Reserve Bank of New York**

1985-1986    Assistant Economist, International Financial Markets
Analyzed Eurobond markets, interest rate swap markets, and US commercial banks' balance sheets.

## Testimony (4 years)

Expert Report before the United States District Court Central District of California, Western Division in *Oaktree Principal Fund V, LP., et al. v. Warburg Pincus LLC, et al.*, 2018.

Deposition Testimony and Rebuttal Declaration before the United States District Court for the Southern District of New York in *Suzanna Bowling, et al. v. Johnson & Johnson and McNeil Nutritionals, LLC*, 2018.

Deposition Testimony and Expert Report before the United States District Court Northern District California in *Colleen Gallagher et al., v. Bayer AG, Bayer Corporation, and Bayer Healthcare LLC*, 2018.

Deposition Testimony before the Alameda County Superior Court in *Stephen M. Snyder, Jack L. Luikart, and Sandra R. Hernandez, solely in their capacities as trustees of the Western Asbestos Settlement Trust v. California Insurance Guarantee Association.* 2018.

Rebuttal Declaration before the United States District Court for the Northern District of California in *Jackie Fitzhenry-Russell v. The Coca Cola Company; and DOES 1-10, and DOES 1-50,* 2018.

Rebuttal Report before the United States District Court Central District of California in *David Spacone v. Elmer's Products, Inc., a Delaware Corporation; and DOES 1-10, inclusive*, 2018.

Deposition, Rebuttal Report and Declaration before the United States District Court Central District of California, in *Stephen Wilson v. Odwalla, Inc., a California Corporation; The Coca Cola Company, a Delaware Corporation; and DOES 1-10, inclusive*, 2018.

Testimony, Deposition and Rebuttal Report before the United States District Court Southern District of New York, in *Effat S. Emamian v. Rockefeller University*, 2018.

Deposition, Rebuttal and Supplemental Declarations before the U.S. District Court, Northern District of California in *Preston Jones and Shirin Delalat, et al. v. Nutiva, Inc.*, 2017/2018.

Supplemental and Rebuttal Declarations before the United States District Court Eastern District of California in *Joann Martinelli, et al. v. Johnson & Johnson and McNeil Nutritionals,* LLC, 2017/2018.

Rebuttal Declaration before the United States District Court Southern District of New York in *Jaish Markos, et al., v. Russell Brands, LLC,* 2018.

Affidavit before the Ontario Superior Court of Justice in *Dara Fresco vs. Canadian Imperial Bank of Commerce,* 2017.

Testimony, Deposition and Expert Reports before the Circuit Court of Cook County, Illinois County Department, Chancery Division in *John Crane, Inc. v. Allianz, et al.,* 2015/2016/2017.

Deposition and Declaration before the United States Court District of South Carolina Greenville Division in *Myriam Fejzulai and Monica Moore, et al. v. Sam's West, Inc.; Sam's East Inc.; and Wal-Mart Stores, Inc.,* 2017.

Declaration and Deposition before the United States Court Central District of California in *Morgan Chikosi, et al. v. Sam's West, Inc.; Sam's East Inc.; and Wal-Mart Stores, Inc.,* 2017.

Rebuttal Reports before the United States District Court Western District of Missouri, Western Division in *In Re: Simply Orange, Orange Juice Marketing & Sales Practices Litigation,* 2016.

Expert Report and Declarations before the United States District Court for the Northern District of California in *Senne, et al. vs. Office of the Commissioner of Baseball, et al.,* 2016.

Expert Report before the Superior Court of the State of California County of Santa Clara, in *In Re: FireEye, Inc. Securities Litigation,* 2016.

Affidavit before the State of Wisconsin Circuit Court Milwaukee County in *Harley-Davidson, Inc., v. Hartford Accident and Indemnity Company, et al.,* 2016.

Deposition and Rebuttal Report before the United States District Court Northern District of Ohio Eastern Division in *Christopher Meta, et al. v. Target Corporation, et al.,* 2016.

Deposition, Rebuttal Declaration and Declaration before the United States District Court for the Central District of California Western Division in *In Re NJOY, Inc. Consumer Class Action Litigation,* 2015/2016.

Deposition and Expert Report before the Court of Common Pleas of Lucas County Ohio in *Certain Underwriters at Lloyd's London, et al. v. Allstate Insurance Co., et al.,* 2015.

Deposition, Expert, Supplemental, and Rebuttal Reports before the North Carolina Superior Court for Mecklenburg County in *Radiator Specialty Group v. Arrowood Indemnity Company, et al.,* 2015.

Deposition, Expert, and Rebuttal Reports before the United States District Court Western District of Pennsylvania in *The Goodyear Tire & Rubber Company v. Travelers Casualty and Surety Company and Travelers Indemnity Company*, 2015.

Expert and Rebuttal Reports before the United States District Court Eastern District of New York in *D. Joseph Kurtz, et al. vs. Kimberly-Clark Corporation and Costco Wholesale Corporation*, 2015.

Deposition and Expert Report before the United States District Court Northern District of California San Francisco Division in *Betty Dukes, et al. v. Wal-Mart Stores, Inc*., 2015.

Deposition and Expert Report before the United States District Court Southern District of Florida (Fort Lauderdale Division) in *Zenovida Love, et al. v Wal-Mart Stores, Inc.*, 2015.

Expert Report before the United States Bankruptcy Court for the District of Delaware in *In Re: Blitz U.S.A., Inc., et al.*, 2014.

## Publications and Presentations (10 years)

"Trends in Wage and Hour Settlements: 2013 Update," (co-author) NERA Monograph, November 2013.

"Trends in Wage and Hour Settlements: 2012 Update," (co-author) NERA Monograph, March 2013.

"Trends in Wage and Hour Settlements: 2011 Update," (co-author) NERA Monograph, March 2012.

"Recent Trends in Wage and Hour Settlements," (co-author) NERA Monograph, March 2011.

"Data in Wage and Hour Litigation: What to Do When You Have it and What to do When You Don't," (co-author) NERA Monograph, November 2010.

"Get in the Game: The Latest News and Developments in Wage and Hour Litigation," presented at the *4th Annual Section of Labor and Employment Law Conference,* Chicago, IL, November 2010.

"Why Daubert Makes Sense at Class Certification Under Title VII," (co-author) published in *Law 360*, July 2010.

"The Economic Impact of New MMSEA Regulations," (co-author) published in *Law360,* April 2010.

"The Economic Implications of Medicare Section 111 Reporting Requirements" presented at the *Asbestos Litigation Conference*, Beverly Hills, CA, February 2010.

"Class Certification in Wage and Hour Litigation: What Can We Learn from Statistics?" (co-author) NERA Monograph, November 2009.

"Wage and Hour: Advanced Topics in Litigation," presented at Law Seminars International conference on Litigating Employment Class Actions, April 2009.

"Implications of the Fair Pay Act for Statistical Analysis in Wage Discrimination Suits," (co-author) NERA Monograph, March 2009.

December 2018

# Exhibit B

## Materials Relied Upon

- Class Action Complaint, Suzanna Bowling, Individually and on behalf of all others similarly situated, Plaintiff, vs. Johnson & Johnson and McNeil Nutritionals, LLC, Defendants, United States District Court for the Southern District of New York, Case No. 1:17-cv-03982-AJN, May 25, 2017

- Declaration of Colin B. Weir, July 30, 2018

- Declaration and Expert Report of J. Michael Dennis, Ph.D., July 30, 2018

- Reply Declaration of Colin B. Weir, November 16, 2018

- Reply Declaration of J. Michael Dennis, Ph.D., November 16, 2018

- Deposition Transcript of Colin B. Weir, September 6, 2018

- Declaration of Elizabeth Steele, September 20, 2018

- Rebuttal Declaration of Dr. Denise N. Martin, September 20, 2018, and all Materials Relied Upon referenced therein

- Deposition of Dr. Denise N. Martin, November 9, 2018

- Deposition transcript of Laura Zeno, May 24, 2017, and exhibits

- Allenby, Greg, Jeff Brazell, John R. Howell and Peter E. Rossi, "Valuation of Patented Product Features," *Journal of Law and Economics.* Vol. 57, No. 3 (August 2014)

- Allenby, Greg, Peter E. Rossi, Lisa Cameron, and Yikang Li. "Computing Damages in Products Mislabeling Cases: Plaintiffs' Mistaken Approach in Briseno v. ConAgra," 45 *Products Safety & Liability Reporter* 208, 2017

- Orme, B.K. (2014) *Getting Started with Conjoint Analysis: Strategies for Product Design and Pricing Research, Third Ed.* Research Publishers LLC

- Sedjo, Roger A. and Stephen K. Swallow. (2002) "Voluntary Eco-Labeling and the Price Premium." *Land Economics*, 78(2): 272-284

- Tomlin, Jonathan and Robert Zeithammer. "Product Labeling Class Actions   Identifying the 'Con' in Conjoint Surveys," *Bloomberg Law*, November 1, 2018

- "Typical Questions for Choice Simulators." *Sawtooth Software*, www.sawtoothsoftware. com/help/lighthouse-studio/manual/index.html?hid_typicalquestions.html, accessed September 17, 2018

- "How do I calculate the willingness to pay attribute levels in a CBC?" *Sawtooth Software*, https://sawtoothsoftware.com/forum/17220/how-calculate-the-willingness-pay-for-attribute-levels-cbc*, accessed December 11, 2018

- Gregory Mankiw, <u>Principles of Microeconomics</u>, 7th Edition (2014)

- Electronic Data:

    - MARTI_EREV001_00004940.xls

    - MARTI_EREV001_00006082.xlsx

    - Confidential document production from IRI, received by Neal J. Deckant, Bursor & Fisher, P.A. "Benecol - Bursor Subpeona HIGHLY CONFIDENTIAL AEO.xlsx"

# Exhibit C

**Monthly Weighted Average Retail Price**
**Benecol Regular and Benecol Light**
**2008 – 2009**



**Notes and Sources:**
  - Data are from file "MARTI_EREV001_00006082 xlsx." Sales are reported on a monthly basis.

# Exhibit D

**Weighted Average Retail Price by Retailer**
**Benecol Regular and Benecol Light**
**52 Weeks Ending 9/6/2009**



■ Benecol Regular  ■ Benecol Light

**Notes and Sources:**

Data are from file "MARTI_EREV001_00002992.xlsx."

Sales weighted retail price calculated using the [Dollar Sales] and [Unit Sales] variables for 52 weeks ending 9/5/2010 and the [Dollar Sales % Chg YAgo] and [Unit Sales %Chg YAgo] variables to generate the 52 weeks ending 9/6/2009 values.

# Exhibit E

**Weighted Average Retail Price by Retailer**
**Benecol Regular and Benecol Light**
**52 Weeks Ending 9/5/2010**



■ Benecol Regular  ■ Benecol Light

**Notes and Sources:**
- Data are from file "MARTI_EREV001_00002992 xlsx."
- Sales weighted retail price calculated using the [Dollar Sales] and [Unit Sales] variables for 52 weeks ending 9/5/2010.