# EXHIBIT EE

Page 1

CONFIDENTIAL

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
Case No. 1:17-cv-03982-AJN

------------------------

| | | |
|---|---|---|
| SUZANNA BOWLING, | : | Videotaped |
| Individually and on | | Deposition of: |
| behalf of all others | : | |
| similarly situated, | | COLIN B. WEIR |
| | : | |
| Plaintiff, | | |
| | : | |
| vs. | | |
| | : | |
| JOHNSON & JOHNSON and | | |
| McNEIL NUTRITIONALS, | : | |
| LLC, | | |
| | : | |
| Defendants. | | |

------------------------:

TRANSCRIPT of testimony as taken by and before PATRICIA A. SANDS, a Shorthand Reporter and Notary Public of the States of New York and New Jersey, at the offices of O'MELVENY & MYERS, 7 Times Square, New York, New York, on Thursday, September 6, 2018, commencing at 10:10 in the forenoon.

Job No. CS 2998017

Page 47

CONFIDENTIAL

1    If you were to go to Gilligan's Island and
2    ask the Howell's how much would you pay for a
3    boat ride off of the island, they are wealthy,
4    so they would probably tell you something like
5    untold millions, just get us off the island, we
6    never want to see Gilligan again.  And that
7    doesn't help you figure out what the market
8    value of that boat ride home is.
9        But if you go tell the Howell's that
10   someone's coming to the island in thirty
11   minutes with a boat ride to take them home and
12   the -- and the market price for that is $4,000,
13   and they indicate that they will pay the
14   $4,000.  Now you start to get information about
15   a market clearing price.
16       And if you were to survey just the
17   Howell's, that might not be sufficient
18   information, but if you do a sample of the cast
19   members and talk to Ginger and Mary Ann and the
20   Howell's and the professor, then suddenly you
21   can get some information about what the true
22   market value for a boat ride home from
23   Gilligan's Island would be through the use of
24   the realistic and actual market price points
25   for boat rides, rather than something like

Page 48

CONFIDENTIAL

1    willingness to pay.
2         So tying it back to this case,
3    Dr. Dennis's use of the real world market price
4    data in his survey, allows him to calculate the
5    true market valuation of the challenged claims,
6    rather than maximum willingness to pay for
7    products that make those claims.
8         Q    Would it affect your Gilligan's
9    Island scenario if five more boats showed up
10   with different price points, making it possible
11   for the members of the cast away crew to kind
12   of choose something other than the boat that's
13   arriving only in 30 minutes for $4,000?
14        A    So it depends on what type of
15   analysis we're trying to do in Gilligan's
16   Island.  I would say if the consumers were
17   faced with different price points in the
18   market, you would want to reflect a range of
19   those market price points in the survey, and
20   that is what Dr. Dennis has done.
21        But if you're talking about offering
22   consumers the chance to take a purchase that
23   they have made in history, undo that
24   transaction and make a different transaction,
25   uhm, that would not be the appropriate way to

Veritext Legal Solutions
800-567-8658                                          973-410-4098

Page 49

CONFIDENTIAL

1  look at things in this case, because A, sales
2  of the class products have already taken place
3  and are fixed as a matter of history, and it
4  would drive the calculation instead of being a
5  price premium to being a full refund, because
6  in order for a class member to undo their
7  transaction and buy another product, they would
8  have to get all of their money back.
9      Q   And if -- I hate to link it to
10 Gilligan's Island.
11     A   You don't like it?
12     Q   Not a fan.  I guess what I'm trying
13 to understand is your view about what real
14 world data reflects, in terms of reflecting
15 market conditions at the time.  You talked
16 about fixed as a matter of history, your report
17 references how the data reflects other
18 conditions.  You just spoke just now about how
19 the data that was analyzed at the time reflects
20 all of the variations in retail prices.
21     So is it your view that using those data
22 helps establish in a point in time what, uhm --
23 the market conditions during the class?
24         MR. MARCHESE:  Objection to form.
25         THE WITNESS:  Yeah, I'm afraid with

CONFIDENTIAL

1    the preamble, I didn't quite follow the
2    whole question.  If you could ask it again
3    I would appreciate that.
4        Q    Well, I will try to come back to it.
5        If you look at paragraph 12 of your
6    report.
7        A    (Referring to document.)
8        Q    It says here it's possible to
9    determine class-wide damages using defendants'
10   own available business records, third-party
11   records, and industry resources.
12       In what sense is it possible to determine
13   class-wide damages using defendants' records?
14       A    Some of the sales data that I
15   obtained came from defendant, as I understand
16   it.  So that would be an example of a
17   defendant's business record that would fit into
18   the calculus of damages in this case.
19       Q    But, so you're saying that that sales
20   data is necessary for the conjoint analysis?
21           MR. MARCHESE:  Objection to form.
22           THE WITNESS:  I don't know that it's
23       necessary for the conjoint analysis, but I
24       used it to inform my understanding of the
25       market prices that were extant during the

CONFIDENTIAL

1    A    What I had was information by state,
2    and information on a nation -- on a nationwide
3    basis.  And I have tabulated both on a
4    nationwide basis and on a state-by-state basis
5    what that data looks like.
6         Q    And were there any gaps on the
7    state-by-state basis, do you recall?
8         A    I don't recall as I sit here right
9    now, but none is jumping to mind.
10        Q    Do you have an opinion about
11   statutory damages in this case?
12        A    My opinion is that subject to the
13   guidelines set forth in the statute that have
14   been described to me by counsel for plaintiffs,
15   the necessary data is available to determine
16   those statutory damages.
17        Q    And is it fair to say that you have
18   multiplied the number of units sold by the
19   statutory damages amounts to reach that
20   statutory damages amount?
21        A    After aggregating the sales data for
22   New York purchases, yes.  You multiply the
23   number of injuries, which is the number of
24   units sold, if plaintiffs established their
25   theory of liability by the statutory remedies

```
                                                    Page 192

                          CONFIDENTIAL
 1      which are 5 or $500.
 2              Q    So to aggregate the number of sales
 3      you just added them up; is that right?
 4              A    Again, I have to look at the
 5      nationwide and the state by state, but yes, I
 6      add up the New York sales data from a number of
 7      different data sources.
 8              Q    So you add you up the sales data, you
 9      multiply it by the statutory amount, and that's
10      your opinion on the statutory damages amount,
11      subject to plaintiffs establishing their theory
12      of liability?
13              A    Right.  Again, I'm not offering an
14      opinion as to whether statutory damages should
15      or should not be granted, but if they are
16      granted, then I have provided the math in order
17      to understand what the economic result would
18      be.
19              Q    Do you think an expert is necessary
20      to add sales and multiply them by the number?
21              A    I certainly would hope -- I certainly
22      hope that the judge or the jury would be
23      capable of the multiplication.
24              I think that I have been asked to do the
25      work that I've been done to help summarize the
```

Page 193

CONFIDENTIAL

1  sales data in a way that would be useful for
2  the jury to pull together in order to do that
3  multiplication.  And since I pulled the sales
4  data together, it was easy for me to do that on
5  their behalf.
6      Q   Okay.  Just one moment.
7      All right, Mr. Weir, can we just turn back
8  to your CV.  I'm looking at Exhibit 1 to your
9  report, which is Weir 2.
10     A   Okay, I'm with you there.
11     Q   All right.  You submitted this on
12 July 30th.  Is there anything that you'd like
13 to add that has occurred to your testimony or
14 publications, or anything that has happened
15 since July 30th?
16     A   I did submit in response to your
17 document request, the latest version as of a
18 few days ago.
19     Q   Okay.
20     A   So I would say this was current and
21 correct to the best of my understanding as of
22 the date.  There are new additional pieces of
23 testimony in that new CV, and it would be much
24 more expedient to just look at that rather than
25 have me try and remember the case captions.

Page 194

CONFIDENTIAL

1   Q   Sure.  So you mentioned that you've
2   testified -- well, actually, you know what, I'm
3   not sure I remember.  You gave an estimate of
4   how many times you have testified this year in
5   a deposition.
6       A   I said maybe 15, but --
7       Q   Maybe 15.  Have you testified at
8   trial?
9       A   Ever or this year?
10      Q   No, ever.
11      A   Yes.
12      Q   How many times?
13      A   I think I have given trial testimony
14  three times.
15      Q   When was that?
16      A   Do you just want the case captions
17  from here, is that helpful?
18      Q   Just general.
19      A   In my first time being disclosed as
20  an expert, I gave testimony at trial.  So that
21  would have been, I think 2007 or very early
22  2008.  And then that case had a follow-on,
23  where the plaintiffs sought to pierce the
24  corporate veil of the company, and sued
25  individuals, but it was a similar case.  I

Page 213

CONFIDENTIAL

C E R T I F I C A T E

I, PATRICIA A. SANDS, a Shorthand Reporter and Notary Public of the States of New York and New Jersey, do hereby certify that prior to the commencement of the examination the witness was sworn by me to testify the truth, the whole truth and nothing but the truth.

I do further certify that the foregoing is a true and accurate transcript of the testimony as taken stenographically by and before me at the time, place, and on the date hereinbefore set forth.

I do further certify that I am neither of counsel nor attorney for any party in this action, and that I am not interested in the event nor outcome of this litigation.

_Patricia A. Sands_

New York Certificate No.: 01SA4974309
New Jersey Certificate No.: 2109345