# EXHIBIT HH

```
1              UNITED STATES DISTRICT COURT
2              SOUTHERN DISTRICT OF NEW YORK
3
4      SUZANNA BOWLING,           )
       Individually and on        )
5      behalf of all others       )
       similarly situated,        )
6                                  )
                    Plaintiff,     )
7                                  )
                 vs.               )    No.
8                                  )    1:17-cv-03982-AJN
       JOHNSON & JOHNSON and       )
9      McNEIL NUTRITIONALS, LLC,   )
                                   )
10                   Defendants.   )
       ------------------------    )
11
12
13                   November 9, 2018
14                   10:02 a.m.
15
16          Deposition of DENISE N. MARTIN, held at
17       the offices of Bursor & Fisher, P.A., 888
18       Seventh Avenue, New York, New York, before
19       Laurie A. Collins, a Registered Professional
20       Reporter and Notary Public of the State of New
21       York.
22
23
24
25   Pages 1- 155

                                              Page 1
```

```
1      have -- how courts have -- and kind of awkward --

2      defined it is the difference between the price

3      paid by a consumer and the price that would have

4      been paid absent some alleged wrongdoing.

5           Q.    So in the context of this case would    11:29:43

6      you agree that the alleged wrongdoing is the

7      placement of the no trans fat claim on the Benecol

8      packaging?

9           A.    Yes, that's my understanding.

10          Q.    Was Benecol a premium priced product?    11:30:12

11                MS. CHANOINE:   Objection, vague.

12          A.    I'd have to say -- you'd have to give

13     me a frame of reference for that question.

14     Compared to what?

15          Q.    Do you know the names of any           11:30:31

16     cholesterol-lowering spreads that competed with

17     the Benecol spreads in the marketplace?

18          A.    ████████████████████████████

   ██  ███████████████████████████████   ████

   ██  ██████████████████████  ████   █████     █████

   ██  █████████████

   ██     ██   ████   ███████████████████

   ██  ████████████████

   ██     ██   ████████████████████████████

   ██  ███████████████████████████      11:31:11
```

Veritext Legal Solutions
866 299-5127

1      ████████████████████ .

2           Q.    As part of your work in this case, did

3      you do anything to attempt to calculate a price

4      premium solely attributable to the no trans fat

5      claim on the Benecol packaging?                    11:31:47

6           A.    I didn't do a fulsome estimation of

7      that.  I did review the estimate put forward by

8      Mr. Weir and am of the opinion that it's

9      completely inflated.  All the evidence that I have

10     reviewed indicates that it's inconsistent with a    11:32:18

11     price premium of that magnitude and is consistent,

12     honestly, with the price premium of potentially

13     zero.

14          Q.    Other than the calculation that

15     Mr. Weir performed of the price premium solely      11:32:43

16     attributed to the no trans fat claim, have you

17     seen any other evidence of price premium

18     calculations in this case concerning the no

19     trans fat claim?

20                MS. CHANOINE:  Objection, form.          11:33:08

21          A.    I disagree with the foundation of that

22     question, which is that Mr. Weir has put forward

23     an estimate of the price premium associated with

24     the challenged claims.  He just hasn't.

25                It's -- the tool that Dr. Dennis is      11:33:27

                                                           Page 51

```
1      using, conjoint survey, is the wrong tool.

2      There's just no circumstance in which that on its

3      own can give an estimate of a price premium.  So I

4      have not -- I can't say that I've seen any

5      evidence of price premium from Mr. Weir.  I          11:33:39

6      haven't.

7              I have done my own analysis to

8      understand the market for the Benecol products,

9      both from the perspective of McNeil and consumers,

10     and they indicate that trans fats were not a        11:33:54

11     focus, not a point of differentiation, which,

12     again, is not a number, but it tells me that this

13     claim is -- I wouldn't expect it to be material.

14             And then I see -- I did an analysis of

15     the price when the claim came off the label, and I  11:34:11

16     find at most a modest reduction in price that I

17     don't believe is linked to the removal of the

18     claim from the label.

19             So, again, all these things together,

20     while I haven't done a fulsome analysis of price    11:34:25

21     premium here, says you can't rule out what

22     Mr. Weir did and everything else points to, you

23     know, a de minimis -- a de minimis price premium,

24     if any.

25         Q.    Okay.  But you personally did not do a    11:34:39
```

Page 52

```
 1        price premium calculation in this case; right?
 2                  MS. CHANOINE:  Objection, form.
 3           A.   I would give exactly the same answer
 4        that I just gave.
 5           Q.   Okay.                              11:34:55
 6                  Is a calculation of the price drop for
 7        the Benecol spread products the same thing as a
 8        calculation for the price premium solely
 9        attributed to the no trans fat claim, if any?
10                  MS. CHANOINE:  Objection, form,     11:35:21
11             incomplete hypothetical.
12           A.   No, I believe additional work would
13        need to be done to assess whether any of that
14        observed change in price is attributable to the
15        label change.  And I'm really not using it for   11:35:39
16        that -- well, I am using it for that purpose, but
17        it's primarily to impeach Mr. Weir; right?
18                  He has this real-world market data
19        that's flatly inconsistent with the results that
20        he's picking up and multiplying from Dr. Dennis.  11:35:55
21        And he has no explanation for the difference;
22        right?  I have an explanation:  He's got the wrong
23        tool, you know, he's got a biased survey, his
24        numbers are just -- are just inflated.
25           Q.   What did you mean when you just used    11:36:18
```

Page 53

```
1          the word "inconsistent" in the context that you

2          used it?  What does the word "inconsistent" mean

3          when you used it?

4               A.    Contradicted by.

5               Q.    And specifically what about Mr. Weir's   11:36:31

6          work is contradicted by the data that you

7          reviewed?  Is it just the amount of his price

8          premium calculation that's contradicted,

9          purportedly?

10                   MS. CHANOINE:  Objection, vague -- I'm   11:36:56

11              sorry, form.

12                   Go ahead.

13               A.    Do you mean the amount versus -- versus

14          what?  I'm having a little trouble understanding

15          the question.                                     11:37:07

16               Q.    I'm just going to ask the court

17          reporter to read it back --

18               A.    Okay.

19               Q.    -- so maybe hearing it again might help

20          you.                                              11:37:16

21                   (Record read.)

22                   MS. CHANOINE:  Same objection.

23               A.    He didn't do a price premium

24          calculation.  He's lifting a number from

25          Dr. Weir's survey that is at best a willingness to  11:37:49
```

Veritext Legal Solutions
866 299-5127

1     pay calculation. 

11:39:40

Veritext Legal Solutions
866 299-5127



1

11:41:10

Veritext Legal Solutions
866 299-5127

1 ████████████████████████████████

2 ████████████████████████████████████

3 ██████████████████████████

4    ██   ███   ██████████████████

5 ███████████████████████████    ██████████

6 █████████████████████████████████████

7 █████

8      Q.    Okay.

9           (Pause.)

10     Q.    As part of your work here, did you do    11:42:25

11 anything to determine whether the price of Benecol

12 with the no trans fat claim on the label would

13 have been higher than the price of Benecol without

14 that claim being on the label, holding everything

15 else equal?                                         11:42:43

16           MS. CHANOINE:  Objection, form.

17     A.    And I believe I testified earlier that

18 I have not done sort of a fulsome analysis of

19 that.  I've done enough to know that Dr. --

20 Mr. Weir's use of 20 percent from Dr. Dennis is    11:43:01

21 speculative, unreliable, flawed, wrong, and that

22 what evidence we do have suggests if anything it

23 would be a small fraction of that and may be zero.

24     Q.    So do you believe that there is

25 evidence suggesting that there may be some          11:43:30

Veritext Legal Solutions
866 299-5127

```
 1        positive price premium solely attributable to the
 2        no trans fat claim?
 3                MS. CHANOINE:  Objection, form,
 4            misstates her testimony.
 5        A.    Again, I haven't done a fulsome        11:43:48
 6        analysis of that.  On the basis of what I have
 7        done, I believe any price premium -- I would not
 8        be surprised to find that there's no -- if I did
 9        that fulsome analysis, to find there's no price
10        premium attributable to the challenged label.   11:44:07
11        Q.    Do you have any opinion whether the
12        price of Benecol would have been higher with the
13        no trans fat claim on the label compared to not
14        having that claim on the label, holding everything
15        else equal?                                  11:44:34
16        A.    Again, I have not done a fulsome
17        analysis of that, but my opinion on the basis of
18        what I have done is that I would not be surprised
19        if there was no -- the price would not have
20        been -- the price was not higher with the       11:44:49
21        challenged claim on the label than it would have
22        been with the challenged claim had been removed.
23        Q.    But based on the work that you've done
24        in this case, you do not know that for sure one
25        way or the other; right?                     11:45:04
```

```
 1              MS. CHANOINE:  Objection, form,

 2         misstates her testimony.

 3         A.    I think it's fair that I have -- to say

 4    that I have not done a fulsome analysis of that,

 5    but it doesn't change my opinion that -- well,      11:45:11

 6    first, the 20 percent is ridiculous; second, that

 7    at most it would be some small fraction of that,

 8    and that the evidence that I've seen leads me to

 9    believe that it might well be zero.

10         Q.    Why didn't you do a fulsome analysis to  11:45:32

11    determine whether the price of Benecol with the no

12    trans fat claim on the label would have been

13    higher than the price of Benecol without that

14    claim on the label?  Why didn't you do that?

15         A.    Because the short answer is I didn't     11:45:51

16    need to do that to offer the opinions that I'm

17    offering here.  I didn't need to do that to let

18    the court know that it cannot rely on the

19    estimates that Mr. Weir is putting forward.

20         Q.    Do you think you should have done that   11:46:06

21    fulsome analysis in connection with your work in

22    this case?

23         A.    No, in the sense that I don't need to

24    do that to render the opinions that I'm offering

25    here.                                               11:46:17
```

```
1       measure of damages that has been put forward here.
2            Q.   And would that refund be?
3            A.   Again, if you could --
4                 MS. CHANOINE:  Objection, calls for a
5            legal conclusion.                              02:29:05
6            A.    From the perspective of economics, if
7       the allegation -- or the measure of damage is
8       based on some assertion that a consumer would not
9       have bought, from the objective of economics --
10      and that's, whatever, validated and found to be    02:29:28
11      the case, they wouldn't have bought but for the
12      challenged claims, from the perspective of
13      economics -- and, again, this is not legal
14      testimony -- would be the difference between the
15      price paid and the value of that product that was  02:29:40
16      received to -- by the consumer.
17                 So they didn't get nothing.  Presumably
18      they got something even though they said they
19      wouldn't have bought.  So you would want to net
20      out whatever they got.  That would be an           02:29:54
21      individualized review -- right? -- the fact that
22      people -- consumers have different values for --
23      different valuations for different products means
24      that that review would need to be conducted at a
25      person-by-person level.                            02:30:11
```

Page 113

```
 1        Q.    Would you have been able to determine

 2   whether there was a price premium attributable to

 3   the no trans fat claim solely from the retail

 4   sales data you reviewed for the Benecol spreads in

 5   this case?                                    02:30:53

 6        A.    I'm sorry, can you be more specific

 7   about what you're asking, would I have been able

 8   to...

 9        Q.    Determine whether there was a price

10   premium attributable to the no trans fat claim   02:31:09

11   solely from looking at the retail sales data you

12   reviewed for the Benecol spreads in this case.

13        A.    Okay.  So if I had been asked to do

14   this more fulsome analysis that I referenced

15   earlier in the deposition, which, again, I don't   02:31:25

16   believe -- I don't -- I did not need to do the

17   render the opinions I have offered here.  But if I

18   was asked to do that, I would need additional

19   information other than just the retail sales data

20   that has been provided here.                  02:31:41

21        Q.    I want to go down to paragraph 9 in

22   your report.  Do you have that?

23        A.    Yes.

24        Q.    Can you just read that to yourself, and

25   let me know when you're ready to continue.    02:32:04
```

Veritext Legal Solutions
866 299-5127

```
 1                    (Pause.)

 2          A.    Okay.

 3          Q.    Do you see there is a sentence that

 4    says on page 8:  Those consumers who would have

 5    decided not to purchase absent the challenged     02:32:45

 6    claims may be harmed.

 7                Do you see the beginning of that

 8    sentence?

 9          A.    Yes.

10          Q.    And when you wrote that were you      02:32:59

11    talking about monetary out-of-pocket harm?

12          A.    Again, I believe from the perspective

13    of economics that if a person is asserting they

14    would not have bought absent the claims, the right

15    economic measure -- not necessarily the legal     02:33:41

16    measure; I don't know -- it would be the

17    difference between the price they paid and the

18    value of whatever they received.  You can say the

19    market value, but the value to them.  So it's an

20    individualized -- individualized amount.  But I    02:33:52

21    believe it could be assessed monetarily.

22          Q.    Can you please turn to page 10 of your

23    report.  Do you have that?

24          A.    Yes.

25          Q.    So you are a managing director at NERA; 02:34:37
```

```
 1        tracked that, not to my knowledge.

 2            Q.    Do you think it's good idea to put

 3        stuff like that on NERA's Web site?

 4            A.    I guess a good idea for what?

 5        Personally I don't --                              02:46:01

 6            Q.    For anything.  Do you think it has any

 7        merit to post?

 8                  MS. CHANOINE:  Objection to form.

 9            A.    I would say I get asked about -- every

10        time I've been asked about it, it's always been in  02:46:13

11        a deposition by opposing counsel.  So in that

12        sense I have not found it particularly helpful.

13        Again, I haven't studied any other effects.

14            Q.    Do you have page 11 of your report?  Do

15        you still have that?                               02:46:49

16            A.    Yes.

17            Q.    Do you see in paragraph 20 at the

18        bottom there's subparagraph C?  Do you see that?

19        It says, Market prices are determined by the

20        interaction of these demand and supply processes.  02:47:00

21                  Do you see that?

22            A.    Yes.

23            Q.    You're talking about actual market

24        prices there; right?

25            A.    Yes.                                     02:47:08
```

Page 123

```
1        Q.    And if we turn the page, there's

2    paragraph 21 at the top; right?

3        A.    Yes.

4        Q.    Paragraph 21 says, Because these

5    accepted principles of microeconomics explain that   02:47:25

6    market prices are determined by the interaction of

7    the forces of supply and demand, both supply side

8    and demand side forces must be incorporated into

9    any attempt to estimate a market-based price

10   premium.                                              02:47:43

11           Do you see that?

12       A.    Yes.

13       Q.    What do you mean by the word

14   "incorporated" in that sentence?

15       A.    Taken into account, factored in.         02:47:48

16       Q.    Is it fair to say that Dr. Dennis

17   factored in information about supply side

18   considerations into his conjoint survey by using

19   actual market prices for Benecol in the survey

20   design?                                               02:48:10

21       A.    No, not in the way that's necessary to

22   have the results of that analysis be a price

23   premium.

24       Q.    What do you mean by that?

25       A.    That conjoint survey is a tool that      02:48:37
```

```
 1      asks consumers questions, and its results are

 2      entirely based on those consumer preferences.  In

 3      fact, it's measuring those -- at best, if done

 4      well, it's measuring those consumer preferences.

 5             It's not taking into account anything      02:49:00

 6      about how the supply side might have been

 7      different if the demand side were different.  So

 8      it's not -- it's just not designed to estimate a

 9      price premium.  It just isn't.  That's not the

10      right economic tool.                             02:49:12

11         Q.    But now you're talking about

12      hypothetical scenarios that are not real; correct?

13         A.    Mr. Weir's 20 percent is a hypothetical

14      scenario that is not real.  It bears no

15      relationship to reality.  It's flatly contradicted  02:49:26

16      by actual market data.

17         Q.    The market data that shows that the

18      price went down and the quantity sold went down

19      when the label was removed from the package, is

20      that the market data you're talking about?       02:49:41

21             MS. CHANOINE:  Objection, form,

22         misstates her testimony.

23         A.    I would say that that description of it

24      is not consistent with or not how I would describe

25      it.  And, again, how I would describe it is the   02:49:54
```

Veritext Legal Solutions

866 299-5127

```
 1      price, you know, hardly moved.  And to the extent

 2      it did move, we're not sure whether it actually

 3      moved or it was just some change in concentration

 4      of where that product was sold.

 5              We're not sure if it did come down        02:50:09

 6      whether that change happened prior to the label

 7      change.  And to the extent it did come down, we're

 8      not sure if that decline is the continuation of a

 9      decline we have seen before, and it sure looks

10      like that.                                        02:50:28

11              So, no, I would say we have not seen

12      evidence that the price has changed.

13          Q.   And when you kept saying we're not sure

14      and we don't see, what you really mean is you

15      don't see and you're not sure because you didn't  02:50:39

16      do anything to study that; correct?

17              MS. CHANOINE:  Objection to form.

18          A.   I completely disagree with that,

19      respectfully.  But, no, I did -- I did -- I did

20      work to cite that, and I described the work in my  02:50:51

21      report.

22              And the conclusion of that is that your

23      expert's estimate is not plausible in this market

24      and that I believe that if I were to do a fulsome

25      analysis of how the price might have changed       02:51:12
```

Page 126

```
 1        absent the labeling, it would not surprise me to

 2        find it was unchanged.

 3             Q.    But in fact you may be surprised that

 4        it did change and you'd never know because you

 5        never did the work; right?                        02:51:29

 6                  MS. CHANOINE:  Objection, form,

 7             misstates her answer.

 8             A.    I did a lot of work here, and I

 9        certainly did enough work to reach the conclusions

10        and offered the opinions that I'm offering here.  02:51:48

11                  What's before the court is not my

12        estimate of a price premium.  What's before the

13        court is Mr. Weir's estimate of 20.8 percent,

14        which is not even in the realm of -- it's

15        inconsistent with everything else that I looked at 02:52:05

16        and inconsistent with economics, economic theory.

17        There's just no chance that that's a reliable

18        estimate of the -- any price premium here.

19             Q.    But when you say it's inconsistent,

20        what you mean is just that the amount of the price 02:52:22

21        premium that Dr. Dennis and Mr. Weir found was

22        just different than the price premium suggested by

23        the sales data, the actual market data that you

24        reviewed; right?

25                  MS. CHANOINE:  Objection, form,         02:52:43
```

Veritext Legal Solutions
866 299-5127

1        misstates her prior testimony, and asked and

2        answered.

3        A.    I want to be really clear about this --

4        Q.    Great.

5        A.    -- because, no, this is not about a        02:52:56

6    degree.  This is not about an amount.  This is

7    about they are applying a wrong tool.  This can't

8    be fixed by fixing some implementation of the

9    conjoint.  The conjoint is just not the right

10   tool.                                              02:53:09

11            And the way it's implemented here is

12   bad, and the result is this estimate of purported

13   price premium that is at best some willingness to

14   pay of one consumer in the survey and at worst is

15   a random number.  It doesn't -- it doesn't bear    02:53:27

16   any relationship to any price premium in this

17   market, any price premium attributable to the

18   label.

19            So it's not a question of degree.

20   We're not saying he says 20, I say 3.  I'm saying  02:53:42

21   20 is based on bad science.  You can't use that.

22       Q.    Do you understand that some courts in

23   fact have ruled that conjoint studies are actually

24   reliable methodologies for this sort of analysis;

25   right?  You recognize that?                        02:54:06

                                           Page 128

```
 1              MS. CHANOINE:  Objection, calls for a
 2         legal conclusion.
 3         Q.    Do you recognize some courts have come
 4    out that way?
 5         A.    I do -- I am aware that some courts    02:54:16
 6    have found that conjoint survey is an acceptable
 7    way to estimate class-wide damages, and I would
 8    like to help this court understand why that's not
 9    right.
10         Q.    You just think that all those other    02:54:37
11    courts are wrong; correct?
12         A.    Again, I haven't studied each of the --
13    each of the circumstances and the particular
14    surveys put forward there, but, yes, generally
15    I -- conjoint is not the right tool.  I can't     02:54:57
16    estimate a price premium.
17              So if courts are being confused into
18    thinking that that's what it does, that's wrong.
19    That's just not what the tool is about.
20         Q.    You just think that all the judges     02:55:07
21    ruled that way, they were just confused; right?
22         A.    Confused, misled, I don't know.  I
23    just -- I just know that -- this is not even my
24    opinion; right?  This is what textbooks say about
25    conjoint, what the software that Dr. Dennis is    02:55:28
```

```
1       using say about conjoint, what -- again, anyone

2       who really is familiar with this tool will tell

3       you that it's a demand side tool, and so it only

4       takes into account one half of the equation.  It's

5       not taking into account what the supply side is.    02:55:47

6       So it can't generate a price premium.

7           Q.   But Dr. Dennis's conjoint was designed

8       using actual retail market prices for the Benecol

9       spreads which you've testified incorporate or take

10      into account supply side factors, haven't you?      02:56:18

11              MS. CHANOINE:  Objection, form,

12          misstates her testimony.

13          A.   No, I believe I testified that what

14      Mr. -- or Dr. Dennis and Mr. Weir both label as

15      taking into account the supply side is               02:56:34

16      insufficient is -- to reach any determination

17      about the price premium.

18          Q.   At what level would it be sufficient,

19      you know, for supply side factors to be taken into

20      account?  What's the level?                          02:57:10

21              MS. CHANOINE:  Objection to form.

22          A.   Again, I don't want to pretend it's a

23      degree thing here.  The conjoint, not the right

24      tool.  So no matter what you do -- I think all he

25      says he does is he put a benchmark price -- the      02:57:24
```

```
 1      4.80 price is used as a benchmark in his -- in the

 2      simulation, and everything else that feeds into

 3      that simulation is the results from the consumers'

 4      responses.

 5              And further I know that even that        02:57:47

 6      demand side simulation only works in a certain

 7      range of prices.  I understand that it doesn't

 8      work if you get below $4.10.  So even as a demand

 9      side tool it's not telling us the full -- any kind

10      of full story.                                   02:58:06

11          Q.    Can you please turn to page 13 of your

12      report?  Do you have that?

13          A.    I do.

14          Q.    Okay.

15              Do you see the third sentence down       02:58:19

16      where it says, The historical sales and prices of

17      the products reflect the outcome of particular

18      demand and supply decisions given the specific

19      circumstances that existed at that time?

20              Do you see that?                         02:58:40

21          A.    Yes.

22          Q.    And did you write that?

23          A.    I did.

24          Q.    Do you still agree that historical

25      sales and prices of Benecol reflect the outcome of  02:58:53
```

Page 131

```
 1      demand and supply decisions given circumstances

 2      that existed in the actual market?

 3              MS. CHANOINE:  Objection to the extent

 4          it doesn't actually reflect the wording of the

 5          document.                                  02:59:27

 6          A.    Yeah, you left out -- you left out a

 7      couple of words.  But I am still of the opinion

 8      that historical sales and prices of products

 9      reflect the outcome of a particular demand -- of

10      particular demand and supply decisions given the  02:59:42

11      specific circumstances that existed at that time.

12          Q.    And when I'm talking about

13      circumstances and points in time, you're talking

14      about circumstances and points in time in the

15      actual marketplace, in the real world; right?    02:59:58

16          A.    Yes.  And I guess --

17          Q.    Not a hypothetical world; right?

18          A.    What Mr. -- Dr. Dennis and Mr. Weir are

19      doing is a hypothetical world; right?  They are

20      saying what if consumer demand or consumer        03:00:17

21      willingness to pay were to be reduced by 20

22      percent.

23              Again, I don't think that's a realistic

24      number for all sorts of reason.  But that's a

25      hypothetical.  What would hypothetically happen to  03:00:33
```

Veritext Legal Solutions
866 299-5127

```
 1      supply, you have to model that to understand what

 2      would happen to price, and they're just moving

 3      that whole half of the equation.

 4           Q.   Okay.  We'll see.

 5                Can you please turn to page 16 in your    03:01:11

 6      report.  Do you have that?

 7           A.   Yes.

 8           Q.   Do you see at the bottom there's

 9      paragraph 31 that begins on page 16?  Do you see

10      that?                                              03:01:27

11           A.   Yes.

12           Q.   And it says, It is not the case, as

13      Mr. Weir asserts, that such supply side modeling

14      would allow defendants to avoid liability.

15                And it goes on to say, If the price of    03:01:39

16      the products with the challenged claims was

17      actually higher than it otherwise would have been,

18      economic models exist that could take into account

19      both demand side and supply side changes and allow

20      estimation of the "but for" price.                 03:01:58

21                Do you see that?

22           A.   Yes.

23           Q.   And then it says, Any price premium

24      that resulted from this exercise could then be

25      awarded to all consumers during the alleged class   03:02:07
```

Veritext Legal Solutions
866 299-5127

```
1      period.

2             Do you see that?

3      A.    Yes.

4      Q.    So the economic models that you're

5      talking about in paragraph 31 could be used, in    03:02:20

6      your opinion, to calculate damages on a class-wide

7      basis in this case; right?

8             Why are you looking at Ms. Chanoine?

9      A.    I thought she was going to object.  I

10     wanted to wait.                                     03:02:40

11            Yeah, in theory there is a class of

12     general equilibrium economic models that allow the

13     re-estimation of both the demand curve and supply

14     curve and so could, again, in theory -- I haven't

15     tried to do that here -- estimate the "but for"     03:03:01

16     price.  They require a significant amount of data

17     and time and...

18     Q.    And do you agree that the results of

19     Dr. Dennis's conjoint survey could be used to then

20     award all consumers in the putative class their     03:03:29

21     refunds on a class-wide basis if liability is

22     determined here?

23            MS. CHANOINE:  Objection, form, calls

24         for legal speculation, and misstates her

25         testimony.                                      03:03:47
```

Veritext Legal Solutions
866 299-5127

```
 1                    C E R T I F I C A T E
 2        STATE OF NEW YORK      )
 3                               :  ss.
 4        COUNTY OF NEW YORK     )
 5
 6                 I, LAURIE A. COLLINS, a Registered
 7            Professional Reporter and Notary Public
 8            within and for the State of New York, do
 9            hereby certify:
10                 That DENISE N. MARTIN, the witness
11            whose deposition is hereinbefore set forth,
12            was duly sworn by me and that such
13            deposition is a true record of the
14            testimony given by the witness.
15                 I further certify that I am not
16            related to any of the parties to this
17            action by blood or marriage and that I am
18            in no way interested in the outcome of this
19            matter.
20                 IN WITNESS WHEREOF, I have hereunto
21            set my hand this 12th day of November 2018.
22
23                        Lauree A. Collins
24
25                   LAURIE A. COLLINS, RPR
```

Page 154